Martin J. Bienenstock
Irena M. Goldstein
DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

*Attorneys for The Royal Bank of
Scotland N.V. (Formerly Known as
ABN AMRO Bank N.V.)*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re:<br><br>LEHMAN BROTHERS INC.,<br><br>             Debtor. | 11 Civ. _____<br><br>Bankr. Case No. 08-01420 (JMP)<br>SIPA |
| THE ROYAL BANK OF SCOTLAND N.V.,<br><br>             Movant,<br><br>             v.<br><br>JAMES W. GIDDENS, AS TRUSTEE FOR<br>SIPA LIQUIDATION OF LEHMAN<br>BROTHERS INC.,<br><br>             Respondent. | |

<u>**NOTICE OF THE ROYAL BANK OF SCOTLAND**</u>
<u>**N.V.'S MOTION FOR ORDER WITHDRAWING**</u>
<u>**REFERENCE PURSUANT TO 28 U.S.C. §  157(d)**</u>

      PLEASE TAKE NOTICE that upon this notice of motion and the accompanying

memorandum of law and declaration of Irena M. Goldstein, The Royal Bank of Scotland N.V.,

formerly known as ABN AMRO Bank N.V., hereby moves this Court for entry of an order

pursuant to 28 U.S.C. § 157(d), Rule 5011(a) of the Federal Rules of Bankruptcy Procedure, and

Rule 5011-1 of the Local Bankruptcy Rules for the Southern District of New York withdrawing the reference of this Court to the United States Bankruptcy Court for the Southern District of New York of the *Motion of Trustee Pursuant to Bankruptcy Code Sections 105(a) and 362 and the Lehman Brothers Inc. Liquidation Order, for an Order Enforcing the Automatic Stay and the Stays in the Liquidation Order and Compelling Payment of Amounts Payable by RBS N.V. (Acquirer of and Successor to ABN AMRO Bank N.V.)*, filed by James W. Giddens, Trustee for the Securities Investors Protection Act Liquidation of Lehman Brothers Inc., in the above-captioned proceeding on June 29, 2011 [Bankr. Ct. Docket No. 4370].

Dated:  August 16, 2011
        New York, New York

Respectfully Submitted,

/s/ Martin J. Bienenstock
Martin J. Bienenstock
Irena M. Goldstein
DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

*Attorneys for The Royal Bank of Scotland N.V. (Formerly Known as ABN AMRO Bank N.V.)*

2

NYA 650929.1

Martin J. Bienenstock
Irena M. Goldstein
DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

*Attorneys for The Royal Bank of
Scotland N.V. (Formerly Known as
ABN AMRO Bank N.V.)*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re:<br><br>LEHMAN BROTHERS INC.,<br><br>                 Debtor. | 11 Civ. _____<br><br>Bankr. Case No. 08-01420 (JMP)<br>SIPA |
| THE ROYAL BANK OF SCOTLAND N.V.,<br><br>                 Movant,<br><br>                 v.<br><br>JAMES W. GIDDENS, AS TRUSTEE FOR<br>SIPA LIQUIDATION OF LEHMAN<br>BROTHERS INC.,<br><br>                 Respondent. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE
ROYAL BANK OF SCOTLAND N.V.'S MOTION FOR ORDER
<u>WITHDRAWING REFERENCE PURSUANT TO 28 U.S.C. § 157(d)</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

SUMMARY OF ARGUMENT ......................................................................................1

BACKGROUND .........................................................................................................10

**I.**     The ISDA Agreements and Their Early Termination.........................................10

**II.**    RBS N.V. has a Contractual Right to Setoff Pursuant to the Terms of Agreement ..........13

**III.**   The LBI Trustee's Motion to Compel and RBS N.V.'s Response ...................16

ARGUMENT ...............................................................................................................17

**I.**     Legal Standard for Withdrawal of the Reference ..............................................17

**II.**    Withdrawal of the Reference of the Motion to Compel is Warranted Because the *Orion* Factors Weigh in Favor of Withdrawal ...................................................18

    A.      The Motion to Compel Requires Exercise of Article III Judicial Power..............18

    (1)     Pre-Liquidation Order Contract Actions Cannot Escape Article III Determination with Bankruptcy Disguises ........................................... 19

    (2)     The LBI Trustee's Invocation of Section 362(a)(3) of the Bankruptcy Code Does Not Eliminate the Article III Requirement....................................... 22

    B.      Other Factors Weigh in Favor of Withdrawing the Reference of the Motion to Compel.................................................................................25

    (1)     Withdrawal of the Reference Will Ensure Efficient Use of Judicial Resources and will Avoid Undue Delay........................................... 25

    (2)     The Underlying Policy Behind Mandatory Withdrawal of the Reference under 28 U.S.C. § 157(d) Supports Discretionary Withdrawal in this Instance ........................................................................... 28

    (3)     Withdrawal of the Reference Will Enable a Court Other than the Bankruptcy Court to Consider Unprecedented Issues Lacking Bankruptcy Court Jurisprudence .......................................................... 29

    (4)     Withdrawal of the Reference will Not Cause and will Minimize Forum Shopping ....................................................................... 30

    (5)     Withdrawal of the Reference Will Not Adversely Affect the Uniformity of the Bankruptcy Administration.......................................... 32

CONCLUSION............................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*1800 Postcards, Inc. v. Morel*,
    153 F. Supp. 2d 359 (S.D.N.Y. 2001)..........................................................................18, 20, 26

*Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co.)*,
    529 F.3d 432 (2d Cir. 2008)..........................................................................................25

*Beard v. Braunstein*,
    914 F.2d 434 (3d Cir. 1990)..........................................................................................20

*Brodene v. Biltmore Sec., Inc.*,
    No. 96-cv-0572 (W.D.N.Y. Apr. 22, 1998).....................................................................2

*In re Chan*,
    355 B.R. 494 (Bankr. E.D. Pa. 2006) .............................................................................29

*Citizens Bank of Maryland v. Strumpf*,
    516 U.S. 16 (1995)......................................................................................................24

*Complete Mgmt., Inc. v. Arthur Andersen, LLP (In re Complete Mgmt., Inc.)*,
    No. 02-cv-1736, 2002 WL 31163878 (S.D.N.Y. Sept. 27, 2002) ...........................27

*Contemporary Lithographers, Inc. v. Hibbert (In re Contemporary Lithographers, Inc.)*,
    127 B.R. 122 (M.D. N.C. 1991) ....................................................................................29

*Crowell v. Benson*,
    285 U.S. 22 (1932)........................................................................................................7

*DHP Holdings II Corp. v. Peter Skop Indus., Inc. (In re DHP Holdings II Corp.)*,
    435 B.R. 220 (Bankr. D. Del. 2010) ..............................................................................20

*Drexel Burnham Lambert, Inc. v. Mancino*,
    951 F.2d 348 (6th Cir. 1991) .........................................................................................2

*In re Enron Corp.*,
    300 B.R. 201 (Bankr. S.D.N.Y. 2003)............................................................................8

*Enron Power Mktg., Inc. v. Cal. Power Exch. Corp. (In re Enron Corp.)*,
    No. 04-cv-8177, 2004 WL 2711101 (S.D.N.Y. Nov. 23, 2004).....................................29

*In re Fairfield Sentry Ltd.*,
    No. 10-cv-7340, 2010 WL 4910119 (S.D.N.Y. Nov. 22, 2010).....................................17

*G.M. Crocetti, Inc. v. Trataros Constr., Inc. (In re G.M. Crocetti, Inc.),*
    No. 08-cv-6329, 2008 WL 4601278 (S.D.N.Y. Oct. 15, 2008)..............................................27

*Germain v. Conn. Nat'l Bank,*
    988 F.2d 1323 (2d Cir. 1993)...................................................................................25

*Granfinanciera v. Nordberg,*
    492 U.S. 33 (1989)............................................................................. passim

*Grant Thornton Int'l v. Parmalat Finanziaria S.p.A. (In re Parmalat Finanziaria S.p.A.),*
    320 B.R. 46 (S.D.N.Y. 2005)..................................................................27

*Interconnect Tel. Servs., Inc. v. Farren,*
    59 B.R. 397 (S.D.N.Y. 1986)...................................................................20

*John Hancock Mut. Life Ins. Co. v. Watson (In re Kincaid),*
    917 F.2d 1162 (9th Cir. 1990) ...............................................................24

*Keller v. Blinder (In re Blinder, Robinson & Co.),*
    162 B.R. 555 (D. Colo. 1994)..................................................................17

*Kentile Floors, Inc. v. Congoleum Corp. (In re Kentile Floors, Inc.),*
    No. 92-cv-46466, 1995 WL 479512 (S.D.N.Y. Aug. 10, 1995)..............................................27

*Lawrence Grp., Inc. v. Hartford Cas. Ins. Co. (In re Lawrence Grp., Inc.),*
    285 B.R. 784 (N.D.N.Y. 2002) ...............................................................32

*In re Lehman Bros. Holdings Inc.,*
    433 B.R. 101 (Bankr. S.D.N.Y. 2010), *aff'd, Swedbank AB v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.),* 445 B.R. 130 (S.D.N.Y. 2011) ................8

*In re Lehman Bros. Holdings Inc.,*
    445 B.R. 143 (Bankr. S.D.N.Y. 2011) ...................................................31

*Lehman Bros. Special Fin. Inc. v. Bank of New York Mellon Corp. (In re Lehman Bros. Holding Inc.),*
    No. 11-cv-2404, 2011 WL 2651771 (S.D.N.Y. June 21, 2011) .......................................10, 29

*Lehman Bros. Special Fin., Inc. v. BNY Corp. Tr. Servs., Ltd.,*
    422 B.R. 407 (Bankr. S.D.N.Y. 2010) ...................................................9

*Levitin v. PaineWebber, Inc.,*
    933 F. Supp. 325 (S.D.N.Y. 1996)..........................................................13

*M. Fabrikant & Sons, Inc. v. Long's Jewelers Ltd.,*
    No. 08-cv-1982, 2008 WL 2596322 (S.D.N.Y. June 26, 2008) ..............................................32

