Richard G. Menaker
Samuel F. Abernethy
Steven J. Purcell
Karen Kim
MENAKER & HERRMANN LLP
10 East 40th Street
New York, New York 10016
Telephone: (212) 545-1900
Facsimile: (212) 545-1656

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation
of Lehman Brothers Inc.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>    LEHMAN BROTHERS INC.,<br><br>                        Debtor. | 11 Civ. 05709 (NRB)<br><br>Bankr. Case No. 08-01420 (JMP)<br>SIPA |
| THE ROYAL BANK OF SCOTLAND N.V.,<br><br>                        Movant,<br><br>            v.<br><br>JAMES W. GIDDENS, AS TRUSTEE FOR<br>SIPA LIQUIDATION OF LEHMAN<br>BROTHERS INC.,<br><br>                        Respondent. | |

**SIPA TRUSTEE'S MEMORANDUM IN OPPOSITION TO**
**THE ROYAL BANK OF SCOTLAND N.V.'S MOTION FOR ORDER**
**WITHDRAWING PRIOR REMOVAL TO BANKRUPTCY COURT**
**AND IN SUPPORT OF SUMMARY JUDGMENT**

## Table of Contents

Table of Authorities ........................................................................................ ii

Summary of Argument ....................................................................................1

Statement of the Case.....................................................................................4

A.     The SIPA Liquidation ...................................................................5

B.     ABN's "Early Termination" of the ISDA Master Agreement.................................6

C.     Proceedings in the Bankruptcy Court ...................................................10

Argument......................................................................................................12

I.     RBS Is Withholding Property of the LBI Estate in Violation
       of the Automatic Stay and Liquidation Order.........................................12

       A.     RBS Has Admitted That It Is Withholding
              "Property of the Estate." ..........................................................12

       B.     RBS Engaged In a Post-Petition "Triangular" Setoff in Violation
              of the Stay .........................................................................14

II.    RBS's Setoff Cannot Be Upheld as a Matter of Law ............................................15

       A.     The Questions Presented Are Purely Bankruptcy Law Issues.....................15

       B.     RBS's Setoff Violated the Mutuality Requirement
              of Section 553(a) of the Bankruptcy Code ....................................17

       C.     Section 560 of the Bankruptcy Code Is Not an Exception
              to the Mutuality Requirement ..................................................21

       D.     RBS's Violation of the Stay Warrants Denial of Setoff ............................19

III.   There Is No Basis for Withdrawal of the Removal ...........................................20

       A.     The Original Removal of This Proceeding to
              Bankruptcy Court Was Required by SIPA ..................................20

B. The Trustee's Motion Belongs in the Bankruptcy Court under Basic Bankruptcy Law ....................................................... 23

C. RBS's Various Arguments for Withdrawing the Removal Are Without Merit ................................................................................. 25

D. Resolution of the Trustee's Motion is Integral to the "Restructuring of the LBI-RBS Relationship" in Connection with LBI's SIPA Liquidation and RBS's Proof of Claim .................................. 28

IV. Whatever the Forum, the Trustee Is Entitled to Judgment as a Matter of Law ................................................................................. 31

Conclusion .................................................................................................. 32

## Table of Authorities

**Cases**

*Allstate Ins. Co. v. My Choice Medical Plan for LDM Technologies, Inc.,*
298 F.Supp.2d 651 (E.D. Mich. 2004) .......................................................................... 18

*Am-Haul Carting, Inc. v. Contractors Cas. & Sur. Co.,*
33 F.Supp.2d 235 (S.D.N.Y. 1998) ............................................................................... 13

*Auto Owners Ins. Co. v. Thorn Apple Valley, Inc.,*
31 F.3d 371 (6th Cir. 1994) .......................................................................................... 18

*Boston and Maine Corp. v. Chicago Pacific Corp.,*
785 F.2d 562 (7th Cir. 1986) ........................................................................................ 18

*Cohen v. Sav. Bldg. & Loan Co.,*
896 F.2d 54 (3d Cir. 1990) ........................................................................................... 29

*Elcona Homes Corp. v. Green Tree Acceptance, Inc. (In re Elcona Homes Corp.),*
863 F.2d 483 (7th Cir. 1988) ........................................................................................ 18

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.,*
No. 09-5122 2011 WL 2536101 (2d Cir. 2011) ........................................................... 19

*In re Bernard L. Madoff Inv. Sec. LLC,*
No. 10-2378-bk, 2011 WL 3568936 (2d Cir. 2011) ..................................................... 23

*In re Brown,*
734 F.2d 119 (2d Cir. 1984) ......................................................................................... 13

*In re Chan,*
355 B.R. 494 (Bankr. E.D. Pa. 2006) ........................................................................... 27

*In re Computer Comm'n, Inc.,*
824 F.2d 725 (9th Cir. 1987) ........................................................................................ 19

*In re Eastern Freight Ways, Inc.,*
577 F.2d 175 (2d Cir. 1978) ......................................................................................... 29

*In re 48th St. Steakhouse, Inc.,*
61 B.R. 182 (Bankr. S.D.N.Y. 1986) ............................................................................ 32

*In re Fugazy Express, Inc.*

982 F.2d 769, 776 (2d Cir. 1992) ................................................................19

*In re Lehman Bros. Holdings Inc.,*
  439 B.R. 811 (Bankr. S.D.N.Y. 2010) ........................................ 19, 25, 32

*In re Lehman Bros. Holdings Inc.,*
  433 B.R. 101 (Bankr. S.D.N.Y. 2010) ........................................................ 19

*In re Nemko, Inc.,*
  143 B.R. 980 (Bankr. E.D.N.Y. 1992) ...................................................... 13

*In re Operation Open City, Inc.,*
  170 B.R. 818 (Bankr. S.D.N.Y. 1994) ................................................ 14, 25

*In re Orion Pictures Corp.,*
  4 F.3d 1095 (2d Cir. 1993) ...................................................................... 24

*In re Salander O'Reilly Galleries,*
  No. 07-30005, 2011 WL 2837494 (Bankr. S.D.N.Y.) .................................. 24

*In re SemCrude, L.P.,*
  399 B.R. 388 (Bankr. D. Del. 2009)........................................................... 17

*In re Smith Corona Corp,*
  205 B.R. 712 (D. Del. 1996) .................................................................... 27

*In re United States Lines, Inc.,*
  197 F.3d 631 (2d Cir. 1999) ............................................................... 14, 29

*Langenkamp v. Culp,*
  498 U.S. 42 (1990) .................................................................................. 31

*MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.,*
  882 F.2d 615 (2d Cir. 1989) .................................................................... 20

*NLRB v. Bildisco & Bildisco,*
  465 U.S. 513 (1984) ................................................................................. 18

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,*
  458 U.S. 50 (1982) .................................................................................. 26

*Official Comm. of Unsecured Creditors of Operation Open City, Inc. v.*
   *N.Y. Dep't of State,*
   148 B.R. 184 (Bankr. S.D.N.Y. 1992) ........................................................ 25

*Official Committee of Unsecured Creditors of Tousa, Inc. v. Citicorp*
*North America, Inc. (In re Tousa, Inc.), No. 08-1435,*
   JKO, 2009 WL 3519403 (Bankr. S.D. Fla. 2009)....................................... 18

*Picard v. HSBC Bank PLC,*
   Nos. 11 Civ. 763, 11 Civ. 836, 2011 WL 1544494 (S.D.N.Y. April 25, 2011)............ 23

*Prudential Ins. Co. of America v. Doe,*
   140 F.3d 785 (8th Cir. 1998)..................................................................... 18

*Resolution Trust Corp. v. Best Prods. Co., Inc. (In re Best Products Co., Inc.),*
   68 F.3d 26 (2d Cir. 1995) .......................................................................... 29

*S.E.C. v. American Bd. of Trade, Inc.,*
   830 F.2d 431 (2d Cir. 1987) ...................................................................... 23

*SEC v. Brennan,*
   230 F.3d 65 (2d Cir. 2000)........................................................................ 14