*In re Marie Pastor's Morningstar Mgmt., Ltd.*,
  109 B.R. 58 (Bankr. S.D.N.Y. 1990) .................................................................25

*Petition of McMahon*,
  222 B.R. 205 (S.D.N.Y. 1998) ..........................................................................20

*Michaelesco v. Shefts*,
  303 B.R. 249 (D. Conn. 2004) ...........................................................................32

*Mishkin v. Ageloff*,
  220 B.R. 784 (S.D.N.Y. 1998) ...........................................................................17

*In re Morrison*,
  409 B.R. 384 (S.D. Tex. 2009) ...........................................................................24

*Mt. McKinley Inc. Co. v. Corning, Inc.*,
  399 F.3d 436 (2d Cir. 2005) ...............................................................................20

*N. Pipeline Const. Co. v. Marathon Pipe Line Co*.,
  458 U.S. 50 (1982) ...................................................................................... passim

*Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*,
  336 B.R. 39 (Bankr. S.D.N.Y. 2006) ..................................................................25

*Official Comm. of Unsecured Creditors of FMI Forwarding Co. v. Union Transp.
  Corp. (In re FMI Forwarding Co.)*,
  No. 01-cv-9462, 2004 WL 1348956 (S.D.N.Y. June 16, 2004) ....................26, 32

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
  4 F.3d 1095, 1101 (2d Cir. 1993) .................................................................. passim

*Pension Benefit Guaranty Corp. v. Smith Corno Corp. (In re Smith Corona Corp.)*,
  205 B.R. 712 (D. Del. 1996) ...............................................................................29

*Pervel Indus. v. T M Wallcovering, Inc.*,
  871 F.2d 7 (2d Cir. 1989) ......................................................................................2

*Picard v. HSBC Bank PLC*,
  No. 11-cv-0913, 2011 WL 2119720 (S.D.N.Y. May 23, 2011) ...........................29

*Picard v. HSBC Bank PLC*,
  No. 11-cv-763, 2011 WL 1544494 (S.D.N.Y. Apr. 25, 2011) .......................17, 18

*In re Pied Piper Casuals, Inc.*,
  65 B.R. 780 (S.D.N.Y. 1986) ..............................................................................20

*S. St. Seaport L.P. v. Burger Boys, Inc. (In re Burger Boys Inc.)*,
  94 F.3d 755 (2d Cir. 1996) ..................................................................................27

iv

*Sec. and Exch. Comm'n v. Goren*,
   No. 00-cv-970, 2002 WL 32963582 (E.D.N.Y. Mar. 6, 2002)................................17

*In re SemCrude, L.P.*,
   399 B.R. 388 (Bankr. D. Del. 2009), *aff'd*, 428 B.R. 590 (D. Del. 2010).............29

*Shirl v. Drexel Burnham Lambert, Inc.*,
   No. 88-cv-866, 1989 WL 90159 (S.D.N.Y. May 24, 1989) ......................................2

*Snodgrass v. New Century Mortg. Corp.*,
   358 B.R. 675 (S.D. W. Va. 2006) .........................................................................29

*In re St. Mary Hosp.*,
   115 B.R. 495 (E.D. Pa. 1990) ..............................................................................29

*Stern v. Marshall*,
   131 S. Ct. 2594 (2011)................................................................................. passim

*The Arctrade Liquidation Trust v. Greenwich Ins. Co. (In re Arctrade Fin. Techs., Ltd.)*,
   No. 09-01196, 2010 WL 3386945 (Bankr. S.D.N.Y. Aug. 3, 2010).......................26

*In re U.S. Brass Corp.*,
   110 F.3d 1261 (7th Cir. 1997) ..............................................................................32

*United States v. O'Hagan*,
   139 F.3d 641 (8th Cir. 1998) ................................................................................13

*Vornado Realty Trust v. Stop & Shop Supermarket Cos. (In re Bradlees, Inc.)*,
   No. 04-cv-500, 2005 WL 106794 (S.D.N.Y. Jan. 19, 2005) ..................................32

*VWE Grp. Inc. v. Amlicke (In re The VWE Grp., Inc.)*,
   359 B.R. 441 (S.D.N.Y. 2007)..................................................................18, 26, 32

STATUTES

11 U.S.C. § 105(a) ......................................................................................................9, 22

11 U.S.C. § 362(a) ......................................................................................................7, 22

11 U.S.C. § 362(a)(3) .............................................................................................9, 22, 23

11 U.S.C. § 365(e)(1) .......................................................................................................3

11 U.S.C. § 541(a) ............................................................................................................9

11 U.S.C. § 542(a) ......................................................................................................8, 24

11 U.S.C. § 542(b) ......................................................................................................6, 7

11 U.S.C. § 548 ................................................................................................................7

11 U.S.C. § 548(a)(2) .......................................................................................................7

11 U.S.C. § 553 ..........................................................................................................7, 9

11 U.S.C. § 555 ..............................................................................................................11

11 U.S.C. § 560 ................................................................................................................3

11 U.S.C. § 561 ..............................................................................................................11

28 U.S.C. § 157(b)(1) .....................................................................................................18

28 U.S.C. § 157(b)(2) ...................................................................................................4, 19

28 U.S.C. § 157(b)(2)(C) ......................................................................................5, 6, 19, 21

28 U.S.C. § 157(b)(2)(E) ................................................................................................24

28 U.S.C. § 157(b)(2)(H) ............................................................................................6, 19

28 U.S.C. § 157(c)(1) ..................................................................................................4, 26

28 U.S.C. § 157(d) .................................................................................................. passim

Fed. R. Bankr. P. 5011(a) ..................................................................................................1

Fed. R. Bankr. P. 5011(c) ................................................................................................17

Fed. R. Bankr. P. 7001(1) ................................................................................................30

Fed. R. Bankr. P. 7008 ....................................................................................................22

Fed. R. Civ. P. 60(b) ........................................................................................................31

Bankr. S.D.N.Y.R. 5011-1 .................................................................................................1

Securities and Exchange Commission Rule 10b-10 ....................................................13

**OTHER AUTHORITIES**

17 C.F.R. § 240.10b-10...................................................................................................13

The Royal Bank of Scotland N.V. ("RBS N.V."), formerly known as ABN AMRO Bank N.V., respectfully submits this memorandum of law (the "Memorandum of Law") in support of its motion (the "Motion to Withdraw the Reference") for an order pursuant to 28 U.S.C. § 157(d), Rule 5011(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 5011-1 of the Local Bankruptcy Rules for the Southern District of New York, withdrawing the reference of the United States District Court for the Southern District of New York (the "District Court") to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") of the *Motion of Trustee Pursuant to Bankruptcy Code Sections 105(a) and 362 and the Lehman Brothers Inc. Liquidation Order, for an Order Enforcing the Automatic Stay and the Stays in the Liquidation Order and Compelling Payment of Amounts Payable by RBS N.V. (Acquirer of and Successor to ABN AMRO Bank N.V.)*, filed by James W. Giddens (the "LBI Trustee"), Trustee for the Securities Investors Protection Act ("SIPA") Liquidation of Lehman Brothers Inc. ("LBI"), in the above-captioned proceeding on June 29, 2011 [Bankr. Ct. Docket No. 4370] (the "Motion to Compel").

## SUMMARY OF ARGUMENT

The District Court should withdraw its reference to the Bankruptcy Court of the LBI Trustee's Motion to Compel because, among other reasons provided below, the Supreme Court determined in *Stern v. Marshall* that an Article I bankruptcy court cannot exercise the essential attributes of Article III judicial power over a bankruptcy estate's prepetition state law counterclaim against a claimant, 131 S. Ct. 2594, 2620 (2011), which is exactly what the LBI Trustee is asking the Bankruptcy Court to do here.

In the Motion to Compel, the LBI Trustee asserts a counterclaim to collect over $345 million allegedly payable by RBS N.V. pursuant to a swap agreement and confirmations governed by state and English law.  The LBI Trustee filed his Motion to Compel for a

Bankruptcy Court order awarding damages of over $345 million, but RBS N.V. is entitled to an Article III District Court and jury (the Motion to Compel requests final judgment with no jury, no Article III judge, and no summary judgment papers).  As admitted in the LBI Trustee's Motion to Compel, the dispute revolves around whether the Terms of Agreement (as defined below) confirming the parties' securities transactions, which were delivered to LBI hundreds of times without objection, allow RBS N.V. to net and offset amounts greater than $345 million (over $800 million) that LBI and its affiliates (together, "Lehman") owed RBS N.V. and its affiliates (together, "RBS").  Under both New York and English law, LBI is not entitled to collect from RBS N.V. amounts Lehman owed, but did not pay, RBS.  Under the LBI Trustee's theory, the Terms of Agreement are disregarded.  The LBI Trustee provides no rationale for disregarding New York law governing contract formation, as interpreted by the Second Circuit.[1]

Significantly, this is not even a situation where RBS N.V.'s rights under non-bankruptcy law are changed by title 11 of the United States Code (the "Bankruptcy Code").  Rather, the timing of events could eliminate consideration of the Bankruptcy Code entirely, and moreover, the Bankruptcy Code and the Liquidation Order themselves require that bankruptcy law 'get out of the way,' because to preserve stability in the financial markets, Congress legislated that the Bankruptcy Code's normal provisions do not apply to swap agreements and that courts cannot

---

[1] See, e.g., Pervel Indus. v. T M Wallcovering, Inc., 871 F.2d 7, 8 (2d Cir. 1989) ("Where, as here, a [seller] has a well established custom of sending purchase order confirmations containing an arbitration clause, a buyer who has made numerous purchases over a period of time, receiving in each instance a standard confirmation for which it … retained without objection is bound by [such] provision"); Drexel Burnham Lambert, Inc. v. Mancino, 951 F.2d 348 (6th Cir. 1991) (the Pervel "rule has consistently been enforced in the context of transactions between securities brokers/dealers and their customers"); Brodene v. Biltmore Sec., Inc., No. 96-cv-0572 (W.D.N.Y. Apr. 22, 1998) ("in light of the facts that after opening a [brokerage] account with Biltmore, Brodene was sent and had received a copy of the Customer Agreement … and yet continued his business relationship with Biltmore without objection … Brodene assented to and was and is bound by the Customer Agreement"); Shirl v. Drexel Burnham Lambert, Inc., No. 88-cv-866, 1989 WL 90159, at *2 (S.D.N.Y. May 24, 1989) (written confirmation sent to customer by Drexel Burnham Lambert after each transaction constituted a valid contract).

interfere with enforcement of the swap agreement at issue.  Specifically, section 560 of the Bankruptcy Code provides RBS N.V. the "safe harbor" from the Bankruptcy Code's other provisions and expressly deprives all federal courts, including the Bankruptcy and District Courts, from enjoining RBS N.V.'s contractual right to "offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration" of a swap agreement.[2]  Similarly, Paragraph VIII.B of the Liquidation Order expressly allows RBS N.V. to exercise contractual rights "to offset or net termination values, payment amounts, or other transfer obligations arising under or in connection with [swap] agreements."