*Sherman v. First City Bank of Dallas (In re United Sciences of America, Inc.),*
   893 F.2d 720 (5th Cir. 1990) ..................................................................... 17

*Shugrue v. Fischer,*
   164 B.R. 839 (S.D.N.Y. 1994) .................................................................. 20

*Snodgrass v. New Century Mortg. Corp.,*
   358 B.R. 675 (S.D. W. Va. 2006) .............................................................. 27

*Stern v. Marshall,*
   13_U.S._ S. Ct. 2594 (2011) ................................................. 15, 16, 30, 31

*Swedbank AB v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.),*
   445 B.R. 130 (S.D.N.Y. 2011) .................................................................... 4

**Statutes and Rules**

11 U.S.C. § 362 ............................................................................................. 11

11 U.S.C. § 362(a)........................................................................................... 2

11 U.S.C. § 506(a)................................................................................................ 28

11 U.S.C. § 704................................................................................................... 21

15 U.S.C. § 78aaa............................................................................................... 21

15 U.S.C § 78eee(b)(4) ......................................................................................... 3

28 U.S.C. § 157(b) ............................................................................... 3, 22, 24, 30

28 U.S.C. § 157(b)(2)................................................................................... 24, 30

28 U.S.C. § 157(b)(2)(B) ..................................................................................... 31

28 U.S.C. § 157(b)(2)(G) ..................................................................................... 24

28 U.S.C. § 157(b)(2)(O) ....................................................................................... 2

28 U.S.C. § 157(c)(1)................................................................................ 1, 32, 33

28 U.S.C. § 157(d) .............................................................................................. 23

## Rules and Orders

Bankruptcy Rule 9014.................................................................................2, 11, 12

Local Standing Order No. M-61 (1084)................................................................3

## Other Authorities

S. Harbeck, Stockbroker Bankruptcy: The Role of the
   District Court and the Bankruptcy Court under the
   Securities Investor Protection Act, 56 Am. Bankr. L.J. 277 (1982) ............................ 21

## SIPA TRUSTEE'S MEMORANDUM IN OPPOSITION TO
## THE ROYAL BANK OF SCOTLAND N.V.'S MOTION FOR ORDER
## <u>WITHDRAWING PRIOR REMOVAL TO BANKRUPTCY COURT</u>

James W. Giddens (the "Trustee"), as Trustee for the liquidation of the business of Lehman Brothers Inc. ("Debtor" or "LBI") pursuant to the Securities Investor Protection Act of 1970, as amended ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, respectfully submits this memorandum in opposition to the motion of The Royal Bank of Scotland, N.V. ("RBS") to withdraw the prior removal of this case to the Bankruptcy Court under SIPA § 78eee(b)(4).  In the event withdrawal is granted, the Trustee submits that this proceeding is ripe to proceed promptly to summary judgment, either before this Court or, pursuant to 28 U.S.C. § 157(c)(1), to the Bankruptcy Court for proposed findings of fact and conclusions of law.

RBS seeks by its motion to return to this Court a core proceeding in the Bankruptcy Court in which there is no disputed issue of fact. On May 14, 2009, eight months after Judge Lynch removed the SIPA liquidation of LBI to the Bankruptcy Court, RBS admitted in writing that it owed the LBI estate a "Close-out Amount" from currency trading which, after subtracting $1,562,719 owed by LBI to RBS, comes to $345,938,625.  This admitted sum is property of the LBI estate as a matter of law. RBS has nevertheless refused to return that property, alleging that it and an RBS affiliate have claims against two affiliates of LBI and that another RBS affiliate has a claim against LBI, all of which it claims a right to set off.  But bankruptcy law is clear that the non-mutual setoffs claimed by RBS are impermissible.  Section 553(a) of the Bankruptcy

Code bars setoff of non-mutual claims, even if state law would permit it. Moreover, as this Court held in *Swedbank*, affirming the Bankruptcy Court, the Bankruptcy Code "safe harbors" do not create an exemption from the mutuality requirement of Section 553(a).

Because the dispute was ripe for determination in the Bankruptcy Court as a "contested matter" under Bankruptcy Rule 9014 and as a "core" matter under Section 157(b)(2) of the Judiciary Code, the Trustee moved in the Bankruptcy Court for resolution of the issue. RBS obtained a consent adjournment of the Trustee's motion. Then RBS interposed its own expedited motion in the Bankruptcy Court for an order dismissing the Trustee's motion on the ground that it was supposedly the wrong procedure for the relief sought, or alternatively, (i) converting the Trustee's motion to an adversary proceeding complaint, (ii) requiring application of the Part VII Bankruptcy Rules, and (iii) staying the entire proceeding  pending a decision by this Court on a motion it intended to file to withdraw the case from the Bankruptcy Court. Two weeks later, RBS filed the present motion in this Court.

The motion should be denied. The underlying case is a classic "core" bankruptcy matter in the context of a SIPA proceeding. RBS is a creditor which has filed a proof of claim while also holding property of the Debtor's estate. Its refusal to return the property has led to the Trustee's motion "affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor ... relationship," a core proceeding under 28 U.S.C. § 157(b)(2)(O). And RBS's post-filing, cross-affiliate setoff involving non-mutual relationships, in violation of 11 U.S.C. § 362(a) and the SIPA Liquidation Order, significantly concerns "the administration of the estate" and the "allowance or

disallowance of claims against the estate" under § 157(b)(2)(A) and (B), which are also core matters.

Contrary to RBS's argument, the case is not fundamentally about New York or English contract law. RBS admits that it owes the sum in question, so contract interpretation is not implicated. The main issues are pure questions of bankruptcy law – (i) whether the mutuality requirement of Bankruptcy Code § 553(a) bars the cross-affiliate ("triangular") setoff claimed by RBS, and (ii) whether the safe harbor of Bankruptcy Code § 560 provides an exemption from the mutuality requirement of Section 553(a). Both are issues suited for and typically heard by the Bankruptcy Court, both in SIPA cases and in conventional bankruptcies, with the parties' constitutional rights, if any, reserved by the availability of review in the District Court.

These points are reinforced by the fact that the LBI liquidation, as a case brought under SIPA, was mandatorily *removed* to the Bankruptcy Court under 15 U.S.C § 78eee(b)(4) rather than referred under 28 U.S.C. § 157(b) and Local Standing Order No. M-61 (1984). The SIPA basis for Bankruptcy Court jurisdiction raises the bar RBS must surmount to persuade this Court that revocation of the removal is somehow warranted. Congress's intent to have stock brokerage liquidations administered in the Bankruptcy Courts (in the absence of supervening constitutional limitations) is stated in the SIPA legislation. In any event, the case for retaining Bankruptcy Court jurisdiction here is so compelling under a conventional bankruptcy analysis that the Court need not reach the question of whether SIPA bars revocation of the original removal.

While the Trustee favors retention of proceedings in the Bankruptcy Court,

the proper concerns should be efficiency, speed, minimized expense, and adherence to constitutional requirements. If this Court determines that the original removal to the Bankruptcy Court should be revoked as to RBS, then the Trustee requests that this Court "fast track" this proceeding to the summary judgment stage, since there are no issues of material fact and the Trustee is entitled to judgment as a matter of law.  If the Court retains jurisdiction and does not grant summary judgment, the Trustee suggests that the matter be sent back to the Bankruptcy Court for recommended findings and conclusions pursuant to 28 U.S.C. §157(c)(1).

## STATEMENT OF THE CASE

### A.    The SIPA Liquidation

The Court is familiar with the general outlines of the Lehman Brothers bankruptcy as a result of the appeal in *Swedbank AB v. Lehman Bros. Holdings Inc.* (*In re Lehman Bros. Holdings Inc.*), 445 B.R. 130 (S.D.N.Y. 2011). The present case involves a proceeding related to, but distinct from, the Chapter 11 case in which the *Swedbank* matter arose. Specifically, LBI was the U.S. broker-dealer for the Lehman group of companies. When the Lehman enterprise failed, LBI was subject to special liquidation procedures under SIPA rather than conventional bankruptcy under Title 11 of the United States Code.