Pursuant to 28 U.S.C. § 157(d), "[t]he district court may withdraw, in whole or in part, any case or proceeding referred [to the bankruptcy court] … on timely motion of any party, for cause shown."  The Second Circuit explained in *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)* that the threshold inquiry in determining whether to withdraw

---

[2] Section 560 of the Bankruptcy Code provides:

> The exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365(e)(1) of this title or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title. As used in this section, the term "contractual right" includes a right set forth in a rule or bylaw of a derivatives clearing organization (as defined in the Commodity Exchange Act), a multilateral clearing organization (as defined in the Federal Deposit Insurance Corporation Improvement Act of 1991), a national securities exchange, a national securities association, a securities clearing agency, a contract market designated under the Commodity Exchange Act, a derivatives transaction execution facility registered under the Commodity Exchange Act, or a board of trade (as defined in the Commodity Exchange Act) or in a resolution of the governing board thereof and a right, whether or not evidenced in writing, arising under common law, under law merchant, or by reason of normal business practice.

the reference for cause is whether the proceeding is core or non-core. 4 F.3d 1095, 1101 (2d Cir. 1993). This follows because bankruptcy courts are not Article III courts and cannot hold jury trials in non-core proceedings. *See id*. ("the constitution prohibits bankruptcy courts from holding jury trials in non-core matters"). If a bankruptcy court proposes findings of fact and conclusions of law in a non-core proceeding where no party has demanded a jury, the proposal must be reviewed de novo pursuant to 28 U.S.C. § 157(c)(1),[3] thereby making reference withdrawal more efficient because once the reference has been withdrawn, the facts need only be determined once by one court. *Id*. at 1101-02. If a party demands a jury, the bankruptcy court cannot even conduct it.

*Orion's* focus on the core/non-core distinction is based on the assumption that when Congress enacted a list of core proceedings in 28 U.S.C. § 157(b)(2), determination of such proceedings did not require juries or the exercise of Article III judicial power and could therefore be accomplished by Article I bankruptcy judges. (The determination of a litigant's right to a jury trial is based on the same analysis as its right to an Article III court. *Granfinanciera v. Nordberg*, 492 U.S. 33, 53 (1989)). Section 157(b)(2) was enacted as part of an overhaul of the bankruptcy court system after the Supreme Court ruled in *N. Pipeline Const. Co. v. Marathon Pipe Line Co*. that bankruptcy judges could not determine state law contract actions against defendants which had not filed proofs of claim against the debtor's estate. 458 U.S. 50, 57

---

[3] 28 U.S.C. § 157(c)(1) provides:

> A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

(1982).  As the Second Circuit explained in *Orion*, "[i]n *Northern Pipeline* ... the Supreme Court ruled that Congress could not constitutionally empower a non-Article III bankruptcy court with the authority to adjudicate a state breach-of-contract action, based on a pre-petition contract, brought by a debtor against a *defendant that had not filed a claim* with the bankruptcy court."  4 F.3d at 1100 (emphasis added).  As shown by the italicized language, the thinking at that time was that bankruptcy courts could constitutionally determine state law breach of contract actions against claimants which had filed proofs of claim, consistent with 28 U.S.C. § 157(b)(2)(C), which provides that any action brought as a counterclaim against an entity that filed a proof of claim is a core proceeding determinable by a bankruptcy judge.

*Stern v. Marshall*, however, held that thinking wrong.  In *Stern v. Marshall*, the Supreme Court held an Article I bankruptcy court could not constitutionally determine the estate's prepetition counterclaim if it is not resolved by ruling on the claimant's proof of claim.  *See* 131 S. Ct. at 2620 (the bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim").  Here, RBS N.V.'s Proof of Claim (as defined below) is for $1.562 million of underwriting fees.  Therefore, the Article I Bankruptcy Court cannot determine the LBI Trustee's counterclaim, which has nothing to do with underwriting fees.  Thus, the Second Circuit's primary indicator of reference withdrawal – the need for an Article III court – is present here.

The Supreme Court made clear in *Northern Pipeline* that prepetition contract actions are classic common law actions as of 1789, which are the actions requiring exercise of the Article III judicial power.[4]  In the instant proceeding, the Terms of Agreement and the ISDA Agreements

---

[4] *See Northern Pipeline*, 458 U.S. at 70 (plurality opinion) ("Private-rights disputes, on the other hand, lie at the core of the historically recognized judicial power"); *id*. at 90 (Rehnquist, J., concurring in judgment) ("From the record before us, the lawsuit in which Marathon was named defendant seeks damages for breach of contract,

5

(as defined below) were all entered into prior to the commencement of LBI's SIPA proceeding. Further, the Motion to Compel does not affect a core bankruptcy function because it is a plain vanilla contract action.  In light of the Supreme Court's holding in *Stern v. Marshall*, although the Motion to Compel is labeled a core proceeding because it is a counterclaim by the estate against an entity that filed a proof of claim, within the meaning of 28 U.S.C. § 157(b)(2)(C), the Motion to Compel cannot be determined by an Article I bankruptcy court like most other core proceedings.  This was the second time the Supreme Court ruled that Congress' list of core proceedings were not all susceptible to determination by Article I courts.  *See Granfinanciera*, 492 U.S. at 50-52 (although fraudulent transfer claims are listed as core proceedings under 28 U.S.C. § 157(b)(2)(H), such claims cannot be determined by a bankruptcy court without juries and Article III judicial power).

The LBI Trustee's attempt to couch the Motion to Compel as a core motion to enforce the automatic stay likewise fails on at least two grounds.  First, based on the LBI Trustee's own motion and legal theory, there can only be an automatic stay violation if the LBI Trustee first proves RBS N.V. owes the LBI Estate money under pre-Liquidation Order contracts.  The Supreme Court could not have ruled the estate's contract claim required an Article III tribunal, as it did in *Northern Pipeline*, if the failure to pay the amount the estate contended was owed under a prepetition contract somehow converted the action into a core proceeding for enforcement of the automatic stay not requiring an Article III tribunal.  Second, Congress legislated in section 542(b) of the Bankruptcy Code that entities shall pay amounts due to the bankruptcy estate when

---

misrepresentation, and other counts which are the stuff of the traditional actions at common law tried by the courts at Westminster in 1789.  There is apparently no federal rule of decision provided for any of the issues in the lawsuit; the claims of Northern arise entirely under state law.  No method of adjudication is hinted, other than the traditional common-law mode of judge and jury.  The lawsuit is before the Bankruptcy Court only because the plaintiff has previously filed a petition for reorganization in that court").

the debt is owed to the estate.[5]  If failure to pay were a stay violation, as the LBI Trustee contends, section 542(b) would have been placed in section 362(a) of the Bankruptcy Code with all the other stay violations.  The LBI Trustee does not cite section 542(b).

Second, the Supreme Court ruled in *Granfinanciera* that when a federal statute codifies a common law action that is not a "public right,"[6] determination of the action pursuant to the federal statute still requires an Article III court because it requires Article III judicial power.[7] Indeed, in *Granfinanciera*, the bankruptcy trustee was attempting to prove a federal cause of action under section 548 of the Bankruptcy Code to collect a fraudulent transfer, similar to fraudulent transfers under state law.  Likewise, the Supreme Court ruled in *Northern Pipeline* that a prepetition contract action between two private parties is not a public right.[8]  The fact that

---

[5] Section 542(b) of the Bankruptcy Code provides:

> Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

[6] The Supreme Court has defined a "public right" as a right that is closely intertwined with a federal regulatory program which right belongs to or is against the federal government, *Granfinanciera*, 492 U.S. at 54, and a right that historically could be conclusively determined by the executive or legislative branches of government, *Northern Pipeline*, 458 U.S. at 68.

[7] *See Granfinanciera*, 492 U.S. at 53-54 (quoting *Crowell v. Benson*, 285 U.S. 22, 51 (1932)) ("Indeed, our decisions point to the conclusion that, if a statutory cause of action is legal in nature, the question whether the Seventh Amendment permits Congress to assign its adjudication to a tribunal that does not employ juries as factfinders requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal.  For if a statutory cause of action, such as respondent's right to recover a fraudulent conveyance under 11 U.S.C. § 548(a)(2), is not a 'public right' for Article III purposes, then Congress may not assign its adjudication to a specialized non-Article III court lacking 'the essential attributes of the judicial power' … And if the action must be tried under the auspices of an Article III court, then the Seventh Amendment affords the parties a right to a jury trial whenever the cause of action is legal in nature").

[8] *See Northern Pipeline*, 458 U.S. at 71 (quoting *Crowell*, 285 U.S. at 51) ("But the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case.  The former may well be a 'public right,' but the latter obviously is not.  Appellant Northern's right to recover contract damages to augment its estate is 'one of private right, that is, of the liability of one individual to another under the law as defined'").

LBI owns contract rights in its swap agreement with RBS N.V. has no impact on whether the Motion to Compel can be determined by an Article I court.  Like the LBI Trustee, the debtor in *Northern Pipeline* also owned contract rights in the contract it was attempting to enforce, yet the Supreme Court ruled an Article III court was required.