On September 19, 2008, the Honorable Gerard E. Lynch, United States District Judge, Southern District of New York, entered the Order Commencing Liquidation of LBI (the "Liquidation Order"), finding that LBI's customers were in need of protection and commencing liquidation of LBI pursuant to the provisions of SIPA in

the case captioned *Sec. Inv. Prot. Corp. v. Lehman Bros. Inc.*, No. 08 CV.8119 (GEL).

The Liquidation Order, *inter alia*, (i) appointed James W. Giddens trustee for the

liquidation of the business of LBI pursuant to SIPA § 78eee(b)(3); and (ii) removed the

case to the United States Bankruptcy Court for the Southern District of New York

pursuant to SIPA § 78eee(b)(4), with the case captioned *In re Lehman Brothers Inc.*,

Case No. 08-01420 (JMP) SIPA (the "SIPA Proceeding").

  The Trustee is charged with liquidation of the business of LBI pursuant to

the provisions of 78eee(b)(3) of SIPA and the orders of this Court and the Bankruptcy

Court.  The Trustee is vested by SIPA with the same powers and rights to avoid transfers

as a trustee in a case under Title 11, 15 U.S.C.A. § 78fff-1(a), and is also specifically

authorized by SIPA to recover property transferred by the debtor that would have been

customer property if the transfer were held voidable under the Bankruptcy Code. The

Liquidation Order accordingly authorized the Trustee to take immediate possession of the

property of LBI and notified all persons that the automatic stay provisions of Bankruptcy

Code section 362(a) operate as a stay of, among other things, "any act to obtain

possession of property of the estate or property from the estate" (*id.* ¶¶ I, II, III.C, XII and

XIV).  The Liquidation Order also ordered that all entities are stayed and enjoined from

directly or indirectly retaining or setting off, or interfering with any assets or property

owned by LBI (*id.* ¶ IV).

  In the course of the Trustee's ongoing efforts to effect the liquidation of

LBI and administer the LBI estate, and in furtherance of his duty to return SIPA-defined

customer property to customers while maximizing the general estate for all creditors, the

Trustee has acted to marshal assets and recover value from the unwinding of derivatives transactions among LBI and other entities.  The unwind efforts cover foreign exchange relationships such as the one at issue here (Trustee's Fifth Interim Report, ¶¶ 131-34 Bankr. Ct. Docket No. 4245). Marshaling assets from the unwinding of financial transactions has a direct impact on the Trustee's ability to fulfill his duty to return customer property to LBI's public customers because amounts recovered from the counterparties will, in part, be allocated to customers (*See* Trustee's Third Interim Report, at 17, ¶ 56, Bankr. Ct. Docket No. 3244).

**B.    ABN's "Early Termination"of the ISDA Master Agreement**

The case now before the Court concerns one of several circumstances in which the Trustee has needed court intervention to deal with LBI estate assets in the hands of a third-party creditor.  For many years LBI and ABN AMRO Bank N.V. ("ABN") were foreign exchange ("FX") counterparties under a March 16, 1998 master agreement in the form published by the International Swap Dealers Association (the "ISDA Master Agreement").[1] As explained below, ABN recently became known as The Royal Bank of Scotland N.V. (referred to hereinafter as "RBS") and is now an affiliate of other entities in the RBS group of companies.

The ISDA Master Agreement was amended by a March 31, 2004 Amendment Agreement and an ISDA Credit Support Annex (respectively, the "Amendment Agreement" and "Credit Support Annex") (Goldstein Decl., Ex. A-1).

---

[1]  A copy of the ISDA Master Agreement is annexed as Ex. E to the Declaration of Irena Goldstein, dated August 16, 2011 ("Goldstein Decl.) submitted by RBS.

Under the Credit Support Annex, LBI transferred cash collateral to ABN as security for the foreign exchange transactions LBI and ABN entered into with each other. LBI and ABN were later parties to an August 29, 2008 Close-out Amount Multilateral Agreement entered into by 91 parties, which further amended the ISDA Master Agreement (Goldstein Decl., Ex. J, ¶ 14). The terms of these governing agreements are not in dispute.

On or about September 14, 2008, ABN gave notice to LBI under Section 6(a) of the ISDA Master Agreement of an event of default under that agreement and designating an Early Termination Date of September 15, 2008. On September 15, 2008, Lehman Brothers Holdings, Inc. ("LBHI") filed for protection under Chapter 11 of the United States Bankruptcy Code. The SIPA liquidation proceeding of LBI followed on September 19, 2008.

Thereafter, ABN delivered a second notice to LBI under Section 6(a) of the ISDA Master Agreement, dated September 22, 2008,  again advising of an event of default under that agreement and designating an Early Termination Date of September 22, 2008 ("Early Termination Date") (Goldstein Decl. Ex. J, ¶ 16).  As of the September 22 Early Termination Date, there were 247 active FX transactions subject to the ISDA Master Agreement, either open or terminated but not settled, between ABN and LBI.  In addition, as of the Early Termination Date, ABN was holding $53,999,000 in cash received from LBI as security for FX transactions between it and LBI under the terms of the Credit Support Annex (*id.* Ex. A-2).  At no time did RBS claim any ownership interest in the cash, except to the extent it purported to engage in a post-filing "triangular"

setoff as described below.

The ISDA Master Agreement, Section 6(d), provides that when a party declares an early termination as the result of an event of default, the terminating party must provide a statement showing the net amounts owed under the Agreement. In accordance with that provision, by letter dated May 14, 2009, ABN, using The Royal Bank of Scotland letterhead,[2] submitted a formal Section 6(d) statement acknowledging that it owed LBI a "Close-out Amount" of $347,501,344 (Goldstein Decl., Ex. A-2). ABN arrived at that figure by adding up the amounts LBI owed to it from FX transactions and by netting those amounts against the amounts "owed by ABN" to LBI. ABN represented that the net balance was in LBI's favor, consisting of the $53,999,000 in cash collateral and the balance ($293,502,344) constituting unpaid termination currency equivalent value (*id.* p. 2).

ABN's May 14, 2009 Section 6(d) statement did not, however, acknowledge ABN's obligation to return the admitted Close-out Amount to the LBI estate. Instead, ABN asserted that under a document entitled "Terms of Agreement," another entity called "RBS Securities, Inc. (f/k/a Greenwich Capital Markets, Inc.) (d/b/a/ RBS Greenwich Capital) and each of its affiliates"[3] were entitled to set off not just

---

[2]  85.6% of the equity of ABN was acquired on October 17, 2007, by a consortium that included The Royal Bank of Scotland plc. Following several further organizational and ownership changes, ABN was legally renamed The Royal Bank of Scotland N.V. As of April 1, 2010, it became a direct subsidiary of an entity called RBS Holdings N.V., which is currently 98% owned by The Royal Bank of Scotland Group plc., with the remaining 2% being held by Banco Santander, S.A. and the Dutch State. *See* accompanying Declaration of Richard G. Menaker, dated September 13, 2011 ("Menaker Decl.") Ex. A.

[3]  Effective April 1, 2009, Greenwich Capital Markets, Inc. changed its name to RBS Securities, Inc., which is a wholly owned subsidiary of RBS Holdings USA Inc. (f/k/a/ Greenwich Capital Holdings, Inc.).

against a debt of LBI but against debts of Lehman affiliates, including specifically Lehman Brothers International (Europe) and Lehman Brothers Special Financing Inc. (*id.* p. 3). ABN advised that it was "exercising [its] right of set-off" in connection with such cross-obligations (*id.*). RBS subsequently provided the Trustee with a copy of the "Terms of Agreement" in question, which states that it confirms transactions between Greenwich Capital Markets, Inc., and an unnamed "Customer" (Goldstein Decl. Ex. G). Greenwich Capital Markets, Inc., was not a party to the ISDA Master Agreement, and the "Close-out Amount" calculated in ABN's Section 6(d) statement does not relate to any FX transactions involving that entity (*id.* Ex. A-2, p. 2).