Notably, for good reason the LBI Trustee could not and did not attempt to invoke section 542(a) of the Bankruptcy Code relating to turnover of property of the estate.  As explained below, it is black letter law that money a defendant may use to satisfy an amount payable to a debtor's estate under a contract is not itself property of the estate.  Indeed, the LBI Trustee stops short of claiming it is, and instead claims the LBI estate owns contract rights in its swap agreement.[9]  Debtors' estates always own rights in their contracts with nondebtors.  This did not cause the Supreme Court in *Northern Pipeline* to determine the debtor's contract action could be determined by the Article I bankruptcy judge, and it cannot do so here.

Many other factors also weigh in favor of withdrawing the reference of the Motion to Compel, in addition to ensuring the efficient use of judicial resources and avoiding undue delay by having the Article I Bankruptcy Court make proposed findings the District Court must review de novo or discard and hold a jury trial.  First, the action requires consideration of potentially conflicting laws and policies inherent in English law and the Bankruptcy Code.  Federal comity is at issue.  The Motion to Compel requires substantial consideration of English law because the ISDA Agreements provide that English law governs, and the LBI Trustee contends sections

---

[9] *See* Motion to Compel ¶53 (citing *In re Enron Corp.*, 300 B.R. 201, 206 (Bankr. S.D.N.Y. 2003), *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (JMP), Hearing Tr. at 99:15-113:9 (Bankr. S.D.N.Y. Sept. 15, 2009) [Bankr. Ct. Docket No. 5261], *In re Lehman Bros. Holdings Inc.*, 433 B.R. 101, 108 (Bankr. S.D.N.Y. 2010), *aff'd, Swedbank AB v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.)*, 445 B.R. 130 (S.D.N.Y. 2011)) ("Courts have consistently held that contract rights are property of the estate and any contract rights of the debtor are protected by the automatic stay").

105(a), 362(a)(3), 541(a), and 553 of the Bankruptcy Code support his action.   Motion to

Compel at ¶¶ 51-53.   When an action requires substantial consideration of the Bankruptcy Code

and other federal law affecting interstate commerce, 28 U.S.C. § 157(d) renders reference

withdrawal mandatory.[10]   Therefore, while reference withdrawal is not mandatory here, the

policy underlying mandatory withdrawal – that a court of general jurisdiction having no special

affection for any particular field of law adjudicate matters implicating non-bankruptcy law – is

applicable and supports the discretionary reference withdrawal that RBS N.V. requests pursuant

to 28 U.S.C. § 157(d).   Additionally, in the context of a different Lehman matter before the

Bankruptcy Court involving English law on which the English courts had already ruled, subject

to one further appeal, United States District Judge Colleen McMahon has already expressed

certain important observations:

> On July 28, 2009, the High Court ruled in favor of Perpetual and
> the Belmont Noteholders, concluding that the priority clauses were
> valid and enforceable.  On January 25, 2010, the Bankruptcy Court
> issued an unprecedented and contrary decision in the Perpetual
> Adversary Proceeding, holding that the priority clauses were
> unenforceable.  *See Lehman Bros. Special Fin., Inc. v. BNY Corp.*
> *Tr. Servs., Ltd.*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010).  Despite its
> obvious importance, the order was not signed for many months
> thereafter, preventing any appeal.  BNY finally filed a notice of
> appeal on August 2, 2010, but before this Court could hear the
> merits, BNY, Perpetual and LBSF settled.  Thus, the Bankruptcy
> Court's unreviewed decision remains the law of the case here.

---

[10] 28 U.S.C. § 157(d) provides:

> The district court may withdraw, in whole or in part, any case or proceeding
> referred under this section, on its own motion or on timely motion of any party,
> for cause shown. The district court shall, on timely motion of a party, so
> withdraw a proceeding if the court determines that resolution of the proceeding
> requires consideration of both title 11 and other laws of the United States
> regulating organizations or activities affecting interstate commerce.

*Lehman Bros. Special Fin. Inc. v. Bank of New York Mellon Corp. (In re Lehman Bros. Holding Inc.)*, No. 11-cv-2404, 2011 WL 2651771, at *4 (S.D.N.Y. June 21, 2011) (footnotes omitted). In addition to providing an Article III court when necessary, as here, the most vital purpose of reference withdrawal is to provide litigants a forum where there is no actual or perceived predilection for one field of law over another.

Second, the LBI Trustee is plainly engaging in forum shopping by trying to shoehorn his Motion to Compel within the Bankruptcy Court's Article I power by masking his action for an amount allegedly payable under a pre-Liquidation Order contract governed by state and English law as a motion to enforce the automatic stay to prevent RBS N.V. from controlling "property of the estate." As explained above, there can be no determination of an automatic stay violation before the contract action is tried and determined, and the Supreme Court's decision in *Northern Pipeline* shows clearly the contract action requires an Article III court.

Third, withdrawal of the reference will not have an adverse effect on the uniformity of bankruptcy administration because the District Court is the only court empowered to render final judgments on the LBI Trustee's contract action in the first place.

## BACKGROUND

### I.   The ISDA Agreements and Their Early Termination

RBS N.V. and The Royal Bank of Scotland plc ("RBS plc") entered into the following swap agreements with LBI, Lehman Brothers International (Europe) ("LBIE"), or Lehman Brothers Special Financing Inc. ("LBSF"):

> (i)    LBI and RBS N.V. entered into a 1992 ISDA Master Agreement, dated as of March 16, 1998 (as amended and supplemented, the "LBI-RBS N.V. ISDA Agreement");
>
> (ii)   LBI and RBS plc entered into a 1992 ISDA Master Agreement, dated as of November 25, 1996 (as amended and supplemented, the "LBI-RBS plc ISDA Agreement");

(iii)  LBIE and RBS N.V. entered into a 1992 ISDA Master Agreement, dated as of January 24, 1997 (as amended and supplemented, the "LBIE-RBS N.V. ISDA Agreement"); and

(iv)  LBSF and RBS plc entered into a 1992 ISDA Master Agreement, dated as of September 15, 2003 (as amended and supplemented, the "LBSF-RBS plc ISDA Agreement," and together with the LBI-RBS N.V., LBI-RBS plc, and LBIE-RBS N.V. ISDA Agreements, the "ISDA Agreements").

Copies of the Schedules, Credit Support Annexes, and Amendments which form a part of the respective ISDA Agreements are attached to the Declaration of Irena M. Goldstein in Support of RBS N.V.'s Motion to Withdraw the Reference, filed contemporaneously herewith (the "Goldstein Declaration"), as Exhibit A-1, Exhibit B-1, Exhibit C-1, and Exhibit D-1, respectively.  An unexecuted 1992 ISDA Master Agreement which forms a part of each ISDA Agreement is attached to the Goldstein Declaration as Exhibit E.

On September 15, 2008, Lehman Brothers Holdings Inc. ("LBHI") commenced its chapter 11 case.  Beginning on September 16, 2008 and periodically thereafter, certain of LBHI's United States affiliates, including LBSF, also commenced chapter 11 cases.  On September 19, 2008, the Honorable Gerard E. Lynch of the District Court entered an *Order Commencing Liquidation* of LBI in *Securities Investor Protection Corp. v. Lehman Brothers Inc.*, Case No. 08-cv-8119 (GEL), which is attached to the Goldstein Declaration as Exhibit F, thereby commencing LBI's SIPA proceeding [Bankr. Ct. and District Ct. Docket No. 1] (the "Liquidation Order").  The Liquidation Order provides that subject to the safe harbor provisions of the Bankruptcy Code, *i.e.*, 11 U.S.C. §§ 555-61, the automatic stay and certain provisions of SIPA apply to LBI's SIPA proceeding.  *See* Liquidation Order ¶VIII.B.

In addition, the LBI Trustee recites that on September 15, 2008 and September 22, 2008, RBS N.V. and RBS plc delivered termination notices to their respective Lehman counterparties

under the ISDA Agreements designating an Early Termination Date (as defined in the 1992 ISDA Master Agreement).

Pursuant to Section 6(d)(i) of the 1992 ISDA Master Agreement, following the occurrence of an Early Termination Date, the non-defaulting party is required to calculate the amount payable by it or to it under Section 6(e) of the 1992 ISDA Master Agreement in accordance with the methodology selected by the parties in the Schedule and "provide to the other party a statement … showing, in reasonable detail, such calculations."   In addition, pursuant to Section 6(e) of the 1992 ISDA Master Agreement, the amount payable following the occurrence of an Early Termination Date is subject to a party's setoff rights.[11]

On May 14, 2009, RBS N.V. and RBS plc delivered notices to LBI, LBSF, or LBIE, as applicable, calculating an amount payable by or to RBS N.V. or RBS plc, as applicable, under the ISDA Agreements as of the Early Termination Date (as amended or supplemented, the "Section 6(d)(i) Statements").   Copies of the Section 6(d)(i) Statements are attached to the Goldstein Declaration as Exhibit A-2, Exhibit B-2, Exhibit C-2, and Exhibit D-2, respectively.

As set forth in greater detail in the Section 6(d)(i) Statements, before taking into account the setoffs provided for in the trade confirmations: (i) RBS N.V. owed LBI $347,501,344 under the LBI-RBS N.V. ISDA Agreement, (ii) LBI owed RBS plc $40,023,040 under the LBI-RBS plc ISDA Agreement, (iii) LBIE owed RBS N.V. $85,722,058 under the LBIE-RBS N.V. ISDA

---

[11] Specifically, Section 6(e) of the 1992 ISDA Master Agreement provides, in relevant part, that "[t]he amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off."   Section 14 of the 1992 ISDA Master Agreement, in turn, defines "Set-off" as "set-off, offset … or [any] similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer."

Agreement, and (iv) LBSF owed RBS plc $805,576,399 under the LBSF-RBS plc ISDA Agreement.[12]

## II.     RBS N.V. has a Contractual Right to Setoff Pursuant to the Terms of Agreement

RBS N.V. is contractually entitled to exercise setoff rights with respect to the amount payable by it as of the Early Termination Date under the LBI-RBS N.V. ISDA Agreement.