Eight days after delivering its Section 6(d) statement, on May 22, 2009, ABN filed a proof of claim in the LBI liquidation proceeding, (Goldstein Decl. Ex. H). The ABN proof of claim contains a claim for $1,562,717.39 against the LBI estate, consisting of unpaid underwriting fees payable by LBI to ABN less an amount payable by ABN to LBI under a Master Securities Loan Agreement. The proof of claim does not list any amount due from LBI to ABN in connection with the ISDA Master Agreement. Instead, the proof of claim begins with the following heading: "Amount payable by [ABN] to LBI under the Master Agreement Prior to Setoff: $347,501,344.00." (*Id.*)  Net of the claimed amount (and without reference to setoff) the balance owed by ABN to the LBI estate is $345,938,625, (referred to hereinafter as the "Withheld Funds").

---

RBS Holdings USA is an indirect wholly owned subsidiary of The Royal Bank of Scotland plc, which in turn is a wholly-owned direct subsidiary of The Royal Bank of Scotland Group plc. (Menaker Decl. Ex. B).

**C.       Proceedings in the Bankruptcy Court**

      The Trustee promptly attempted to recover the Withheld Funds outside the formal liquidation proceedings in the Bankruptcy Court. In a letter dated June 24, 2009, the Trustee explained his disagreement with the triangular setoff claimed by ABN and requested delivery of the sum ABN admitted to be due (Menaker Decl. Ex. C). ABN responded in a letter dated August 25, 2009, claiming setoff rights on account of obligations (i) that LBI affiliate Lehman Brothers International (Europe) ("LBIE") allegedly owed to ABN, (ii) that LBI allegedly owed to RBS's affiliate, The Royal Bank of Scotland plc ("RBS plc"), and (iii) that LBI affiliate Lehman Brothers Special Financing Inc. ("LBSF") allegedly owed to RBS plc (together, the "Alleged Setoffs") (*id.* Ex. D). The relationships on which the Alleged Setoffs were said to be based may be diagrammed as follows:



**<u>RBS' Admitted Net Liability to LBI</u>**

**<u>Alleged Obligations of LBI and Its Affiliates to RBS Entities</u>**

ABN argued in its August 25, 2009 letter that LBI had agreed to the triangular setoff involving ABN affiliates and LBI affiliates under the "Terms of Agreement," which bypassed the mutuality requirement of Section 553(a) of the Bankruptcy Code. In addition, ABN argued that the safe harbor for swap agreements in Section 560 of the Bankruptcy Code exempted ABN and the various RBS affiliates from the mutuality limitations of the Code. Thus, while there is no dispute as to the amount owed by ABN to the LBI estate, there remains a legal disagreement between the parties as to whether triangular setoff is permitted.

       The Trustee and ABN thereafter entered into a tolling and standstill agreement to enable the parties to discuss the matter further in the hope of reaching an amicable resolution (Menaker Decl. Ex. E). Information was shared between the LBI estate office and ABN during 2010 to permit verification of the amounts in question. In early 2011 (after ABN's name had been changed to RBS), counsel for the Trustee made contact with RBS's counsel, and settlement discussions ensued concerning the Withheld Funds. By June 2011, however, it became clear that judicial intervention would be necessary. On June 29, 2011, the Trustee commenced a contested matter under Bankruptcy Rule 9014 in the liquidation proceeding by motion (i) seeking a declaration from the Bankruptcy Court that ABN (now known as RBS) had violated the automatic stay of 11 U.S.C. § 362 in retaining the Withheld Funds and (ii) compelling payment thereof as wrongfully withheld property of the LBI estate.

ARGUMENT

I.    **RBS Is Withholding Property of the LBI Estate in Violation of the Automatic Stay and Liquidation Order.**

The dispute between the Trustee and LBI is a core bankruptcy proceeding involving the wrongful withholding of property of the estate in violation of the automatic stay. Thus, the Trustee's motion was properly brought in the Bankruptcy Court pursuant to Sections 105(a) and 362 of the Bankruptcy Code, the Liquidation Order and Bankruptcy Rule 9014. As explained below, RBS violated the automatic stay by engaging in an improper cross-affiliate setoff against funds that by its own admission belonged to the LBI estate. There are no issues of fact or of state (or English) law. The only issues relevant to the Trustee's motion are purely matters of bankruptcy law.

A.    **RBS Has Admitted That It Is Withholding "Property of the Estate."**

As RBS acknowledges in its motion, RBS has conceded that it owed LBI $347,501,344 as a "Close-Out Amount" under the LBI-RBS N.V. ISDA Agreement (RBS Mot. 12; *see also* Goldstein Decl., Ex. H). RBS arrived at that figure by adding up the amounts owed to it by LBI and by netting those amounts against the amounts owed by RBS to LBI. This net balance in LBI's favor consisted of $53,999,000 in cash collateral and $293,502,344 in unpaid termination currency equivalent value under the agreement (*id.* at 2).

Rather than pay this amount to the LBI estate or at least hold it in escrow while promptly seeking relief from the stay, RBS elected unilaterally to engage in a cross-affiliate ("triangular") setoff. Specifically, RBS asserted that under a document

entitled "Terms of Agreement," another entity called "RBS Securities, Inc. (f/k/a Greenwich Capital Markets, Inc.) (d/b/a/ RBS Greenwich Capital) and each of its affiliates" were entitled to set off any obligation owing by them to LBI against any obligation owing by LBI and various Lehman affiliates, and then purported to "set off" over $917,000,000 in claims against LBI and two such affiliates – Lehman Brothers International (Europe) and Lehman Brothers Special Financing Inc. (*id.* p. 3).

   Having converted LBI's property into "RBS's cash" by virtue of the cross-affiliate post-petition setoff, RBS now denies that it holds "property of the estate" and argues that the dispute instead is over a contractual "failure to pay" (RBS Mot. 7, 22; *see also id.* at 24-25 (contending that "no property of the estate is involved" after RBS's triangular setoff "reduced to zero" what RBS admitted it owed to LBI)).  But RBS's position assumes that its setoff was valid, which is not the case as a matter of law.

   Section 541(a) of the Bankruptcy Code defines "property of the estate" as "all legal or equitable interests of the debtor."  Courts have accorded this definition of property "the broadest possible interpretation."  *In re Brown*, 734 F.2d 119, 123 (2d Cir. 1984).  Of particular importance here, courts have found that "[a]n admitted liability owed to a debtor under a contract," such as the $347,501,344 Close-Out Amount RBS acknowledged it owed LBI under the ISDA Agreement, "is property of the estate." *In re Nemko, Inc.*, 143 B.R. 980, 985 (Bankr. E.D.N.Y. 1992); *see also Am-Haul Carting, Inc. v. Contractors Cas. & Sur. Co.*, 33 F. Supp.2d 235 (S.D.N.Y. 1998) (concluding that funds withheld by general contractor were "property of the estate" of the debtor-subcontractor because the former "has admitted that it owes this liability" to the latter).

This critical and for RBS *conceded* fact separates the instant case from the *Northern Pipeline* line of cases on which RBS principally relies (RBS Mot. 19). In those cases, there was no admission of liability and thus no established fact that the creditor was holding "property of the estate."

**B.    RBS Engaged In a Post-Petition "Triangular" Setoff in Violation of the Stay.**

Of central importance in any bankruptcy or liquidation proceeding, the automatic stay "is intended 'to allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas.'" *SEC v. Brennan*, 230 F.3d 65, 70 (2d Cir. 2000), quoting *In re United States Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999). Violations of the stay defy the authority of the bankruptcy court and threaten to disrupt its ability to carry out its mandate. Thus, it is well established that "actions taken in violation of the stay are void and without effect." *In re 48th Street Steakhouse, Inc.*, 835 F.2d 427, 431 (2d Cir. 1987).

RBS argues that, despite the stay, it was "contractually entitled to exercise setoff rights payable by it as of the Early Termination Date under the LBI-RBS N.V. ISDA Agreement" (RBS Mot. 13). But it is axiomatic that a party cannot "contract out" of a duty to abide by the stay. *In re Operation Open City, Inc.*, 170 B.R. 818, 825 (S.D.N.Y. 1994). After the stays went into effect, RBS was legally precluded from exercising any contract rights it claims to have with respect to moneys owed to the LBI estate unless it sought, and until it received, relief from the court. That never happened.