Pursuant to the Terms of Agreement accompanying confirmations of securities transactions[13] (the "Terms of Agreement"), upon the occurrence of certain defaults and insolvency events with respect to Lehman, RBS was entitled to set off any obligation owing by it to Lehman against any obligation owing by Lehman to RBS.   Specifically, the Terms of Agreement provide as follows:

> It is agreed by and between you ("Customer" or "you") and Greenwich Capital Markets, Inc. ("RBS Greenwich Capital," "we," or "us") that each transaction as described on the face hereof (a "Transaction") is subject to the following terms and conditions:
>
> 1.     … Provisions contained in and remedies provided by this confirmation which are additional to or more or less expansive than any provision contained in any remedies provided by any agreement with Customer (including, without limitation, provisions or remedies that cover the same subject matter) shall not be deemed to be in conflict with each other, and all such provisions and remedies shall be applicable and available …
>
> 13.     **If Customer or any of its affiliates** (collectively, the "Customer Parties") **shall** default in respect of a Transaction or any

---

[12] Each of the foregoing amounts refers to the amount payable as of the Early Termination Date, exclusive of interest, fees, and expenses which are due and owing to RBS N.V. and RBS plc pursuant to Section 11 of the 1992 ISDA Master Agreement.

[13] The Terms of Agreement were delivered to LBI in accordance with Securities and Exchange Commission Rule 10b-10, which provides that it is "unlawful" for any broker or dealer to trade securities unless such broker or dealer provides its customers with a confirmation at or before the completion of a securities transaction.  *See* 17 C.F.R. § 240.10b-10; *United States v. O'Hagan*, 139 F.3d 641, 652 (8th Cir. 1998); *Levitin v. PaineWebber, Inc.*, 933 F. Supp. 325, 329 (S.D.N.Y. 1996) ("The 'confirmation rule,' Rule 10b-10, requires broker-dealers to provide customers with a written confirmation at or before completion of a securities transaction").

other transaction with RBS Greenwich Capital or any of its affiliates (collectively, the "RBS Greenwich Capital Parties"), state that any Customer Party will not perform any obligation to any RBS Greenwich Capital Party, apply for, consent to or be the subject of any application or petition for the appointment of or the taking of possession by a receiver, custodian, trustee, liquidator or similar person of itself or of all or a substantial part of its property, admit in writing its inability, or become generally unable, to pay its debts as such debts become due … **file or be the subject of the filing … of a petition or order for relief under Title 11 of the U.S. Code … of any application for a protective decree under Section 5 of [SIPA], or of any decree under Section 5 of SIPA**, or if any RBS Greenwich Capital Party believes that it may not be able to apply without delay property that it or any other RBS Greenwich Capital Party is holding or expects to receive from any Customer Party against any obligations to such first RBS Greenwich Capital Party, **each RBS Greenwich Capital Party may (a) cancel or otherwise liquidate and exercise all available remedies under a Transaction between it and you without prior notice to you, and (b) set off any obligation owing by it to you against any obligations owing by you or any other Customer Party to it or any other RBS Greenwich Capital Party.**

14.     Customer hereby grants to each of us and our affiliates a security interest in all securities, moneys or other property, and all proceeds of any of the foregoing, now or hereafter held or carried by us or our affiliates for you as collateral security for the payment of any and all obligations and liabilities of you or your affiliates to us or our affiliates, now existing or arising hereafter.  You hereby irrevocably constitute and appoint each of us and our affiliates as your true and lawful agent and attorney in fact, with full power to act in your name and on your behalf, with respect to the execution of all instruments and the taking of all action necessary or desirable to effectuate the rights and remedies provided hereunder and by applicable law to any RBS Greenwich Capital Party.  To satisfy your obligations to us or our affiliates we may in our discretion at any time, without notice to you, close or reduce your accounts by public or private sale or purchase, or both, of all or any securities carried in your account, any balance due to us to be promptly paid by you …

18.     This Agreement shall inure to the benefit of RBS Greenwich Capital, its affiliates, and its and their successors and assigns.  The parties acknowledge that each Transaction hereunder is a "securities contract" within the meaning of 11 U.S.C. [§] 741(7) …

19.    **This confirmation shall be deemed to have been accepted and signed by Customer if not objected to in writing by Customer to RBS Greenwich Capital within 3 days of receipt hereof.**

21.    This confirmation and all Transactions hereunder shall be governed and construed in accordance with the laws of the State of New York (excluding choice or conflict of law doctrine) and all applicable federal laws and regulations.

(emphasis added).  A copy of the Terms of Agreement is attached to the Goldstein Declaration as Exhibit G.  No Lehman entity, including LBI (which, as a broker-dealer, received the Terms of Agreement over 800 times in connection with the confirmation of securities transactions with RBS Greenwich Capital), ever objected to the Terms of Agreement or asserted in any manner that the confirmations did not faithfully confirm the terms of the transactions RBS and Lehman were entering into.

Indeed, as a matter of common sense, no trading party would ever object to such setoffs or netting, because that would suggest the party thought one of its entities might default.  No trading party can trade with others if default is considered a plausible possibility.

On May 14, 2009, RBS N.V. delivered to LBI the Section 6(d)(i) Statement in respect of the LBI-RBS N.V. ISDA Agreement.  As noted above, the Section 6(d)(i) Statement in respect of such agreement stated that as of the Early Termination Date, before taking into account the Terms of Agreement, the amount payable by RBS N.V. to LBI was $347,501,344.  Further, the Section 6(d)(i) Statement stated that RBS N.V. exercised its right under the Terms of Agreement to set off the amount payable by it under the LBI-RBS N.V. ISDA Agreement against the obligations of: LBI under the LBI-RBS plc ISDA Agreement, LBIE under the LBIE-RBS N.V. ISDA Agreement, and LBSF under the LBSF-RBS plc Agreement.

In addition, on May 22, 2009, RBS N.V. filed a proof of claim against LBI, which is attached to the Goldstein Declaration as Exhibit H (the "Proof of Claim").   The Proof of Claim

asserted a claim for $1,562,717.39, which amount represents unpaid underwriting fees payable by LBI to RBS N.V. less the amount payable by RBS N.V. to LBI under a Master Securities Loan Agreement.

On July 24, 2009, counsel for the LBI Trustee notified RBS N.V. in writing that the LBI Trustee disputed the propriety of RBS N.V.'s setoff of the amount payable under the LBI-RBS N.V. ISDA Agreement.  On August 25, 2009, RBS N.V.'s counsel responded in writing to the positions set forth in the LBI Trustee's letter.  The LBI Trustee did not respond to the August 25, 2009 letter for nearly two years, until several weeks before the LBI Trustee filed his Motion to Compel.

### III.   The LBI Trustee's Motion to Compel and RBS N.V.'s Response

On June 29, 2011, the LBI Trustee filed the Motion to Compel, which is attached to the Goldstein Declaration as Exhibit I, together with a declaration by the LBI Trustee's counsel in support thereof [Bankr. Ct. Docket Nos. 4370 and 4371, respectively].  In the Motion to Compel, the LBI Trustee alleges that LBI is entitled to $345,938,625, representing the $347,501,344 payable by RBS N.V. to LBI under the LBI-RBS N.V. ISDA Agreement less the amount of the Proof of Claim, plus interest thereon, because (i) The LBI-RBS N.V. ISDA Agreement did not authorize the setoff; (ii) the Terms of Agreement are unenforceable under New York law because of an integration clause in the LBI-RBS N.V. ISDA Agreement; and (iii) RBS N.V.'s failure to pay the amount payable under its ISDA Agreement to the estate of LBI constitutes a violation of the automatic stay and the Liquidation Order.

On August 2, 2011, RBS N.V. filed a motion [Bankr. Ct. Docket No. 4454], a copy of which is attached to the Goldstein Declaration as Exhibit J (the "Motion"), for entry of an order dismissing without prejudice the Motion to Compel, or alternatively, converting the Motion to Compel to an adversary proceeding complaint, requiring application of the Part VII Bankruptcy

Rules (and associated local civil and bankruptcy rules) to any proceeding relating thereto, and staying any such proceeding, other than with respect to discovery, pursuant to Bankruptcy Rule 5011(c), pending a determination by the District Court with respect to this Motion to Withdraw the Reference.

## **ARGUMENT**

### I.  **Legal Standard for Withdrawal of the Reference**

Pursuant to 28 U.S.C. § 157(d), "[t]he district court may withdraw, in whole or in part, any case or proceeding referred [to the bankruptcy court] … on timely motion of any party, for cause shown."

This section applies to proceedings under SIPA.  *See*, *e.g.*, *Mishkin v. Ageloff*, 220 B.R. 784, 795-98 (S.D.N.Y. 1998) (citations omitted) ("Courts have held, and the parties do not dispute, that this provision [28 U.S.C. § 157(d)], and the cases interpreting it, apply in SIPA proceedings"); *Sec. and Exch. Comm'n v. Goren*, No. 00-cv-970, 2002 WL 32963582, at *3 (E.D.N.Y. Mar. 6, 2002) (withdrawing the reference with respect to an entire SIPA proceeding); *Keller v. Blinder (In re Blinder, Robinson & Co.)*, 162 B.R. 555, 559 (D. Colo. 1994) ("withdrawal of the reference is contemplated in SIPA proceedings under the same circumstances as are appropriate in regular bankruptcy cases").

The Second Circuit has stated that in evaluating whether cause exists to justify withdrawal of the reference, a district court "should first evaluate whether the claim is core or non-core."  *Orion*, 4 F.3d at 1101.  *See also Picard v. HSBC Bank PLC*, No. 11-cv-763, 2011 WL 1544494, at *2 n.3 (S.D.N.Y. Apr. 25, 2011) (citing *Orion*, 4 F.3d at 1101); *In re Fairfield Sentry Ltd.*, No. 10-cv-7340, 2010 WL 4910119, at *2 (S.D.N.Y. Nov. 22, 2010) (quoting *Orion*, 4 F.3d at 1101) ("The Court of Appeals suggests that the core/non-core determination is a

'threshold' issue"); *VWE Group Inc. v. Amlicke (In re The VWE Group, Inc.)*, 359 B.R. 441 (S.D.N.Y. 2007) (same).