RBS instead chose the "self-help" approach, unilaterally seizing the money as if the stays did not exist, thereby forcing the Trustee to seek judicial intervention to enforce the stays. As explained in section II, D, below, this alone warrants denying RBS any right to setoff that it otherwise may have had.

## II.    RBS's Setoff Cannot Be Upheld as a Matter of Law.

In light of the foregoing, RBS's dilatory motivation for seeking to remove this dispute from the bankruptcy court is obvious.  The Bankruptcy Court is the forum primarily mandated by Congress to enforce the automatic stay of Section 362(a) of the Bankruptcy Code and the stays imposed under SIPA.  However, changing forums would not improve RBS's position on the merits.  Whatever the forum, RBS simply cannot prevail – there are no genuine questions of fact, and the Trustee is entitled to judgment as a matter of law.

## A.    The Questions Presented Are Purely Bankruptcy Law Issues.

According to RBS, the Trustee's motion involves a "prepetition contract action," which, RBS insists, requires adjudication by an Article III court  (RBS Mot. 19). In that connection, RBS argues that "the Supreme Court determined in *Stern v. Marshall* that an Article I bankruptcy court cannot exercise the essential attributes of Article III judicial power over a bankruptcy estate's prepetition state law counterclaim against a claimant[,] which is exactly what the LBI Trustee is asking the Bankruptcy Court to do here" (*id.* at 1).  That assertion is without merit.  The Trustee's motion in the Bankruptcy Court does not involve a "prepetition state law counterclaim."  The Trustee has sued to enforce the Bankruptcy Code and SIPA stays; he is not seeking interpretation of any

contract, nor is he claiming that RBS's exercise of a triangular setoff is a breach of contract.

The disputed contractual aspect of this matter arises from RBS's defense that it and its affiliates could engage in a triangular setoff following LBI's bankruptcy petition (notwithstanding the stays) under Section 560 of the Bankruptcy Code (RBS Mot. 2-3, 25, 28). Thus, the relevant question is whether *bankruptcy law* allows the setoff; whether there is an agreement by the parties that allows it is a red herring. The validity of that defense comes directly within the Bankruptcy Court's bailiwick, as it boils down to two pure bankruptcy law questions – (i) whether such a setoff is consistent with the mutuality requirement of Section 553(a), and if not, (ii) whether Section 560 of the Code is an exception to Section 553(a)'s mutuality requirement. Notably, RBS does not even mention the mutuality requirement in its papers.[4]

Contrary to RBS's position, *Stern v. Marshall* has no bearing on this dispute. The state law tort action at issue in that case, tortious interference with an expectation of a gift, was "in no way derived from or dependent upon bankruptcy law." 131 S. Ct. at 2618. In stark contrast to the situation in *Stern*, the Trustee's motion to enforce the stays in the wake of an improper post-petition setoff *by definition* "stems from the bankruptcy itself (*id.*)," as the majority decision in *Stern* put it, and thus falls squarely within the Bankruptcy Court's core jurisdiction.

---

[4] Similarly, RBS is incorrect in asserting that "there can be no determination of an automatic stay violation before the contract action is tried and determined" (RBS Mot. 10). RBS has admitted the liability; there is therefore no contested issue with respect to any contract to be "determined."

**B.    RBS's Setoff Violated the Mutuality Requirement
         of Section 553(a) of the Bankruptcy Code.**

The requirement that all setoffs be of mutual debts is a fundamental requirement of bankruptcy law.  It is codified in Section 553(a) of the Bankruptcy Code, which preserves any right of setoff that a creditor may have under applicable non-bankruptcy law, while imposing the additional requirement that any debt sought to be set off be a "mutual debt" – *i.e.*, a debt owing by the debtor to the creditor seeking to avail itself of the setoff.  *Citizens Bank v. Strumpf*, 516 U.S. 16, 18 (1995).

RBS concedes that the purported setoff at issue here does not involve "mutual debts" but instead constitutes an attempt by RBS to set off the debts it admittedly owed to LBI against obligations LBI owed to *entities other than RBS*, or that LBI *affiliates* owed to RBS (RBS Mot. 15).  RBS's conduct violates basic principles of bankruptcy and SIPA law.

RBS has no right to a "triangular setoff" as a matter of law.  The state of the law on this is clear.  Most recently, in a well-publicized decision, the Delaware Bankruptcy Court squarely held that the mutuality requirement of Bankruptcy Code § 553(a) precludes triangular setoff in bankruptcy even where the parties have a pre-petition agreement which explicitly provides for it.  *In re SemCrude*, L.P., 399 B.R. 388 (Bankr. D. Del. 2009), *aff'd* 428 B.R. 490 (D. Del. 2010).  Other courts have reached the same conclusion. *See, e.g., Sherman v. First City Bank of Dallas (In re United Sciences of America, Inc.)*, 893 F.2d 720, 723 (5th Cir. 1990) ("The mutuality requirement is designed to protect against 'triangular' set-off; for example, where the creditor attempts

- 17 -

to set off its debt to the debtor with the latter's debt to a third party."); *Elcona Homes Corp. v. Green Tree Acceptance, Inc. (In re Elcona Homes Corp.)*, 863 F.2d 483, 486 (7th Cir. 1988) ("the statute speaks of 'mutual debt' . . . and therefore precludes 'triangular' set offs").

        The mutuality requirement and other limitations imposed on setoff under Section 553 were Congress' way of ensuring that setoff in bankruptcy, and its attendant disruption of the priority and distribution principles of the bankruptcy process, would have reasonable limitations.  *See Boston and Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562, 565 (7th Cir. 1986).  The plain language of § 553(a) evinces Congress' intent to override state common law, and *a fortiori* foreign law, where such law might not require mutuality.  Any attempt by private parties to accomplish the same result by contract, namely an end-run around federal law in a bankruptcy proceeding, must be similarly ineffective.[5]  *See Official Committee of Unsecured Creditors of Tousa, Inc. v. Citicorp North America, Inc. (In re Tousa, Inc.)*, No. 08-1435-JKO, 2009 WL 3519403 at *76 & n. 50 (Bankr. S.D. Fla. 2009), citing *SemCrude*, 399 B.R. at 389; *Glenn v. Sutton (In re Sutton)*, 324 B.R. 624, 627 (Bankr. W.D. Ky. 2005).

---

[5] Courts have rejected contractual attempts by private parties to avoid requirements of federal law in other contexts.  *See Prudential Ins. Co. of America v. Doe*, 140 F.3d 785, 791 (8th Cir. 1998) ("parties may not contract to choose state law as the governing law of an ERISA-governed benefit plan."); *accord Allstate Ins. Co. v. My Choice Medical Plan for LDM Technologies, Inc.*, 298 F. Supp.2d 651, 655 (E.D. Mich. 2004) ("choice-of-law provision cannot be used to contract around or out of federal law.")  This result is consistent with the fact that ERISA, like the Bankruptcy Code itself, is designed to protect a broader constituency.  *See Auto Owners Ins. Co. v. Thorn Apple Valley, Inc.*, 31 F.3d 371, 375 (6th Cir. 1994) ("The underlying purpose of ERISA is to protect 'the interests of participants in employee benefit plans and their beneficiaries.'") (citation omitted); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522-23 (1984) (collective bargaining agreements subject to NLRA not exempt from provisions of Bankruptcy Code authorizing debtor-in-possession's rejection of executory contracts).

**C.** **Section 560 of the Bankruptcy Code Is Not an Exception to the Mutuality Requirement.**

        RBS argues that, notwithstanding the foregoing, Section 560 of the Bankruptcy Code authorizes its triangular setoff. The argument should be rejected. In a recent related case involving LBHI, Judge Peck ruled to the contrary and this Court affirmed. *In re Lehman Brothers Holdings Inc. (Swedbank)*, 433 B.R. 101, 110 (Bankr. S.D.N.Y. 2010), *aff'd* 445 B.R. 130, 133 (S.D.N.Y. 2010). RBS does not mention the *Swedbank* decision.