As explained in the Summary of Argument, the core/non-core determination is based on the threshold need to determine whether the bankruptcy court will be constitutionally able to determine the proceeding by making findings of fact and conclusions of law. Efficiency, judicial time, and uniformity of administration all tilt towards reference withdrawal when the bankruptcy court cannot determine facts and render final judgments.

"[O]nce [the] district court makes the core/non-core determination, it should weigh questions of efficient use of judicial resources, delay, and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors." *Orion*, 4 F.3d at 1101. Although the core/non-core determination is not completely dispositive of a motion to withdraw the reference, it "is upon this issue that questions of efficiency and uniformity will turn." *Id. See also Picard*, 2011 WL 1544494, at *2 n.3 (citing *Orion*, 4 F.3d at 1101); *VWE Group*, 359 B.R. at 447 (citing *Orion*, 4 F.3d at 1101); *1800 Postcards, Inc. v. Morel*, 153 F. Supp. 2d 359, 367 (S.D.N.Y. 2001) (citing *Orion*, 4 F.3d at 1101).

## II.   Withdrawal of the Reference of the Motion to Compel is Warranted Because the *Orion* Factors Weigh in Favor of Withdrawal

### A.   The Motion to Compel Requires Exercise of Article III Judicial Power

As explained in the Summary of Argument, the underpinning of the core/non-core determination was the assumption by Congress that core proceedings could be heard and determined by bankruptcy judges. That assumption is manifested by 28 U.S.C. § 157(b)(1), which provides:

> Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and

may enter appropriate orders and judgments, subject to review under section 158 of this title.

Congress listed actions to recover fraudulent transfers and counterclaims against entities that filed proofs of claim as core proceedings in 28 U.S.C. § 157(b)(2)(C) and (H).  *See* 28 U.S.C. § 157(b)(2) ("Core proceedings include, but are not limited to … (C) counterclaims by the estate against persons filing claims against the estate … (H) proceedings to determine, avoid, or recover fraudulent conveyances").  As it turned out, however, the Supreme Court later held that the debtor-estate's fraudulent transfer actions and counterclaims cannot be determined by Article I bankruptcy courts because they require Article III courts and juries.  *See Granfinanciera*, 492 U.S. at 53 (fraudulent transfer action requires jury based on same analysis showing an Article III court is required); *Stern v. Marshall,* 131 S. Ct. at 2620 (an Article I bankruptcy court cannot exercise the essential attributes of Article III judicial power over a bankruptcy estate's prepetition, state law counterclaim against a claimant).

Therefore, the core/non-core test no longer encapsulates the entire inquiry.  Here, Congress has listed the LBI Trustee's counterclaim as a core proceeding, but its determination requires an Article III court and jury if requested.  The Supreme Court's decision in *Northern Pipeline* makes crystal clear that a debtor's prepetition contract actions require Article III courts for their determinations.  458 U.S. at 70, 90.

> (1)  Pre-Liquidation Order Contract Actions Cannot Escape Article III Determination with Bankruptcy Disguises

The LBI Trustee admits he is attempting to enforce a pre-Liquidation Order contract, Motion to Compel ¶31, and that alone has long signaled the need for Article III courts.  This is demonstrated by the decisions following *Northern Pipeline*, rendered on debtors' prepetition contract claims brought against entities which had not filed proofs of claim, which actions were not, therefore, listed as core proceedings in 28 U.S.C. § 157(b)(2)(C); and disguising prepetition

contract actions in bankruptcy terms does not alter the need for an Article III court.  *See DHP Holdings II Corp. v. Peter Skop Indus., Inc. (In re DHP Holdings II Corp.)*, 435 B.R. 220, 229 (Bankr. D. Del. 2010) ("The action is non-core because it is 'nothing more than a state law breach of contract claim disguised in bankruptcy terms'"); *see also Mt. McKinley Inc. Co. v. Corning, Inc.*, 399 F.3d 436, 448 (2d Cir. 2005) ("Militating against a finding of core jurisdiction was the fact that the policies were purchased pre-petition … As in *United States Lines*, the pre-petition execution of the insurance contracts suggests that this lawsuit is not core"); *Beard v. Braunstein*, 914 F.2d 434, 445 (3d Cir. 1990) ("We conclude that this action, involving pre-petition contracts, allegedly breached both before and after the filing of the petition, is entirely a non-core matter"); *1800Postcards*, 153 F. Supp. 2d at 367 (finding that debtors' adversary proceeding was non-core because it was a "conventional breach of contract action that does not depend in any respect on the bankruptcy laws and that could have been brought in another court"); *Petition of McMahon*, 222 B.R. 205, 208 (S.D.N.Y. 1998) (disputes over prepetition contracts are non-core, irrespective of the timing of the alleged breach of contract); *In re Pied Piper Casuals, Inc.*, 65 B.R. 780, 781 (S.D.N.Y. 1986) (reversing bankruptcy court's exercise of core jurisdiction in a dispute concerning insurance contracts entered into prepetition); *Interconnect Tel. Servs., Inc. v. Farren*, 59 B.R. 397, 400 (S.D.N.Y. 1986) ("Non-core proceedings consist of those claims arising under traditional state law … They are those civil proceedings that, in the absence of a petition in bankruptcy, could have been brought in a district court or state court").

The Motion to Compel is not "unique to" or "uniquely affected by" LBI's SIPA proceeding because, as noted above, the Motion to Compel relates to the rights of LBI and RBS N.V. under pre-Liquidation Order contracts.  Their dispute would, without a doubt, exist outside

of LBI's SIPA proceeding, and further, as noted above, courts have routinely found disputes concerning prepetition contracts to be the type of state law cases that are neither "unique to" nor "uniquely affected by" a bankruptcy proceeding.

Further, in accordance with the Supreme Court's holding in *Stern v. Marshall*, the Motion to Compel cannot be deemed to affect a bankruptcy function even though it is a counterclaim to RBS N.V.'s Proof of Claim under 28 U.S.C. § 157(b)(2)(C).   In *Stern v. Marshall*, Pierce Marshall filed a proof of claim in the chapter 11 case of his step-mother, Vickie Marshall, asserting damages for defamation, and commenced an adversary proceeding against Ms. Marshall seeking entry of an order stating that her defamation liability was non-dischargeable. 131 S. Ct. at 2601.   Ms. Marshall then filed a counterclaim in the adversary proceeding commenced by Mr. Marshall alleging that he tortiously interfered with her expectation of a gift. *Id*.   The Supreme Court held that that although 28 U.S.C. § 157(b)(2)(C) provides bankruptcy courts can determine "counterclaims by the estate against persons filing claims against the estate," Article III of the United States Constitution *prohibits* bankruptcy courts from entering final orders with respect to counterclaims that are not resolved in the process of ruling on creditors' proofs of claim.   *Id*. at 2620.   Specifically, the Supreme Court held that because Ms. Marshall's counterclaim was a common law action brought to "augment the bankruptcy estate," *i.e.*, the kind that must "be decided by an Article III court" under *Northern Pipeline*, the bankruptcy court could not enter final orders with respect to such counterclaim.  *Id*. at 2613-16. In addition, the Supreme Court refused to treat Mr. Marshall's filing of a proof of claim asserting damages for defamation as changing the non-core nature of the counterclaim.  *Id*. at 2614 ("Pierce did not truly consent to resolution of Vickie's claim in the bankruptcy court proceedings.  He had nowhere else to go if he wished to recover from Vickie's estate").

The Bankruptcy Court cannot make fact findings or legal determinations regarding the LBI Trustee's counterclaim, in which he requests judgment (i) on amounts owing under the LBI-RBS N.V. ISDA Agreement and (ii) determining that RBS N.V. has no state law rights or cannot exercise them under the Terms of Agreement, as these issues have nothing to do with RBS N.V.'s Proof of Claim, through which it sought payment of unpaid underwriting fees.

(2)    <u>The LBI Trustee's Invocation of Section 362(a)(3) of the Bankruptcy Code Does Not Eliminate the Article III Requirement</u>

The LBI Trustee clearly thought long and hard about his Motion to Compel.  In other matters where he was attempting to recover money, and in other matters brought by LBHI, the LBI Trustee and LBHI have proceeded by complaint, where pursuant to Bankruptcy Rule 7008, the pleader must declare whether the proceeding is core or non-core and whether the pleader consents to the Article I bankruptcy court's determinations.  *See* Exhibit A to RBS N.V.'s Motion, *Lehman Bros. Commodity Servs., Inc. v. Sempra Energy Trading LLC (In re Lehman Bros. Holdings Inc.)*, Adv. Pro. No. 11-01502 [Bankr. Ct. Docket No. 1]; Exhibit B to RBS N.V.'s Motion, *Lehman Bros. Inc. v. Citibank, N.A. (In re Lehman Bros. Inc.)*, Adv. Pro. No. 11-01681 [Bankr. Ct. Docket No. 1] (the "<u>Citibank Adversary Complaint</u>").

Here, the LBI Trustee is attempting to proceed by motion, which does not invoke Bankruptcy Rule 7008 and does not invoke most of the Part VII Bankruptcy Rules that provide fairness to defendants such as RBS N.V.  Additionally, instead of simply labeling his action an action to collect an amount allegedly payable under a contract, the LBI Trustee labels the action one pursuant to sections 105(a) and 362(a) of the Bankruptcy Code to enforce the automatic stay. Section 105(a) is the bankruptcy version of the All Writs Act and is generally invoked as a last resort when the pleader has no real authority.  The LBI Trustee claims RBS N.V. is violating the automatic stay by controlling property of the LBI estate.  What property?  The LBI Trustee

22

contends the LBI estate owns contract rights in the contract it is seeking to enforce (RBS N.V. agrees) and that RBS N.V. is controlling those contract rights in violation of section 362(a)(3) of the Bankruptcy Code by not having paid what the LBI Trustee contends is due and owing (RBS N.V. completely disagrees). *See* Motion to Compel ¶53.  The logical conclusion of the LBI Trustee's contention disproves his contention.  If the LBI Trustee were correct, then every contract counterparty would have to pay the debtor's estate before trial and judgment whatever disputed amounts the debtor contends are due.  Otherwise, according to the LBI Trustee, the contract counterparty would be violating the automatic stay.  Moreover, the LBI Trustee's position would require the overruling of *Northern Pipeline*, where the Supreme Court held that a contract counterparty was entitled to a trial in an Article III court before it could be required to pay any amount to the debtor.  Indeed, there, no one even suggested the contract counterparty must pay first and litigate later!