        The Trustee anticipates that 439 B.R. 811 RBS will attempt to argue that the Second Circuit's recent decision in *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, No. 09-5122 somehow supports RBS's interpretation of the safe harbors. It does not. *Enron Creditors Recovery Corp.* addressed the Section 546(e) safe harbor for "settlement payments" in the context of securities clearing. 2011 WL 2536101. That decision did not address, and indeed has nothing to do with, the Section 560 or 561 safe harbors or the mutuality requirement of Section 553(a).

**D.** **RBS's Violation of the Stay Warrants Denial of Setoff.**

        The stay is an integral part of the bankruptcy process – violations of the stay are not taken lightly. As the Ninth Circuit Court of Appeals stated, "[a]ll parties benefit from the fair and orderly process contemplated by the automatic stay and judicial relief procedure. Judicial toleration of an alternative procedure of self-help and post hoc justification would defeat the purpose of the automatic stay." *In re Computer Comm'n, Inc.*, 824 F.2d 725, 731 (9th Cir. 1987); *see also In re Fugazy Express, Inc.*, 982 F.2d

769, 776 (2d Cir. 1992) ("Nothing in the Code suggests that a party is entitled to engage in 'self help' in derogation of the automatic stay").

Courts have denied a setoff to creditors such as RBS who deliberately violated the stay. For instance, in *Blava In-Line v. Midatlantic Nat'l Bank/North*, the court stated that "[t]he bankruptcy court should deny setoff to those creditors who violate the automatic stay." 133 B.R. 33, 36 (Bankr. S.D.N.Y. 1991), citing *MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615, 618 (2d Cir. 1989). This Court has ruled similarly. *Shugrue v. Fischer*, 164 B.R. 839, 843 (S.D.N.Y. 1994) (denying setoff because "even if mutuality did exist, [creditor] would not be entitled to set off because of its disregard for, and violation of, the automatic stay.").

### III.   There Is No Basis for Withdrawal of the Removal.

As the above discussion shows, the underlying case is a classic "core" bankruptcy matter in the context of a SIPA proceeding. The Trustee's motion seeks to enforce the stays under Section 362(a) of the Bankruptcy Code and the SIPA Liquidation Order and ensure appropriate distribution among LBI's creditors. RBS's attempt to divest the Bankruptcy Court of its jurisdiction over that motion should be denied.

### A.   The Original Removal of This Proceeding to Bankruptcy Court Was Required by SIPA.

RBS's motion for "withdrawal of the reference" under Section 157 of the Judicial Code, 28 U.S.C. § 157(d), starts with a mistaken assumption – Section 157 was *not* the authority under which the proceedings were lodged in the Bankruptcy Court. This is a SIPA liquidation under the Securities Investor Protection Act of 1970, as amended,

15 U.S.C. § 78aaa, et seq., and has its own specific Congressional mandate separate and apart from a conventional bankruptcy. It is RBS's burden to demonstrate that this SIPA proceeding belongs in the District Court, not in the Bankruptcy Court where Congress explicitly declared it (and all SIPA liquidations) should be heard. RBS does not even attempt to meet that burden.

While SIPA is closely tied to the conventional bankruptcy process and expressly incorporates by reference much of the Bankruptcy Code,[6] the procedure by which a broker-dealer liquidation enters the courts differs from that applicable to a non-SIPA bankruptcy. *See* S. Harbeck, Stockbroker Bankruptcy: The Role of the District Court and the Bankruptcy Court under the Securities Investor Protection Act, 56 Am. Bankr. L.J. 277 (1982). When the Securities Investor Protection Corporation ("SIPC") determines that one of its broker-dealer members may fail to meet its obligations to its customers, it may apply for a "protective decree" in an appropriate United States District Court. SIPA § 78eee(a)(3). The court is required under SIPA to issue an immediate stay of efforts by creditors to enforce rights against the broker-dealer other than setoffs permitted under Section 553 of the Bankruptcy Code. *Id.* § 78eee(b)(2)(B)(iii). The court also appoints a trustee to carry out the liquidation. *Id.* § 78eee(b)(3). In the event the broker-dealer objects to issuance of a protective decree, the statute provides for an

---

[6] For example, SIPA § 78fff(b) provides that a liquidation proceeding brought thereunder "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 and subchapters I and II of chapter 7 of Title 11." These consist of all the provisions of the Bankruptcy Code applicable in a Chapter 7 liquidation (with the exception of the stockbroker and commodity broker provisions). SIPA § 78fff-1(8) grants to the SIPA Trustee "the same powers and title with respect to the debtor in the property of the debtor … As a trustee in a case under title 11." One of the enumerated powers of the trustee under Title 11 is the power to determine claims asserted against a debtor. *See* 11 U.S.C. § 704.

expedited hearing before the District Judge. *Id.* § 78eee(b)(1).

In the absence of objection, the District Court issues the decree and thereupon removes the entire liquidation proceeding to the Bankruptcy Court of the same District. SIPA *mandates* the removal and grants to the Bankruptcy Court "all the jurisdiction, powers and duties conferred by this chapter [i.e., SIPA] upon the court to which application for the issuance of a protective decree was made." *Id.* § 78eee(b)(1), (4). That is precisely what occurred here. On September 19, 2008, SIPC applied to this Court (Lynch, J.) for a protective decree with respect to LBI, resulting in issuance of the Liquidation Order.  James W. Giddens was appointed Trustee, and the stays were put in place in accordance with SIPA § 78eee(b) (*see* Liquidation Order, Goldstein Decl. Ex. F ¶¶ II, III-VII). Most significant for present purposes, the Liquidation Order explicitly "removed" all further proceedings in the SIPA liquidation to the Bankruptcy Court in accordance with SIPA § 78eee (b)(4) (*id.* ¶ XIII).

That procedure stands in marked contrast to the procedure applicable to conventional bankruptcies under 28 U.S.C. § 157(b), which provides that bankruptcy judges "*may* hear and determine all cases under title 11 and all core proceedings arising under title 11 … subject to review under section 158 of this title" (emphasis added). Reference of a conventional bankruptcy case to the Bankruptcy Court is thus discretionary.  As a practical matter, given the volume of cases and the expertise of bankruptcy judges, the District Courts uniformly refer conventional bankruptcy cases to the Bankruptcy Courts pursuant both to Section 157(b) and to Standing Orders issued in virtually every federal judicial district. *See, e.g.,* Standing Order of United States District

Court, Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.) (Menaker Decl. Ex. H).

Accordingly, the SIPA liquidation of LBI is taking place in the Bankruptcy Court under a Congressionally-mandated removal, not under the permissive provisions of Section 157 or the Standing Order of the Southern District. As the Court of Appeals has emphasized, the Bankruptcy Court, not the District Court, is the proper forum for the liquidation of a broker-dealer. *S.E.C. v. American Bd. of Trade, Inc.*, 830 F.2d 431, 436-38 (2d Cir. 1987) (criticizing the S.E.C.'s use of an equity receiver in District Court rather than liquidation of brokerage firm in the Bankruptcy Court).[7]

RBS never addresses this fundamental point, yet it bears the burden of demonstrating the legal basis for sending the case back to this Court. It has not even attempted to meet that burden here, and for that reason alone its motion should be denied.