In *Northern Pipeline*, the debtor commenced a suit against a company asserting state law claims which existed independent of the bankruptcy (specifically, breach of contract, warranty, misrepresentation, coercion, and duress claims).  458 U.S. at 56.  The only relationship these claims had to the bankruptcy was the potential that they would yield damages that would add value to the debtor's estate.  *Id*. at 57.  As noted above, in holding that the Article I bankruptcy court could not exercise Article III judicial power with respect to the debtor's contract claims, the Supreme Court held that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case." *Id*.

Like the debtor in *Northern Pipeline*, the LBI Trustee has contract rights in the LBI-RBS N.V. ISDA Agreement.  Indeed, it was trying to enforce those contract rights, the same as the LBI Trustee here.

Significantly, nowhere in the Motion to Compel does the LBI Trustee invoke section 542(a) of the Bankruptcy Code regarding turnover of property of the estate or allege that the Motion to Compel is a core turnover proceeding under 28 U.S.C. § 157(b)(2)(E).  The LBI Trustee has good reason, given that the money a defendant may use to satisfy an amount payable to a debtor's estate under a contract is not property of the estate subject to a turnover action.  *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 21 (1995) (stating that a bank account is "nothing more or less than a promise to pay, from the bank to the depositor … and [that the bank's] refusal to [permit the depositor to draw upon the balance of his account pending the bank's exercise of setoff rights] was neither a taking of possession of respondent's property nor an exercising of control over it, but merely a refusal to perform its promise").  Consistent with this principle, numerous courts have held that 28 U.S.C. § 157(b)(2)(E), which provides that proceedings for turnover of property of the estate are core, "only applies to claims for turnover of property *owned* by the debtor rather than claims for amounts *owed* to the debtor" and that "broadening § 157(b)(2)(E) to include any damages remedy a party seeks would conflict with … *Marathon*."  *In re Morrison*, 409 B.R. 384, 390 (S.D. Tex. 2009) (citing *John Hancock Mut. Life Ins. Co. v. Watson (In re Kincaid)*, 917 F.2d 1162, 1165 (9th Cir. 1990)).  The instant case is clearer than *Citizens Bank* because the LBI estate has no bank account with RBS N.V.  Rather, it simply has a disputed contract claim against RBS N.V.

Here, RBS N.V. has netting and setoff rights under the Terms of Agreement that reduced to zero the amount owing under the swap agreement the LBI Trustee seeks to enforce.  No

property of the estate is involved.  Try as he might, the LBI Trustee cannot get to first base without proving liability under various contracts.  The crux of his action is a state law contract action and labeling it an action to enforce the automatic stay is of no help.  Moreover, the *ex parte* Liquidation Order allows RBS N.V. to enforce its rights under the safe harbors.

### B.    Other Factors Weigh in Favor of Withdrawing the Reference of the Motion to Compel

#### (1)    Withdrawal of the Reference Will Ensure Efficient Use of Judicial Resources and will Avoid Undue Delay

RBS N.V. is entitled to a jury trial in any proceeding relating to the Motion to Compel. The Seventh Amendment to the United States Constitution provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."  In addition, the Supreme Court and numerous other courts have held that a cause of action that seeks money damages is an action at law, within the meaning of the Seventh Amendment.  *See*, *e.g.*, *Granfinanciera*, 492 U.S. at 46 n.5 ("With respect to suits like respondent's, the court expressly noted that 'an action by a … trustee-in-bankruptcy seeking money damages is an action at law'"); *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 336 B.R. 39, 60-61 (Bankr. S.D.N.Y. 2006) ("Actions for breach of contract, of course, import a right to trial by jury"); *In re Marie Pastor's Morningstar Mgmt., Ltd.*, 109 B.R. 58 (Bankr. S.D.N.Y. 1990) ("There is no question that the Seventh Amendment right to trial by jury exists in an action based upon a common law claim for money damages").[14]

---

[14] The filing of the Proof of Claim has no effect on RBS N.V.'s right to a jury trial because the Proof of Claim has no relationship to the contract action that is the subject of the Motion to Compel.  *See*, *e.g.*, *Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co.)*, 529 F.3d 432, 466 (2d Cir. 2008) ("Filing a proof of claim against a bankruptcy estate triggers the process of 'allowance and disallowance of claims,' and therefore, a creditor who files such a claim subjects itself to the bankruptcy court's equitable jurisdiction *in proceedings affecting that claim*") (emphasis added); *Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1330 (2d Cir. 1993) ("neither  precedent nor logic supports the proposition that … the creditor … automatically waives all right to a jury trial whenever a proof of claim is filed.  For waiver to occur, the dispute *must be part of the claims-allowance process or affect the*

The Bankruptcy Court, however, cannot conduct a jury trial in matters requiring the exercise of judicial power. *See Orion*, 4 F.3d at 1101-02. Thus, the factors of preservation of judicial economy and avoidance of undue delay favor withdrawal of the reference when parties have Article III rights and are entitled to or have requested a jury trial. *See, e.g., id.* at 1102 ("If a case is non-core and a jury demand has been filed … the inability of the bankruptcy court to hold the trial constitutes cause to withdraw the reference"); *VWE Group*, 359 B.R. at 451 ("Under *Orion*, the court's finding that the claim is non-core coupled with defendants' jury demand is sufficient cause to withdraw the reference"); *1800 Postcards*, 153 F. Supp. 2d at 367 (where defendants "have requested a jury trial and neither has consented to final resolution of the non-core matter by the Bankruptcy Court[,] [w]ithdrawal of the reference … would solve the constitutional problem that would arise were the adversary proceeding to proceed to trial").

Even if RBS N.V. does not vindicate its right to jury trial, pursuant to 28 U.S.C. § 157(c)(1), any findings of fact and conclusions of law made by the Bankruptcy Court would still be subject to de novo review by the District Court, thereby resulting in unnecessary duplication of effort and delay. Courts have therefore consistently held that where proceedings require Article III judicial power, preservation of judicial economy and avoidance of undue delay favor withdrawal of the reference. *See, e.g., VWE Group*, 359 B.R. at 451 ("Since the Bankruptcy Court's determination of this non-core claim would be subject to de novo review in the district court, unnecessary costs can be avoided by a single proceeding in this court");

*Official Comm. of Unsecured Creditors of FMI Forwarding Co. v. Union Transp. Corp. (In re*

---

hierarchical reordering of the creditors' claims") (emphasis added); *The Arctrade Liquidation Trust v. Greenwich Ins. Co. (In re Arctrade Fin. Techs., Ltd.)*, No. 09-01196, 2010 WL 3386945, at *3 (Bankr. S.D.N.Y. Aug. 3, 2010) ("Filing of a proof of claim does not automatically deprive a party of a right to a jury trial in respect of all proceedings against or involving the debtor. Rather, a party who has filed a proof of claim loses its right 'to adjudicate before a jury any issue *that bears directly on the allowance* of that claim'").

*FMI Forwarding Co.)*, No. 01-cv-9462, 2004 WL 1348956, at *6 (S.D.N.Y. June 16, 2004) ("Because the malpractice claim … is a non-core proceeding, the bankruptcy court cannot adjudicate it but may only issue proposed findings of fact and conclusions of law … However, transferring the malpractice action … to this court would allow for the claim to be adjudicated and disposed of in one proceeding, thereby saving judicial and party time and resources"); *Kentile Floors, Inc. v. Congoleum Corp. (In re Kentile Floors, Inc.)*, No. 92-cv-46466, 1995 WL 479512, at *4 (S.D.N.Y. Aug. 10, 1995) (concluding that because the action was "non-core, the bankruptcy court's determination would be subject to de novo review," and hence, "a single proceeding in [the district court] would avoid unnecessary cost").

Notably, district courts even withdraw the reference of core proceedings bankruptcy courts can constitutionally determine, when appropriate. *See*, *e.g.*, *G.M. Crocetti, Inc. v. Trataros Constr., Inc. (In re G.M. Crocetti, Inc.)*, No. 08-cv-6329, 2008 WL 4601278, at *5 (S.D.N.Y. Oct. 15, 2008) (citations omitted) ("core proceedings may be withdrawn where directing such questions to the Bankruptcy Court in the first instance would be inefficient and counterproductive"); *Grant Thornton Int'l v. Parmalat Finanziaria S.p.A. (In re Parmalat Finanziaria S.p.A.)*, 320 B.R. 46, 50-51 (S.D.N.Y. 2005) (finding that the "higher interest" of judicial efficiency was grounds for withdrawing the reference of a core proceeding); *Complete Mgmt., Inc. v. Arthur Andersen, LLP (In re Complete Mgmt., Inc.)*, No. 02-cv-1736, 2002 WL 31163878, at *3 (S.D.N.Y. Sept. 27, 2002) ("even assuming that the … adversary proceeding is technically a core proceeding, we find that the other factors … [including] considerations of efficiency and fairness favor withdrawal of the reference"). *See also S. St. Seaport L.P. v. Burger Boys, Inc. (In re Burger Boys Inc.)*, 94 F.3d 755, 762 (2d Cir. 1996) (affirming the

District Court's withdrawal of the reference even though the matter involved was "plainly a core bankruptcy matter").