**B.     The Trustee's Motion Belongs in the Bankruptcy Court under Basic Bankruptcy Law.**

Ignoring SIPA, RBS requests revocation of the removal under 28 U.S.C. § 157(d), which provides a district court with discretion to withdraw a proceeding from the bankruptcy court "for cause shown."  As shown below, RBS has not shown any cause

---

[7] Two recent withdrawals of removal have occurred in the Madoff SIPA liquidation, both of which are clearly distinguishable from this case. In *Picard v. Bernard L. Madoff Sec. LLC* (*In re Bernard L. Madoff*), No. 11 Civ. 0913, 2011 WL 2119720 (S.D.N.Y. May 23, 2011), and *Picard v. HSBC Bank PLC*, Nos. 11 Civ. 763, 11 Civ. 836, 2011 WL 1544494 (S.D.N.Y. April 25, 2011), judges of this Court withdrew jurisdiction from the Bankruptcy Court over adversary proceedings filed by the Madoff Trustee against third-party lenders for securities fraud on the ground that those cases required "significant interpretation of federal non-bankruptcy law." No such need to interpret federal non-bankruptcy law is claimed by RBS here. The Court of Appeals, significantly, has recently rejected any suggestion that SIPA is a federal non-bankruptcy law.  *In re Bernard L. Madoff Inv. Sec. LLC*, No. 10-2378-bk, 2011 WL 3568936 at*12 n.10 (2d Cir. Aug. 16, 2011) (stating that a SIPA proceeding is a "hybrid" bankruptcy proceeding).

for withdrawing this matter from the bankruptcy court. In deciding a motion to withdraw the reference, courts consider the following factors: (1) whether the claim or proceeding is core or non-core; (2) judicial economy; (3) uniform bankruptcy administration; (4) reduction of forum shopping; (5) presence of a jury demand. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993). The Trustee briefly responds below to various arguments RBS has made under Section 157(d), most of which overlap considerably with the above discussion of the merits.

       Core proceedings are "those that directly relate to a bankruptcy court's central functions. If a proceeding is core, the bankruptcy judge may determine the matter." *In re Salander O'Reilly Galleries*, No. 07-30005, 2011 WL 2837494 at *1 (Bankr. S.D.N.Y.). Here, the Trustee's motion to enforce the stays is basic to central functions of the bankruptcy process and thus is a core proceeding under at least three different provisions of 28 U.S.C. § 157(b)(2), specifically subsections (A) (matters concerning administration of the estate), (B) (allowance or disallowance of claims) and (O) (other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims).

       If RBS had complied with the stays, before it had exercised the triangular setoff, it still would have needed to bring a motion seeking relief from the stays, in which case the underlying issue – whether its proposed setoff was permitted – would have been the same. In that situation, the case would also clearly be a core proceeding. *See* 28 U.S.C. § 157(b)(2)(G). The fact that RBS's misconduct requires a court to consider that

- 24 -

question after the fact rather than prospectively does not change the substantive issues requiring decision, nor the appropriate forum for resolving those issues. In other words, by seizing property of the estate without seeking relief from the stay, RBS "has done nothing to alter the legal analysis as to the underlying issue . . . . the questions to be decided are purely legal, namely, *whether the funds taken by [the party] were properly subject to being set off under the circumstances and whether such a setoff is permissible under applicable law without first obtaining stay relief.*" *In re Lehman Bros. Holdings Inc.*, 439 B.R. 811, 816 (Bankr. S.D.N.Y. 2010) (emphasis added).

In short, RBS's aggressive conduct in engaging in a triangular setoff in the face of the stays cannot be used to hide the matter from being what it fundamentally is, namely, a core proceeding. *See Official Comm. of Unsecured Creditors of Operation Open City, Inc. v. N.Y. Dep't of State*, 148 B.R. 184, 191 (Bankr. S.D.N.Y. 1992), *aff'd*, 170 B.R. 318 (S.D.N.Y. 1994) (denying creditor's attempt at "an end run around the entire claims reconciliation process" through which creditor sought to "prevent[] th[e] Court from reviewing the propriety" of creditor's setoff, which the court found to have "blatantly violated the automatic stay."), *aff'd*, 170 B.R. 818 (S.D.N.Y. 1994). A party cannot act outside the law and then attempt to avoid Bankruptcy Court oversight of a core matter by interposing a defense based on state (or foreign) law.

**C.    RBS's Various Arguments for Withdrawing the Removal Are Without Merit.**

RBS asserts that the Trustee's motion raises issues that it would be unconstitutional for the Bankruptcy Court to consider (RBS Mot. 19-20). But, as the

discussion of the merits makes clear, there is no need for an Article III adjudication of anything in this case.  RBS has admitted liability; the only question concerns the propriety of its setoff defense in bankruptcy.    RBS relies extensively on *Northern Pipeline*, which has no bearing on the Trustee's motion because it involved an actual contract dispute.  The debtor there, in addition to asserting certain tort claims, claimed to be owed money under a contract and the creditor disputed it.  *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 56 (1982) (debtor "sought damages for *alleged* breaches of contract and warranty, as well as for *alleged* misrepresentation, coercion, and duress") (emphasis added).  In that factual setting, "involv[ing] a right created by *state* law, a right independent of and antecedent to the reorganization petition that conferred jurisdiction on the Bankruptcy Court," an adjudication of the state law contract action was required, which could only be done by an Article III court.  *Id.* at 84 (emphasis in original).

Here, RBS's admission of liability conclusively establishes that the sum held by RBS is property of the LBI estate.  The only issues are pure questions of bankruptcy law.  The Trustee relies on Section 553 of the Bankruptcy Code, not state law.  Whether RBS could engage in a cross-affiliate setoff against that admitted liability after LBI's bankruptcy is the only matter now requiring adjudication and that can be accomplished by the Bankruptcy Court without any constitutional impediment.

RBS repeatedly contends that this dispute "requires substantial consideration of English law" (RBS Mot. 8).  What issues of English law require consideration, exactly, RBS does not say.  RBS also mentions unspecified issues of New

York law without elaboration (*id.* at 28). RBS's reticence on this subject is understandable: there simply are no such issues of state or English law to be decided. The validity of RBS's cross-affiliate setoff does not depend on state or English contract law, and RBS does not contend that it does. Instead, RBS's position that it had the right to exercise a triangular setoff entirely depends on the interpretation of two Bankruptcy Code provisions, Section 553 and Section 560. Interpretation of such provisions falls squarely within the province of the bankruptcy court. *See Salander*, 2011 WL 2837494 at *11.

RBS argues that "the underlying policy behind mandatory withdrawal of the reference under 28 U.S.C. 157(d) supports discretionary withdrawal" in this case (RBS Mot. 28-29). None of the cases it cites, however, involved a creditor's withholding estate property in violation of the automatic stay. Two of the cases concern disputes requiring substantial interpretation of non-bankruptcy federal laws. *See Snodgrass v. New Century Mortg. Corp.*, 358 B.R. 675 (S.D. W. Va. 2006) (adversary proceeding brought by debtors against the lender which required "substantial and material" interpretation of disclosure provisions contained in federal Truth in Lending Act and the Real Estate Settlement Procedures Act); *Picard v. HSBC Bank PLC*, No. 11-cv-0913, 2011 WL 2119720 (S.D.N.Y. May 23, 2011) (holding that Trustee had no standing to assert common-law claims requiring significant interpretation of federal securities law).[8]

---

[8] RBS's reliance on the other two cases is also misplaced. In *In re Smith Corona Corp*, 205 B.R. 712, 714 (D. Del. 1996), the court denied the motion to withdraw the reference on the basis that the case required only straightforward application of the Employee Retirement Income Security Act and thus the matter was properly left to the experience of the bankruptcy court. And in *In re Chan*, 355 B.R. 494 (Bankr. E.D. Pa. 2006), the court denied the motion to withdraw on a similar basis.

While not requesting a jury trial outright, RBS's brief includes considerable discussion of the consequence of the need for a jury trial for withdrawal of the reference purposes (*see, e.g.*, RBS Mot. 2, 8, 26-27).  That discussion is irrelevant.  Even if RBS were to demand a jury trial, none would be needed for the simple reason that there are no factual issues for a jury to decide.  The only issues requiring resolution are questions of law.  RBS also argues that "a cause of action that seeks money damages" involves a right to a jury trial" (*id.* at 25).  However, the Trustee's motion seeks to enforce the automatic stay and bar the continued seizure of improperly held property of the LBI estate; it is not an action seeking "money damages."

Lastly, RBS makes a number of vague arguments about how "judicial economy" and "avoidance of undue delay" supposedly support its motion to withdraw the reference (RBS Mot. 26).  All these arguments are without merit because they are based on RBS's discredited arguments concerning "Article III rights" and entitlement to a jury trial.