Here, even if there were things the Bankruptcy Court could constitutionally rule on, they will inevitably clash with and be intermingled with disputes requiring Article III determinations. Although RBS N.V. submits the LBI Trustee can prove nothing until he proves his contract case and somehow proves the Terms of Agreement do not mean what they say and do not allow RBS to net all amounts owing among the RBS and Lehman entities, the LBI Trustee keeps maintaining he is entitled to a judgment for violation of the automatic stay and the Liquidation Order equal to the alleged amount payable under the LBI-RBS N.V. ISDA Agreement.  We believe that is both wrong and bankruptcy gobbledygook, but it demonstrates how RBS N.V.'s Article III rights are subject to efforts to obscure and dilute them.  We submit, the mere fact that a pre-Liquidation Order swap agreement and the Terms of Agreement are the foundation of the LBI Trustee's affirmative claim and RBS N.V.'s defense is sufficient reason to withdraw the reference rather than take the chance that Article III rights will otherwise be eviscerated by being commingled with the LBI Trustee's purported automatic stay claim.

    (2) <u>The Underlying Policy Behind Mandatory Withdrawal of the Reference under 28 U.S.C. § 157(d) Supports Discretionary Withdrawal in this Instance</u>

As noted in the Summary of Argument, the Motion to Compel requires substantial consideration of English law, New York law, and the Bankruptcy Code.  Although withdrawal of the reference is not mandatory in this instance because the applicable body of non-bankruptcy law is English, as opposed to federal, law, the policy underlying mandatory withdrawal of the reference, namely, that courts of general jurisdiction with no special affection for any particular field of law should determine matters implicating non-bankruptcy law, applies with equal force in this instance and supports RBS N.V.'s request for discretionary withdrawal of the reference.

*See*, *e.g.*, *Pension Benefit Guaranty Corp. v. Smith Corno Corp. (In re Smith Corona Corp.)*, 205 B.R. 712, 714 (D. Del. 1996) (citing *In re St. Mary Hosp.*, 115 B.R. 495, 497 (E.D. Pa. 1990) (noting that "the underlying policy of Section 157(d) … is to withdraw 'matters requiring the application of non-bankruptcy law from the relatively less experienced bankruptcy court to the more experienced district court'"); *Snodgrass v. New Century Mortg. Corp.*, 358 B.R. 675, 678 (S.D. W. Va. 2006) (citing *Contemporary Lithographers, Inc. v. Hibbert (In re Contemporary Lithographers, Inc.)*, 127 B.R. 122, 128 (M.D. N.C. 1991) (same); *In re Chan*, 355 B.R. 494, 506 (Bankr. E.D. Pa. 2006) (same); *see also Picard v. HSBC Bank PLC*, No. 11-cv-0913, 2011 WL 2119720, at *3 (S.D.N.Y. May 23, 2011) (citing *Enron Power Mktg., Inc. v. Cal. Power Exch. Corp. (In re Enron Corp.)*, No. 04-cv-8177, 2004 WL 2711101, at *2 (S.D.N.Y. Nov. 23, 2004)) ("Section 157(d) is meant to 'assure that an Article III judge decides issues calling for more than routine application of [federal laws] outside the Bankruptcy Code'").  In addition, as noted above, the District Court has already observed that the Lehman Bankruptcy Court has already entered "one-of-a-kind" decisions in matters involving English law matters.  *Bank of New York Mellon Corp.*, 2011 WL 2651771, at *4.

> (3)     Withdrawal of the Reference Will Enable a Court Other than the Bankruptcy Court to Consider Unprecedented Issues Lacking Bankruptcy Court Jurisprudence

Only one bankruptcy court decision exists concerning whether contractual triangular setoff rights are enforceable in bankruptcy, and the safe harbor at issue here was expressly not raised in that decision, nor were other issues applicable here.  *In re SemCrude, L.P.*, 399 B.R. 388, 400 (Bankr. D. Del. 2009), *aff'd*, 428 B.R. 590 (D. Del. 2010) (denying a motion seeking relief from the automatic stay to exercise a contractual triangular setoff right in a non-safe harbor contract).  Thus, there is no accumulated bankruptcy expertise to apply to the Motion to Compel, and the bulk of the motion rests on non-bankruptcy state and English law.

(4)   <u>Withdrawal of the Reference will Not Cause and will Minimize Forum Shopping</u>

The LBI Trustee's Motion to Compel is an action to collect over $345 million.  The LBI Trustee has improperly brought it by motion, when Bankruptcy Rule 7001(1) requires an adversary proceeding (commenced by complaint) for actions to recover money, as described in greater detail in RBS N.V.'s Motion.  Interestingly, the LBI Trustee has correctly brought other actions to recover money under derivative contracts as adversary proceedings.  *See* Citibank Adversary Complaint.  While this factor is not dispositive by itself because RBS N.V. can make and has made this argument to the Bankruptcy Court, the LBI Trustee's shenanigans certainly tilt towards granting RBS N.V. a forum with an Article III judge.  The Supreme Court noted the twin policies underlying Article III judicial power include the litigant's liberty interest in knowing the judge is free of outside influences.  *Stern v. Marshall*, 131 S. Ct. at 2609 (quoting 1 Works of James Wilson 363 (J. Andrews ed. 1896)) ("By appointing judges to serve without term limits, and restricting the ability of the other branches to remove judges or diminish their salaries, the Framers sought to ensure that each judicial decision would be rendered, not with an eye toward currying favor with Congress or the Executive, but rather with the '[c]lear heads … and honest hearts' deemed 'essential to good judges'").

Here, the government has not been bashful about trying to influence outcomes.  It was behind the LBI SIPA proceeding and the quickie sale of Lehman's businesses since before the commencement of Lehman's insolvency cases.  At the outset of the Lehman cases, government officials worked with the Lehman debtors in connection with the sale of virtually all of Lehman's businesses for approximately $250 million and the value of certain buildings that went with them.  *See, e.g.*, Hearing Tr. at 17:12-22:11, No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 17, 2008) [Bankr. Ct. Docket No. 352] ("There would be at a point in time … the

commencement of a proceeding under the Securities Investor Protection Act.  And a designated trustee would be appointed immediately and there would be, in effect, Your Honor, concurrent hearings … both in the SIPC proceeding and in the Chapter 11 cases … And I have to inform Your Honor that what has gone on in the last four or five days … is [in] complete cooperation with the regulators, the Securities and Exchange Commission, the Federal Reserve Bank, and the Securities Investor Protection Corporation").

Moreover, government officials appeared in the Bankruptcy Court to make statements urging the Bankruptcy Court to approve the sale.  *See*, *e.g.*, *id*. at 65:5-67:5 (statements in support of the then-proposed sale by counsel for the Federal Reserve Bank of New York and counsel for the Securities and Exchange Commission); Hearing Tr. at 75:24-79:8, No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 19, 2008) [Bankr. Ct. Docket No. 6715] (statement in support of the then-proposed sale by the LBI Trustee).

The Bankruptcy Court granted the relief Lehman requested over creditors' objections and notwithstanding that the statutory creditors' committee announced that it did not even have time to develop a position on the sale.  *Id*. at 67:7-68:18 ("We're not affirmatively supporting the transaction, Your Honor, because there has been insufficient time for us to really do all the due diligence that we … feel should be done to take that next step of saying yes, this is the best deal and we're supportive actively … we have not had time to test the assumptions and do all the due diligence we would normally do").

Later, LBHI realized it was a bad deal and unsuccessfully sued to recover at least $5 billion from the purchaser.  *See In re Lehman Bros. Holdings Inc.*, 445 B.R. 143 (Bankr. S.D.N.Y. 2011) (Judge Peck's opinion on motions seeking modification of the sale order pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, the LBI Trustee's motion for

relief from the sale order, Barclays' cross-motion to enforce the sale orders, and adjudication of related adversary proceedings).   The LBI Trustee's strategic decisions here should not be rewarded and are yet another factor in favor of withdrawing the reference.  *See*, *e.g.*, *In re U.S. Brass Corp.*, 110 F.3d 1261, 1265 (7th Cir. 1997) ("The use of the Bankruptcy Code to obtain a favorable forum should not be encouraged"); *Vornado Realty Trust v. Stop & Shop Supermarket Cos. (In re Bradlees, Inc.)*, No. 04-cv-500, 2005 WL 106794, at *8 (S.D.N.Y. Jan. 19, 2005) ("Vornado's forum shopping should not be rewarded"); *Lawrence Grp., Inc. v. Hartford Cas. Ins. Co. (In re Lawrence Grp., Inc.)*, 285 B.R. 784, 788-89 (N.D.N.Y. 2002) ("prevention of forum shopping" favors withdrawal of the reference).

> (5)   Withdrawal of the Reference Will Not Adversely Affect the Uniformity of the Bankruptcy Administration

Withdrawal of the Bankruptcy Court's reference cannot have an adverse effect on the uniformity of the bankruptcy administration because the District Court is the only court empowered to render final judgments on the LBI Trustee's contract action in the first place.  *See*, *e.g.*, *M. Fabrikant & Sons, Inc. v. Long's Jewelers Ltd.*, No. 08-cv-1982, 2008 WL 2596322, at *4 (S.D.N.Y. June 26, 2008) ("Withdrawing the reference would not hamper uniform administration of the bankruptcy code because this case is a 'non-core' proceeding"); *VWE Group*, 359 B.R. at 451 (finding that withdrawal of the reference of a non-core claim will not "adversely affect the uniformity of bankruptcy administration" when the claim "(a) is not brought under bankruptcy law; (b) arose prior to and independent of the Debtor's bankruptcy filing; and (c) does not otherwise concern administration of the bankruptcy estate"); *Michaelesco v. Shefts*, 303 B.R. 249, 254 n.6 (D. Conn. 2004) ("Because the instant dispute is non-core, it is not likely to have much impact on the uniformity of bankruptcy administration"); *FMI*

*Forwarding*, 2004 WL 1348956, at *7 (withdrawing the reference because the claim in question "does not … concern administration of the bankruptcy estate").

## CONCLUSION

WHEREFORE RBS N.V. respectfully requests that the District Court enter an order withdrawing the reference of the Motion to Compel and grant RBS N.V. such other and further relief as the District Court deems appropriate.

Dated:  August 16, 2011
      New York, New York

Respectfully Submitted,

/s/ Martin J. Bienenstock
Martin J. Bienenstock
Irena M. Goldstein
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

*Attorneys for The Royal Bank of Scotland N.V. (Formerly Known as ABN AMRO Bank N.V.)*