**D.  Resolution of the Trustee's Motion Is Integral to the "Restructuring of the LBI-RBS Relationship" in Connection with LBI's SIPA Liquidation and RBS's Proof of Claim.**

RBS is a creditor of LBI and has filed a proof of claim at the same time that it is withholding property of the estate. The value of that property far exceeds the amount of RBS's proof of claim.  RBS's setoff against such property of the estate reduced its affiliates' claims against LBI and its own claims against LBI affiliates, LBSF and LBIE.

The effect of allowing setoff is to transform an otherwise unsecured claim into a secured claim under 11 U.S.C. § 506(a), which is a departure from the organizing

principle of the Bankruptcy Code – equality among creditors. *Cohen v. Sav. Bldg. & Loan Co.*, 896 F.2d 54, 57 (3d Cir. 1990) ("setoff is at odds with a fundamental policy of bankruptcy, equality among creditors."); *see also North American Energy Conservation, Inc. v. Interstate Energy Resources, Inc., (In re North American Energy Conservation, Inc.)*, 2000 WL 1514614 *2 (S.D.N.Y. 2000) (because "a setoff is a claim against the bankruptcy estate," which "takes on particular importance in the context of a bankruptcy, as it, in effect, 'elevates an unsecured claim to secured to the extent that the debtor has a mutual, pre-petition claim' against the party asserting setoff'"), quoting *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984). In addition, it would subvert the Congressional policy favoring repayment of customers in a SIPA liquidation. If RBS's triangular setoff were upheld, RBS and its affiliates would obtain a higher recovery for their unsecured claims than LBI's customers and general creditors otherwise similarly situated to RBS.

Determination of the priority rights of creditors to the assets of the debtor is necessary to administer the estate. The Second Circuit has consistently recognized that fixing the order of priority of creditor claims against a debtor and placing the property of the bankrupt under the control of the court for appropriate distribution among creditors are core bankruptcy functions. *See, e.g., United States Lines, Inc. v. American S.S. Owners Mut. Protection & Indem. Ass'n (In re United States Lines, Inc.)*, 197 F.3d 631, 637 (2d Cir. 1999); *Resolution Trust Corp. v. Best Prods. Co., Inc. (In re Best Products Co., Inc.)*, 68 F.3d 26, 31 (2d Cir. 1995). In that connection, issues that are necessarily intertwined with a proof of claim – such as the legality of RBS's setoff – are properly resolved by the bankruptcy court. *See, e.g., In re Eastern Freight Ways, Inc.*, 577 F.2d

175, 181 (2d Cir. 1978) (noting that bankruptcy court "clearly has jurisdiction" over propriety of a setoff against a bankrupt and concluding that creditor "had not established a right to the setoffs").

RBS attempts to avoid the consequence of its having filed a proof of claim by distorting the holding and rationale of *Stern v. Marshall*. Specifically, in an attempt to squeeze within *Stern*'s narrow holding, RBS has inaccurately labeled the Trustee's motion in the Bankruptcy Court a "state law counterclaim" that will not be resolved in the process of deciding RBS's proof of claim because it has "nothing to do with underwriting fees," which are the subject of that proof of claim (RBS Mot. 1, 5). But, as discussed above, the Trustee's motion is not a state law counterclaim but is instead based purely on bankruptcy law and is properly before the Bankruptcy Court as a core proceeding under clauses (A), (B) and (O) of 28 U.S.C. § 157(b)(2).

The bankruptcy issues raised in the Trustee's motion are integral to the process of resolving RBS's proof of claim. In *Stern*, in contrast, the Supreme Court "repeatedly emphasizes that it [was] address[ing] only the constitutionality of the bankruptcy court making a final ruling on a state-law counterclaim that would not be finally resolved in the process of allowing or disallowing a proof of claim." *Salander*, 2011 WL at *7. Thus, the Supreme Court plainly did *not* say that a creditor's proof of claim and a debtor's "counterclaim" must share a common subject matter.

Resolving the question of whether RBS will be entitled to a distribution under its proof of claim will necessarily be affected by this Court's determination of whether or not RBS's "triangular setoff" was a violation of the stays. If that setoff is

disallowed, the claimed amount in RBS's proof of claim will be netted out against the $347 million RBS has admitted it owes under the ISDA Master Agreement, resulting in return to the LBI estate of $345,938,625.  The status of RBS's position in the liquidation will thereby be resolved in the process of deciding RBS's proof of claim, as RBS appeared to acknowledge at least in March 2009 when it filed its proof of claim, which document began by stating that 347,501,344 was the "amount payable by [RBS] to LBI" under the Master Agreement prior to setoff.  (Goldstein Decl. Ex. H.)

Properly understood, *Stern v. Marshall* confirms that RBS's filing of a proof of claim constituted its consent to Bankruptcy Court jurisdiction.  Such consent permits this Court to act where, given the claimant's own debt to the estate, adjudication of the claim "become[s] integral to the restructuring of the debtor-creditor relationship." 131 S.Ct. at 2617, quoting with approval, *Langenkamp v. Culp*, 498 U.S. 42, 45 (1990) (per curiam); *see also Northern Pipeline* at 71 ("restructuring of debtor creditor relations [is] at the core of the federal bankruptcy power"); *In re North American Energy Conservation, Inc.*, 2000 WL 1514614 at *2-3 (denying motion to withdraw reference because creditor's claimed right of setoff constituted "a claim against the bankruptcy estate," rendering the dispute a core proceeding under 28 U.S.C. § 157(b)(2)(B)).

## IV.   Whatever the Forum, the Trustee Is Entitled to Judgment as a Matter of Law.

As demonstrated above, RBS has conceded a liability to the LBI estate in the amount of $347,501,344 in connection with the ISDA Master Agreement.  There are no genuine issues of material fact.  The triangular setoff in which RBS engaged was

invalid as a matter of law.  It was undertaken in violation of the stays and lacks the

mutuality required by Section 553(a) of the Bankruptcy Code.  Accordingly, the Trustee

is entitled to summary judgment in his favor declaring that RBS's conduct is in violation

of the automatic stays under Bankruptcy Code 362(a) and the Liquidation Order.  *See,

e.g., Swedbank*, 433 B.R. at 112 (granting debtor's motion to enforce the automatic stay,

declaring that creditor's conduct "is unjustified and constitutes a continuing violation of

the automatic stay."); *In re Lehman Bros. Holdings Inc.*, 439 B.R. 811, 837 (Bankr.

S.D.N.Y. 2010) (granting summary judgment in favor of debtor on basis that creditor's

"seizure of the deposited funds was an unauthorized and impermissible setoff in violation

of the automatic stay."); *see also In re 48th St. Steakhouse, Inc.*, 61 B.R. 182 (Bankr.

S.D.N.Y. 1986) *aff'd*, 77 B.R. 409 (S.D.N.Y. 1987) *aff'd*, 835 F.2d 427 (2d Cir. 1987)

(granting summary judgment for debtor, finding that landlord's notice of termination of

restaurant premises lease violated automatic stay).

On the other hand, if the Court concludes that it should revoke the removal

to the Bankruptcy Court and assume oversight, and if it further concludes that an

evidentiary hearing will be required, it is still empowered under 28 U.S.C. § 157(c)(1) to

refer the case back to the Bankruptcy Court to carry out those functions and submit

proposed findings of fact and conclusions of law for final adjudication by this Court.

## CONCLUSION

For the foregoing reasons, RBS's motion should be denied in all respects.

In the alternative, should this Court choose to withdraw the removal, the case should

promptly proceed to the summary judgment stage.  If the removal is revoked, the Court in

its discretion should refer the matter to the Bankruptcy Court under 28 U.S.C. § 157(c)(1)

for proposed findings of fact and conclusions of law.

Dated:   New York, New York
         September 13, 2011

                                        Respectfully submitted,

                                        MENAKER & HERRMANN LLP

                                        By: /s/ Richard G. Menaker
                                             Richard G. Menaker

                                        10 East 40th Street
                                        New York, NY 10016
                                        Telephone:   (212) 545-1900
                                        Facsimile:   (212) 545-1656

                                        Special Counsel for James W. Giddens
                                        Trustee for the SIPA Liquidation of
                                        Lehman Brothers Inc.