**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re:<br><br>LEHMAN BROTHERS INC.,<br><br>     Debtor. | 11 Civ. 05709 (NRB)<br><br>Bankr. Case No. 08-01420 (JMP)<br>SIPA |
| THE ROYAL BANK OF SCOTLAND N.V.,<br><br>     Movant,<br><br>     v.<br><br>JAMES W. GIDDENS, AS TRUSTEE FOR<br>SIPA LIQUIDATION OF LEHMAN<br>BROTHERS INC.,<br><br>     Respondent. | |

**FIRST SUPPLEMENTAL DECLARATION OF IRENA M. GOLDSTEIN**
**IN SUPPORT OF THE ROYAL BANK OF SCOTLAND N.V.'S MOTION FOR**
**ORDER WITHDRAWING REFERENCE PURSUANT TO 28 U.S.C. § 157(d)**

   I, Irena M. Goldstein, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

   1.   I am a partner in the law firm of Dewey & LeBoeuf LLP, counsel for The Royal

Bank of Scotland N.V. ("RBS N.V."), formerly known as ABN AMRO Bank N.V.  As an

attorney admitted to practice before the District Court and one of the attorneys appearing on

behalf of RBS N.V. in this proceeding, I respectfully submit this declaration to provide the

District Court with a true and correct copy of the document listed below that is referenced in

RBS N.V.'s reply memorandum in support of the Motion to Withdraw the Reference.[1]

---

[1] Capitalized terms used but not defined in this declaration have the meanings set forth in RBS N.V.'s motion to withdraw the reference of the Motion to Compel pursuant to 28 U.S.C. § 157(d), filed August 16, 2011 [Docket No. 1] (the "Motion to Withdraw the Reference").

2.      A copy of RBS N.V.'s response to the LBI Trustee's Motion to Compel and jury

demand, filed September 23, 2011 pursuant to Bankruptcy Rule 7012(a) [Bankr. Ct. Docket No.

4575] is attached hereto as Exhibit A.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: October 3, 2011
          New York, New York

                              /s/ Irena M. Goldstein
                              Irena M. Goldstein

# **EXHIBIT A**

**(Response)**

Martin J. Bienenstock
Irena M. Goldstein
DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

*Attorneys for The Royal Bank of
Scotland N.V. (Formerly Known as
ABN AMRO Bank N.V.)*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re:<br><br>LEHMAN BROTHERS INC.,<br><br>     Debtor. | Bankr. Case No. 08-01420 (JMP)<br>SIPA |
| JAMES W. GIDDENS, AS TRUSTEE FOR SIPA LIQUIDATION OF LEHMAN BROTHERS INC.,<br><br>     Movant,<br><br>     v.<br><br>THE ROYAL BANK OF SCOTLAND N.V.,<br><br>     Respondent. | |

**RESPONSE AND JURY DEMAND OF RBS N.V. IN RESPECT OF
LBI TRUSTEE'S MOTION TO COMPEL, DATED JUNE 29, 2011**

   Respondent The Royal Bank of Scotland N.V. ("RBS N.V."), formerly known as ABN

AMRO Bank N.V. ("ABN"), hereby responds to the motion of James W. Giddens (the "LBI

Trustee"), Trustee for the Securities Investors Protection Act ("SIPA") Liquidation of Lehman

Brothers Inc. ("LBI"), for an order enforcing certain stays and compelling payment from RBS

N.V., filed June 29, 2011 [Docket No. 4370] (the "Motion to Compel") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), in accordance with the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the resolution of RBS N.V.'s motion for procedural relief, filed August 2, 2011 [Docket No. 4454] (the "RBS Motion").

RBS N.V. responds to each numbered paragraph in the Motion to Compel as follows.

1.      Admits that the LBI Trustee has filed what he labels a motion to enforce the automatic stay and the *Order Commencing Liquidation* of LBI in *Securities Investor Protection Corp. v. Lehman Brothers Inc.*, Case No. 08-cv-8119 (GEL) [Docket No. 1] (the "Liquidation Order"), which is attached as Exhibit F to the *Declaration of Irena M. Goldstein in Support of The Royal Bank of Scotland N.V.'s Motion for Order Withdrawing Reference Pursuant to 28 U.S.C. § 157(d)*, filed August 16, 2011 [Docket No. 4497] (the "Goldstein Declaration"), and seeks to recover the sum of $345,938,625 plus interest from RBS N.V., but otherwise denies the allegations and avers that the motion is an action on a pre-SIPA proceeding contract.

2.      Denies the allegations and avers that (i) the "net amount owed," if any, as the result of early termination of the 1992 ISDA Agreement between LBI and RBS N.V., dated March 16, 1998 (as amended and supplemented, the "LBI-RBS N.V. ISDA Agreement") can only be determined after giving effect to the Terms of Agreement accompanying confirmations of securities transactions (the "Terms of Agreement"), attached as Exhibit G to the Goldstein Declaration, as required by Section 6(e) of the LBI-RBS N.V. ISDA Agreement and Part 5(e) of the Schedule thereto, including the setoffs and netting to which RBS N.V. is entitled, and taking account of the value of RBS N.V.'s security interests, (ii) there is no net amount owed to LBI,

and (iii) even the amount claimed by the LBI Trustee is subject to change because of the parties' continuing efforts to reconcile the many transactions between them.

3.      Admits that RBS N.V. asserts setoff rights and security interests based on pre-SIPA proceeding agreements between RBS N.V. and its affiliates (together, "RBS") and LBI, including but not limited to the LBI-RBS N.V. ISDA Agreement and the Terms of Agreement, but otherwise denies the allegations.

4.      Admits that the LBI Trustee objects to RBS N.V.'s position, but otherwise denies the allegations.

5.      Admits.

6.      Admits.

7.      Denies the allegations to extent that they suggest the Bankruptcy Court has constitutional authority to exercise Article III judicial power in this contested matter, but otherwise admits.

8.      Admits, but respectfully refers the Bankruptcy Court to the terms of the Liquidation Order and its carveouts.

9.      Paragraph 9 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

10.     Admits that the first sentence accurately quotes the LBI Trustee's Fifth Interim Report, but denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations and therefore denies these allegations.

11.     Admits that the allegations contain an accurate quotation from a federal statute and describe some of the duties of a SIPA trustee, but otherwise denies the allegations and any suggestion that a SIPA trustee may disregard the legal rights of others.

12.     Admits that at various points in time there were sporadic communications between counsel for the LBI Trustee and counsel for RBS N.V. that did not resolve this matter, but otherwise denies the allegations.

13.     Admits that on or about March 16, 1998, ABN entered into the LBI-RBS N.V. ISDA Agreement and that on or about March 31, 2004, LBI and ABN entered into an Amendment Agreement, but denies that the LBI-RBS N.V. ISDA Agreement was limited to the types of transactions specifically listed in paragraph 13 and otherwise denies the allegations.

14.     Admits that on or about August 29, 2008, ABN and LBI entered into a Close-out Amount Multilateral Agreement, but denies knowledge and information sufficient to form a belief about the additional parties that also entered into this agreement, and therefore denies such allegations.

15.     Admits that RBS N.V. delivered a letter, dated September 14, 2008, to LBI under Section 6(a) of the LBI-RBS N.V. ISDA Agreement, which designated an Early Termination Date (as defined in the LBI-RBS N.V. ISDA Agreement) of September 15, 2008, but otherwise denies the allegations.

16.     Admits that RBS N.V. delivered a letter, dated September 22, 2008, to LBI under Section 6(a) of the LBI-RBS N.V. ISDA Agreement, which designated an Early Termination Date of September 22, 2008, but otherwise denies the allegations.

17.     Admits that between March 16, 1998 and the Early Termination Date, RBS N.V. and LBI entered into numerous transactions, including but not limited to foreign currency transactions in the form of swap, non-deliverable forward, and spot transactions, but otherwise denies the allegations.

18.     Admits that as of the Early Termination Date, there were numerous transactions between RBS N.V. and LBI subject to the LBI-RBS N.V. ISDA Agreement, including but not limited to foreign currency transactions, which were either open or terminated but not settled, but otherwise denies the allegations.

19.     Admits.

20.     Admits that on September 15, 2008, Lehman Brothers Holdings Inc. filed for protection under chapter 11 of the title 11 of the United States Code (the "Bankruptcy Code"), but otherwise denies the allegations.

21.     Admits.

22.     Admits that on September 22, 2008, RBS N.V. delivered in person a notice of an Event of Default (as defined in the LBI-RBS N.V. ISDA Agreement) to LBI under Section 6(a) of the LBI-RBS N.V. ISDA Agreement and designated an Early Termination Date of September 22, 2008, but otherwise denies the allegations.

23.     Admits.

24.     Admits that by letter, dated May 14, 2009, RBS N.V. provided a statement to LBI advising of its setoff rights created under the Terms of Agreement, as expressly permitted by the LBI-RBS N.V. ISDA Agreement, which setoff was defined to include setoffs and security interests, but denies that it acknowledged that any sums were owed (the "Section 6(d)(i) Statement").  RBS N.V. avers that Section 6(e) of the LBI-RBS N.V. ISDA Agreement provides that "[t]he amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section [6] will be subject to any Set-off," with "Set-off" defined as "set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this

Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer." RBS N.V. further avers that Part 5(e) of the Schedule to the LBI-RBS N.V. ISDA Agreement provides that "[t]his Section [governing setoff] shall be without prejudice and in addition to any right of setoff, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract, or otherwise)." RBS N.V. respectfully refers the Bankruptcy Court to Exhibits A-1, A-2, and E of the Goldstein Declaration for the true and complete terms of the LBI-RBS N.V. ISDA Agreement and the Section 6(d)(i) Statement, and otherwise denies the allegations.

25.     Admits that the May 14, 2009 Section 6(d)(i) Statement (i) asserted that under the Terms of Agreement, RBS Securities Inc. and each of its affiliates had rights to setoff any obligation owing by each of them to LBI against any obligation owing by LBI and each of its affiliates (together, "Lehman") to RBS Securities Inc. and each of its affiliates, and (ii) specified over $917,000,000 in claims against LBI and two of its affiliates, Lehman Brothers International (Europe) and Lehman Brothers Special Financing Inc. RBS N.V. also admits that such setoff under the Terms of Agreement is expressly authorized by the LBI-RBS N.V. ISDA Agreement, but otherwise denies the allegations.

26.     Admits that RBS N.V. is an indirect subsidiary of RFS Holdings B.V., which is approximately 98%-owned by The Royal Bank of Scotland Group plc, and further admits that RBS Securities Inc. is an indirect subsidiary of The Royal Bank of Scotland plc, which is a subsidiary of The Royal Bank of Scotland Group plc, but otherwise denies the allegations.

27.     Admits, but denies that the Stays (as defined in the Motion to Compel) apply to RBS N.V. and that it was necessary to seek relief from the Stays.

28.     Admits that the LBI Trustee has filed a motion seeking to collect money from RBS N.V. allegedly due under the LBI-RBS N.V. ISDA Agreement, but respectfully refers the Bankruptcy Court to the Motion to Compel for a complete description of the relief sought.  RBS N.V. denies that the LBI Trustee is entitled to such relief and otherwise denies the allegations.

29.     Admits that RBS N.V. asserts contractual setoff rights, which RBS N.V. defined as including security interests, in its Section 6(d)(i) Statement, and has made no payment to the LBI Trustee, but otherwise denies the allegations.

30.     Paragraph 30 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

31.     Admits, except to the extent that it is alleged that (i) there is an amount "payable" to LBI, and (ii) the relevant transactions arose under only the LBI-RBS N.V. ISDA Agreement, which are denied.

32.     Admits that in the Section 6(d)(i) Statement, RBS N.V. set forth calculations that produced a number before deducting its setoff entitlement and the value of its security interest, but denies stating that any amounts set forth therein were owed to LBI and otherwise denies the allegations.   RBS N.V. respectfully refers the Bankruptcy Court to Exhibit A-2 of the Goldstein Declaration for the true and complete terms of the Section 6(d)(i) Statement.

33.     Denies the allegations and avers that RBS N.V. never calculated any amount "owed to LBI," but instead asserted contractual rights of setoff and security interests pursuant to the Terms of Agreement, as expressly authorized by the LBI-RBS N.V. ISDA Agreement.

34.     Paragraph 34 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

35.     Admits, except denies to the extent the allegations ignore the facts that RBS N.V. is asserting setoff rights against LBI and security interests pursuant to the Terms of Agreement and that the LBI-RBS N.V. ISDA Agreement expressly contemplates that other contractual rights, including setoff rights, would be enforceable under Section 6(e) of the LBI-RBS N.V. ISDA Agreement and Part 5(e) of the Schedule thereto, quoted above.  RBS N.V. also denies that it was the "acquirer" of ABN.

36.     Paragraph 36 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

37.     Paragraph 37 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

38.     Paragraph 38 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

39.     Admits that RBS N.V. asserts that the Terms of Agreement grants it cross-affiliate setoff rights, but otherwise denies the allegations.

40.     Paragraph 40 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

41.     Paragraph 41 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

42.     Admits that an ISDA agreement exists between LBI and RBS N.V., but otherwise denies the allegations.

43.     RBS N.V. admits that it contends LBI accepted the trade confirmations without objection, and thus agreed to the Terms of Agreement, but otherwise denies the allegations.

44. Paragraph 44 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

45. Paragraph 45 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

46. Paragraph 46 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

47. Paragraph 47 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

48. Paragraph 48 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

49. Paragraph 49 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

50. Paragraph 50 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

51. Paragraph 51 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

52. Denies because paragraph 52 ignores section 362(b) of the Bankruptcy Code and all the safe harbors that carve out actions otherwise barred by section 362(a) of the Bankruptcy Code, and further, denies that the automatic stay provisions are applicable.

53. Paragraph 53 contains legal conclusions to which no response is required, but to the extent that a response is required, RBS N.V. denies the allegations.

54. Admits that service on RBS N.V. was proper, but otherwise denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

55.     Admits.

## AFFIRMATIVE DEFENSES

Without assuming any burden of proof or burden of going forward where such burden properly rests with the LBI Trustee and without waiving the right to assert any and all defenses to the extent discovery establishes a basis therefor, RBS N.V. hereby asserts the following affirmative defenses to the claims asserted in the Motion to Compel:

First Affirmative Defense
(Lack of Constitutional Power to Determine the
LBI Trustee's Contract Claims Against RBS N.V.)

56.     The LBI Trustee admits that he "relies upon the ISDA Master Agreement between LBI and ABN … as the basis for his claim to recover the Close-out Amount."  Motion to Compel at ¶35.  The LBI Trustee alleges RBS N.V. bases its belief that it owes nothing to LBI under the LBI-RBS N.V. ISDA Agreement on "a separate contract, entitled 'Terms of Agreement,' between Greenwich Capital Markets, Inc. ('RBS Greenwich Capital') and LBI." Motion to Compel at ¶30.

57.     The Terms of Agreement are trade confirmations RBS sent to LBI over 800 times pursuant to Securities and Exchange Commission Rule 10b-10 under the Securities and Exchange Act of 1934.  LBI never objected to any of the Terms of Agreement.  Section 6(e) of the LBI-RBS N.V. ISDA Agreement and Part 5(e) of the Schedule thereto, quoted above, expressly permit the exercise of setoff rights under the Terms of Agreement.  The LBI-RBS N.V. ISDA Agreement (and not an amendment of such agreement) expressly provides for RBS N.V. to assert setoff rights arising under another contract.

58.     Paragraphs 1 through 50 of the Motion to Compel argue that RBS N.V. owes the LBI estate approximately $347 million under the LBI-RBS N.V. ISDA Agreement and that the Terms of Agreement is ineffective for reasons of state law and bankruptcy law.  Specifically, in

paragraphs 39 through 46 of the Motion to Compel, the LBI Trustee asserts nonbankruptcy and contract defenses to the Terms of Agreement. At the same time, the LBI Trustee admits RBS N.V. sent LBI a notice designating an Early Termination Date of September 15, 2008, *see* Motion to Compel at ¶15, which was at least 4 days before LBI commenced its SIPA proceeding. The contractual rights of RBS N.V. and LBI arose before LBI was subject to SIPA and the applicable provisions of the Bankruptcy Code.

59.     In paragraphs 51 through 55 of the Motion to Compel, the LBI Trustee contends RBS N.V. commits a violation of the automatic stay by withholding the amount the LBI Trustee contends is owing under the LBI-RBS N.V. ISDA Agreement. Even if failure to pay an amount owing under a pre-SIPA proceeding contract were a stay violation (which it is not), the LBI Trustee's stay violation claim in paragraphs 51 through 55 of his Motion to Compel cannot be determined before his contract claim under paragraphs 1 through 50 is determined. The "Conclusion" at page 23 of the Motion to Compel provides that "the Court should enforce the automatic stay and the LBI Liquidation Order and compel UBS [sic] to pay in full the $345,938,625 it is holding together with interest thereon." Thus, the Motion to Compel requests contract damages under the LBI-RBS N.V. ISDA Agreement pursuant to paragraphs 1 through 50, and requests no additional or different damages for an alleged violation of the automatic stay or the Liquidation Order under paragraphs 51 through 55.

60.     The Motion to Compel is a pre-SIPA proceeding contract action against RBS N.V. for money damages equal to contract damages.

61.     RBS N.V. filed a proof of claim against the LBI estate, which is attached as Exhibit H to the Goldstein Declaration.

62.     Whether the Motion to Compel is regarded as an LBI estate action against RBS N.V. on a pre-SIPA proceeding contract governed by English law or as an LBI estate counterclaim against RBS N.V. on a pre-SIPA proceeding contract governed by English Law, the Article I Bankruptcy Court cannot constitutionally exercise the essential attributes of judicial power to determine disputed facts, or mixed questions of law and fact (such as whether the LBI-RBS N.V. ISDA Agreement is or is not subject to the Terms of Agreement), or apply law to facts to determine the Motion to Compel pursuant to *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) and *Stern v. Marshall*, 131 S. Ct. 2594 (2011).

<u>Second Affirmative Defense</u>
(Prior Course of Dealing Doctrine)

63.     The repeated delivery of the Terms of Agreement to LBI, and LBI's repeated acceptance thereof without objection, established a course of dealing which renders the Terms of Agreement valid and enforceable against LBI.  A "course of dealing" is "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."   N.Y. U.C.C. § 1-205(1).   The Second Circuit has held that "[w]here … a manufacturer has a well-established custom of sending … confirmations … a buyer who has made numerous purchases over a period of time, receiving in each instance a standard confirmation form which it … retained without objection, is bound by the … provision[s] [therein]."  *Pervel Indus., Inc. v. T M Wallcovering, Inc.*, 871 F.2d 7, 8 (2d Cir. 1989).  The Second Circuit's holding in *Pervel* applies to confirmations delivered in connection with

securities transactions.[1]   LBI received the Terms of Agreement over 800 times without challenging or instructing RBS to modify the terms thereof, and thus, is contractually bound by the Terms of Agreement under the prior course of dealing doctrine.  Moreover, RBS N.V. is not aware of any institutional account or other agreement governing the securities transactions to which LBI is a party other than that embodied in the Terms of Agreement.

### Third Affirmative Defense
(The Terms of Agreement Applies to All
Transactions Between Lehman and RBS)

64.     The Terms of Agreement applies to all transactions between Lehman and RBS. The Terms of Agreement is not limited in scope to transactions relating to the purchase and sale of securities, as the LBI Trustee asserts.  *See* Motion to Compel at ¶¶39-40.  Section 13 of the Terms of Agreement explicitly states that RBS, *i.e.*, RBS N.V. and each of its affiliates, may "set off *any* obligation owing by it" to Lehman, *i.e.*, LBI and each of its affiliates, against "*any* obligations owing" by Lehman to RBS.

### Fourth Affirmative Defense
(The Terms of Agreement is Enforceable under English Law)

65.     The Terms of Agreement is valid and enforceable against LBI under English law, which governs the LBI-RBS N.V. ISDA Agreement pursuant to Part 4(h) of the Schedule to such

---

[1] *See, e.g., Drexel Burnham Lambert, Inc. v. Mancino*, 951 F.2d 348, at *2 (6th Cir. 1991) ("*Pervel* 'has consistently been enforced in the context of transactions between securities brokers/dealers and their customers'"); *Stedor Enterps., Ltd. v. Armtex*, 947 F.2d 727, 733 (4th Cir. 1991) (citing *Pervel*, 871 F.2d at 8) (upholding terms of confirmations delivered to a broker dealer customer, even though the customer did not read or sign the confirmations); *Brodene v. Biltmore Secs., Inc.*, No. 96-cv-0572, 1998 WL 214766, at *6 (W.D.N.Y. Apr. 22, 1998) ("Where one party has not signed an agreement … the proper inquiry is whether the party evidenced an intent to be bound by the agreement … That inquiry is an objective one and is not dependent upon whether the party subjectively agreed … For example, a party's intent to agree … may be inferred from his conduct"); *Peterson v. Beale*, No. 92-cv-5412, 1995 WL 479425, at *10 (S.D.N.Y. 1995) (customer is bound by agreement governing his brokerage account when he repeatedly received the agreement following each transaction but "paid no attention to it"); *Shirl v. Drexel Burnham Lambert, Inc.*, No. 88-cv-866, 1989 WL 90159, at *6 (D. Minn. May 24, 1989) ("after each transaction on [the customer's] account, he received a written confirmation of the transaction … The confirmation form lists the terms and conditions of the transaction … [Thus,] the parties' conduct establishes the existence of a contract" with respect to such terms and conditions).

agreement.   The LBI Trustee argues that the Terms of Agreement is an impermissible amendment of the LBI-RBS N.V. ISDA Agreement under Section 9(b) of such agreement.[2]  *See* Motion to Compel at ¶¶41-42.   However, this argument ignores the fact that the Terms of Agreement is not an amendment, but rather, an entirely separate agreement that is enforceable under English law.  In *AS Klaveness Chartering v Pioneer Freight Futures Co. Ltd.*, [2009] EWHC 3386 (December 18, 2009), a copy of which is attached hereto as <u>Exhibit A</u>, the High Court of England and Wales held that an oral agreement temporarily suspending payment between two parties to a 1992 ISDA Master Agreement was valid and enforceable, notwithstanding the terms of Section 9(b), because the agreement in question constituted a collateral agreement, rather than an "amendment, modification, or waiver" within the meaning of Section 9(b).[3]  Thus, under applicable English law, nothing prevented the parties from entering into a separate agreement which would affect their rights under the LBI-RBS N.V. ISDA Agreement, such as the Terms of Agreement.

Fifth Affirmative Defense
(The LBI-RBS N.V. ISDA Agreement Permits the
Exercise of Setoff Rights under Separate Agreements)

66.    Section 6(e) of the LBI-RBS N.V. ISDA Agreement and Part 5(e) of the Schedule thereto, quoted above, explicitly permit the parties to enter into separate agreements governing the right to setoff amounts otherwise payable under the LBI-RBS N.V. ISDA Agreement.

---

[2] Section 9(b) of the LBI-RBS N.V. ISDA Agreement provides that "[n]o amendment, modification or waiver in respect of this Agreement will be effective unless in writing … and executed by each of the parties or confirmed by an exchange of … electronic messages."

[3] *See id.* at 8 (citations omitted) ("PFF would contend that, if there was such an agreement it amounts to an amendment, modification or waiver of the Master Agreement and must, in order to be effective be in writing … I do not accept this.  It seems to me that the agreement made during the conversation … may properly be regarded as a contract collateral to the Master Agreement … There is authority that a contract which is collateral to a contract which is required to be in writing does not itself have to be in writing").

<u>Sixth Affirmative Defense</u>
(The Terms of Agreement is Not an Adhesion Contract)

67. Near the outset of the hearing in respect of the RBS Motion, which motion concerned whether the LBI Trustee must proceed by adversary proceeding or contested matter, the Bankruptcy Court observed it had evaluated RBS N.V.'s defenses and that the Terms of Agreement was an internally generated adhesion contract. *See* Hearing Tr. at 59:22-60:6 (Sept. 14, 2011), a copy of which is attached hereto as <u>Exhibit B</u> ("I also looked at the form of this unsigned apparent adhesion contract created by RBS internally"); *id*. at 73:4-73:8 ("No merits conversations, please, I don't want to hear any of your merits arguments … I've read them.  I've evaluated them").  No evidentiary hearing had been held and discovery was only beginning. Notably, the LBI Trustee's Motion to Compel objected to the Terms of Agreement but did not contend it formed an adhesion contract, after having had over two years to consider the issue.

68. The Terms of Agreement does not satisfy any of the requirements for an adhesion contract, as such requirements are set forth by the Second Circuit.  "A contract of adhesion is a contract formed as a 'product of gross inequality of bargaining power' between parties." *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164 (2d Cir. 1997) (citing *Aviall, Inc. v. Ryder Sys., Inc.*, 913 F. Supp. 826, 831 (S.D.N.Y. 1996)).  "Typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms … Factors to be considered in determining whether a contract of adhesion is unconscionable include whether the 'coerced' party was on notice of the offending provision, whether the 'coercing' party achieved agreement by fraud or overreaching, and whether any alternatives existed for the 'coerced' party." *Id*. at 168-69 (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 594-95 (1991)).

69. It is beyond dispute that LBI, one of the largest broker dealers in the United States, represented by sophisticated legal and financial professionals, cannot reasonably be considered "unrepresented," "uneducated," or "needy." Further, none of the other indicia of a contract of adhesion are present here. LBI, having received the Terms of Agreement over 800 times, was clearly on notice of the Terms of Agreement and the provisions therein. There is no suggestion of fraud in connection with the Terms of Agreement, which were clearly printed and sent to LBI and certain of its affiliates. Finally, LBI had numerous opportunities, which it never exercised, to dispute or seek changes of the Terms of Agreement, and is therefore deemed to have accepted the terms thereof. *See* Terms of Agreement at ¶19 (the Terms of Agreement "shall be deemed to have been accepted and signed by [LBI] if not objected to in writing … within 3 days of receipt" thereof). Indeed, LBI had no duty to trade with RBS and had a world of alternative trading counterparties. LBI continued voluntarily to trade with RBS, with full notice of the Terms of Agreement.

### Seventh Affirmative Defense
(Application of Bankruptcy Code Safe Harbor Provisions)

70. RBS N.V.'s exercise of cross-affiliate setoff rights is permitted under the safe harbor provisions of the Bankruptcy Code, namely, 11 U.S.C. §§ 362(b)(6), 362(b)(17), 555, and 560. The Terms of Agreement provide RBS N.V. with contractual setoff rights. The safe harbor provisions of the Bankruptcy Code allow contractual rights of offset and netting to be carried out and provide those rights shall not be "stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title."

Eighth Affirmative Defense
(Section 553's Mutuality Requirement is Inapplicable)

71.     RBS N.V. submits the Terms of Agreement create the mutuality required for setoffs under section 553 of the Bankruptcy Code.  But that is unnecessary.  The mutuality requirement applicable to setoff under section 553 of the Bankruptcy Code does not apply to setoff under the above-referenced safe harbor provisions.  Nothing in the applicable safe harbor provisions requires that RBS N.V. establish that its setoff independently qualifies for protection under section 553 or any other section of the Bankruptcy Code, and further, the definition of "contractual right" in the safe harbor provisions does not refer to section 553 or any other section of the Bankruptcy Code.  In addition, the Second Circuit's decision in *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, No. 09-5122, 2011 WL 2536101, at *9 (2d Cir. June 28, 2011) confirms that the Bankruptcy Court should enforce the "plain language" of the safe harbor provisions of the Bankruptcy Code and not carve out transactions that the safe harbor provisions do not carve out.  Even if the Bankruptcy Court were to look behind the plain language of the safe harbor provisions, however, the legislative history of such provisions demonstrates that Congress intended to remove a mutuality requirement from such provisions.[4]  Finally, courts have held that other sections of the Bankruptcy Code which permit the exercise of setoff rights,

---

[4] Before the passage of the Financial Netting Improvements Act of 2006, sections 362(b)(6) and (17) of the Bankruptcy Code exempted from the automatic stay "the setoff … of any mutual debt and claim" under or in connection with securities contracts and swap agreements, respectively.  However, following the passage of the Financial Netting Improvements Act of 2006, these sections were amended to exempt from the automatic stay "the exercise … of any contractual right … under any security agreement or arrangement or other credit enhancing forming a part of or related to any" securities contract or swap agreement, "or of any contractual right … to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements."  If the only contractual rights of setoff or netting that Congress intended to protect involved "mutual" debts or claims described in section 553 of the Bankruptcy Code, then the language change added nothing and served no purpose.

such as section 558, do not have an implied mutuality requirement.[5]  The LBI Trustee cites to numerous cases holding that a creditor generally cannot set off amounts payable by or to its affiliate against amounts payable by or to the debtor or the debtor's affiliates.  *See* Motion to Compel at ¶¶34, 36.  Other than *In re SemCrude, L.P.*, 399 B.R. 388 (Bankr. D. Del. 2009), *aff'd*, 428 B.R. 590 (D. Del. 2010), however, none of the cases cited by the LBI Trustee concern *contractual* rights of cross-affiliate setoff.[6]  Further, *SemCrude* expressly provides it is not deciding whether cross-affiliate setoffs are permitted when safe harbor contracts are involved.

---

[5] For example, courts routinely permit the setoff of an estate's prepetition claim against a creditor's postpetition claim under section 558, which gives the estate the benefit of any defense available to the debtor as against any entity other than the estate.  Thus, in *Second Penn. Real Estate Corp. v. Papercraft Corp. (In re Papercraft Corp.)*, the leading decision under section 558, the court allowed the debtor to reduce its postpetition rent payments to a lessor by certain prepetition taxes the debtor had paid, observing:

> Were this a creditor seeking a setoff, that time differential would be fatal to applying setoff principles.  However, because section 558 preserves to the Debtor the defenses it would have had prepetition, **the court must examine the transaction as though the bankruptcy has not been filed.  Doing so eliminates the prepetition/postpetition distinction and, in essence, obliterates the requirement that the mutual debts must both be prepetition obligations in a § 558 context.**

127 B.R. 346, 349-50 (Bankr. W.D. Pa. 1991) (emphasis added).  *See also In re Women First Healthcare, Inc.*, 345 B.R. 131, 135 (Bankr. D. Del. 2006) ("Although both section 553 and 558 preserve the right of setoff, there is a significant difference between the two.  Section 553 restricts setoff rights by permitting a creditor to setoff only debts that arose pre-petition.  There is no such restrictive language in section 558 and, consequently, courts have concluded that a debtor may set off pre-petition claims against post-petition obligations it owes").  Like section 558, the safe harbor provisions of the Bankruptcy Code treat contractual rights as though the bankruptcy case has not commenced.  If anything, they do so more straightforwardly than section 558, in which the "obliteration" of the prepetition/postpetition derives not from the plain language of the statute but from interpretation of the statute by courts.

[6] Indeed, two cases cited by the LBI Trustee recognize an exception to the mutuality requirement where the parties contract for triangular setoff rights.  *See Inland Steel Co. v. Berger Steel Co. (In re Berger Steel Co.)*, 327 F.2d 401, 404-05 (7th Cir. 1964) (declining to permit tri-party setoff in absence of agreement authorizing such a setoff); *Heller & Co. v. Food Mktg. Assoc., Ltd. (In re Fasano/Harriss Pie Co.)*, 43 B.R. 864, 870-71 (Bankr. W.D. Mich. 1984), *aff'd*, 70 B.R. 285 (W.D. Mich. 1987) (citing *In re Balducci Oil Co., Inc.*, 33 B.R. 847 (Bankr. D. Colo. 1983)) ("Courts have carved out an exception to this general rule in the 'triangular tradeoff' situation.  The courts have found mutuality between three parties, as a matter of contract law, where there was an express agreement clearly evidencing the intent of the parties to treat the related corporations as a single entity").  Another case cited by the LBI Trustee was reversed by the Second Circuit.  *See Modern Settings, Inc. v. Prudential-Bache Secs., Inc.*, 109 B.R. 605, 607-08 (S.D.N.Y. 1989), *rev'd*, 936 F.2d 640 (2d Cir. 1991).  In its decision, the Second Circuit explicitly recognized that "there may be an exception to the strict mutuality rule where an injustice would be caused by

<u>Ninth Affirmative Defense</u>
(The Terms of Agreement Satisfy Section 553's
Mutuality Requirement, to the Extent Applicable)

72. RBS N.V.'s exercise of cross-affiliate setoff rights satisfies the mutuality requirement of section 553 of the Bankruptcy Code, to the extent that such requirement is applicable. Nothing in section 553 of the Bankruptcy Code indicates that Congress intended to prevent parties from contracting for mutuality where they are permitted to do so under applicable non-bankruptcy law.[7] Further, under New York law, which governs the Terms of Agreement, parties may contractually agree to whatever they choose, other than with respect to matters contrary to law or public policy, including the right to establish setoff rights that are more expansive than those available under New York common law or statutes.[8] Only one decision, *SemCrude*, held that parties cannot contract to create mutuality under section 553 of the Bankruptcy Code.

73. *SemCrude*, however, contains numerous errors. Among other things, in determining that the setoff in question lacked mutuality, it misapplied the definition of "claim" in

---

disallowing a set-off." *Modern Settings*, 936 F.2d at 648 (citing *Beecher v. Vogt Mfg. Co.*, 227 N.Y. 468, 473 (1920)).

[7] *See*, *e.g.*, *United Serv. Protection Corp. v. Bill Heard Enterps., Inc. (In re Bill Heard Enterps.)*, 438 B.R. 745 (Bankr. N.D. Ala. 2010) ("state law must be examined to determine whether mutuality exists"); *In re Garden Ridge Corp.*, 338 B.R. 627, 633 (Bankr. D. Del. 2006), *aff'd*, 299 B.R. 135 (D. Del. 2008), *aff'd*, 386 Fed. Appx. 41 (3d Cir. 2010) (quoting *In re Czyzk*, 297 B.R. 406, 409 (Bankr. D.N.J. 2003)) ("Mutuality of obligations is determined by state law"); *Levine v. Kenny (In re Flooring Am., Inc.)*, 302 B.R. 403 (Bankr. N.D. Ga. 2003) (mutuality is an issue of state law); *Frederick v. Am. First Credit Union (Matter of Frederick)*, 58 B.R. 56, 57 (Bankr. N.D. Ala. 1986) (citing *Straughair v. Palmieri (In re Palmieri)*, 31 B.R. 111, 112 (Bankr. N.D. Ga. 1983)) ("Because section 553 does not define 'mutual,' the definition must be determined under state law").

[8] *See*, *e.g.*, *Fuller v. Fasig-Tipton Co.*, 587 F.2d 103, 107 (2d Cir. 1978) (although creditor's setoff of its debt to agent's disclosed principal against agent's debt to creditor lacked mutuality under common law and statute, the parties could have validly agreed to such setoff by contract); *Bank of N.Y. v. Meridien BIAO Bank Tanz. Ltd.*, No. 95-cv-4856, 1997 WL 53172, at *2-4 (S.D.N.Y. Feb. 10, 1997) (although New York common law and statutes do not permit setoff of contingent obligations, parties may contractually agree that such obligations shall offset each other).

section 101(5) of the Bankruptcy Code and ignored section 102(2) of the Bankruptcy Code, which provides that "'claim against the debtor' includes claim against property of the debtor." Specifically, *SemCrude* reasoned there could be no mutual claims because the contractual right to setoff was not a claim in the first place because it was not a right to payment for purposes of section 101(5) of the Bankruptcy Code. That was a colossal error. Whether a contract gives rise to a right to payment is not determined by whether performance of the contract requires payment. If that were the law, contracts for deliveries of widgets would not give rise to claims. Non-competition covenants would not give rise to claims. *SemCrude*'s error was not realizing that a contract gives rise to a right to payment if an action for its breach is a right to payment. Breach of a contractual right to setoff would yield a right to payment for money damages. Additionally, section 102(2) of the Bankruptcy Code shows that a claim exists when a party has a claim against property of the debtor. Moreover, section 102(2) does not require a secured claim – just a claim. Therefore, RBS's contract granting it a claim against LBI's accounts receivable from RBS is a claim under the plain language of the Bankruptcy Code.

<u>Tenth Affirmative Defense</u>
(Failure to State a Claim)

74.     Failure to pay money due under a contract is not a stay violation. If failure to pay money due under a contract were a stay violation, section 542(b) of the Bankruptcy Code, which requires that debts that are matured, payable on demand, or payable on order be paid to the trustee, would be in section 362(a) of the Bankruptcy Code, which lists automatic stay violations. The LBI Trustee's Motion to Compel does not even bring a claim under or cite section 542(b) of the Bankruptcy Code. Numerous courts have held that the failure, even without good cause, to

pay a debt to a debtor's estate, does not constitute a stay violation.[9]  The rule of common sense also shows the LBI Trustee has not stated a claim.  If failure to pay contract damages before a court rules they are due were an automatic stay violation, parties would have to pay first and litigate later.  The LBI Trustee has not shown a single example of that occurring in the history of the Bankruptcy Code.

Eleventh Affirmative Defense
(No Automatic Stay Violation)

75.     RBS N.V.'s exercise of cross-affiliate setoff rights existed and ripened before the commencement of LBI's SIPA proceeding.  Further, RBS N.V.'s cross-affiliate setoff is not subject to the automatic stay, or alternatively, does not violate the automatic stay.

Twelfth Affirmative Defense
(No Violation of the Liquidation Order)

76.     RBS N.V.'s cross-affiliate setoff is not subject to the Liquidation Order, or alternatively, does not violate the Liquidation Order.

---

[9] *See, e.g.*, *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C. Cir. 1993) (citing *United States v. Inslaw*, 932 F.2d 1467, 1472 (D.C. Cir. 1991)) (section 362(a)(3) does not apply "[w]henever a party against whom the bankrupt holds a cause of action (or other intangible property right) acted in accord with his view of the dispute rather than that of the ... bankruptcy trustee"); *In re Randolph Towers Coop., Inc.*, No. 11-00238, 2011 WL 2940664, at *5 (Bankr. D. D.C. July 19, 2011) ("The failure to pay remains just that, and, under the rationale of *Strumpf*, not an exercise of control over property of the estate"); *In re Bernstein*, 252 B.R. 846 (Bankr. D. D.C. 2000) (citing *Butner v. United States*, 440 U.S. 48, 55 (1979)) ("In enacting § 362(a)(3), Congress was content to preserve the nonbankruptcy status quo until a turnover proceeding could be brought … There is no evidence that Congress intended by § 362(a)(3) to enhance a debtor's ability under nonbankruptcy law to redress an unlawful seizure by making continued retention of unlawfully seized property a contempt prior to a court ordering turnover"); *Mountaineer Coal Co. v. Liberty Mutual Ins. Co. (In re Mountaineer Coal Co.)*, 247 B.R. 633, 644 (Bankr. W.D. Va. 2000) ("If Congress had intended to make a failure to honor one's … payover obligation … a violation of the automatic stay, it could have done so easily and clearly.  The Court does not believe that Congress intended to convert a matter of a contract dispute into a violation of the automatic stay … In conclusion, the Court finds that a party does not violate the automatic stay when its conduct is limited to its failure, even without good cause, to pay over to the … trustee a debt which it owes to the bankruptcy estate"); *In re U.S. Physicians, Inc.*, 235 B.R. 367, 375 (Bankr. E.D. Pa. 1999) ("if Congress intended to prohibit creditors from holding property ... it also could have barred any act to 'retain possession.'  Read in this context, the prohibition against an act to exercise control does not reach the passive act of continuing to possess property").

Thirteenth Affirmative Defense
(Perfected Lien / No Turnover Obligation)

77.     RBS N.V. has a perfected security interest in the funds and/or payable which are the subject of the Motion to Compel and therefore need not turn over the funds and/or payable to the LBI Trustee pursuant to section 542 of the Bankruptcy Code.  The LBI Trustee contends the funds RBS N.V. allegedly owes the LBI estate under the LBI-RBS N.V. ISDA Agreement are property of the LBI estate.  The LBI estate, however, only consists of property interests owned by LBI prior to commencement of its SIPA proceeding, *i.e.*, LBI's contract rights in the LBI-RBS N.V. ISDA Agreement.  *See* RBS Motion at ¶¶19-21 (citations omitted).  If the Bankruptcy Court concludes that the LBI estate includes the actual funds, then pursuant to Section 14 of the Terms of Agreement, LBI granted RBS N.V. a security interest in such funds to secure the over $500 million in claims RBS has against Lehman, which has been perfected by possession pursuant to N.Y. U.C.C. § 9-312(b)(3), as described in paragraphs 16-18 of RBS N.V.'s reply in support of the RBS Motion, filed September 9, 2011 [Docket No. 4548].  Accordingly, RBS N.V. need not turn over such funds because section 542(a) of the Bankruptcy Code provides that entities in control of estate property need not turn over such property if it "is of inconsequential value or benefit to the estate."  Similarly, if the Bankruptcy Court concludes that the LBI estate's interest is limited to LBI's contract rights in the LBI-RBS N.V. ISDA Agreement, RBS N.V. has a perfected security interest in the payable under such contract and need not pay the LBI Trustee the disputed amount pursuant to section 542 of the Bankruptcy Code.

Fourteenth Affirmative Defense
(Statute of Limitations)

78.     Pursuant to section 546(a) of the Bankruptcy Code, the statute of limitations for the LBI trustee to attempt to avoid the grant of the security interest to RBS N.V. has expired, even after giving effect to a terminated tolling agreement.  Pursuant to sections 546(e), (g), and

(j) of the Bankruptcy Code, the LBI Trustee may not bring actions under, among other sections, section 544 of the Bankruptcy Code to avoid any security interest.

<u>Fifteenth Affirmative Defense</u>
(Estoppel/Waiver/Unclean Hands/Laches)

79.     The LBI Trustee's action is barred, in whole or in part, by the doctrines of estoppel, waiver, unclean hands, and/or laches.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, made applicable to this contested matter pursuant to Bankruptcy Rule 9015(a), RBS N.V. demands trial by jury in this proceeding as to all issues so triable.

## STATEMENT PURSUANT TO BANKRUPTCY RULE 7012(b)

RBS N.V. admits that this contested matter is a counterclaim by the estate against a person that filed a claim against the estate, within the meaning of 28 U.S.C. § 157(b)(2)(C).  The Bankruptcy Court lacks constitutional authority to find facts and to apply law to facts, or otherwise to exercise the essential attributes of judicial power, absent RBS N.V.'s consent.  RBS N.V. does not consent to the Bankruptcy Court's exercise of the essential attributes of judicial power, inclusive of entry of orders or judgments by the Bankruptcy Court in this contested matter, except in respect of discovery disputes not requiring the exercise of judicial power.

## RESERVATION OF ARTICLE III RIGHTS OF RBS N.V.

RBS N.V. is filing this Response because a response is required pursuant to the Local Bankruptcy Rules for the Southern District of New York and the United States District Court for the Southern District of New York has not had an opportunity to rule on the Motion to Withdraw the Reference.   The substantive defenses and factual disputes that RBS N.V. raises in this

Response do not constitute consent by RBS N.V. to the Bankruptcy Court's exercise of judicial power and are not a waiver by RBS N.V. of its Article III rights.

## <u>NOTICE PURSUANT TO BANKRUPTCY RULE 9017</u>

Please take notice that pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, made applicable to this contested matter pursuant to Bankruptcy Rule 9017, RBS N.V. intends to raise issues pertaining to foreign law, specifically, the law of England, as it applies to the LBI-RBS N.V. ISDA Agreement and the parties' transactions and course of dealing.

WHEREFORE RBS N.V. requests that the Bankruptcy Court deny the Motion to Compel, without prejudice, due to the unconstitutionality of the Bankruptcy Court exercising the essential attributes of judicial power to find facts and to apply law to facts in this contested matter.

Dated: September 23, 2011
     New York, New York

Respectfully Submitted,

/s/ Martin J. Bienenstock
Martin J. Bienenstock
Irena M. Goldstein
DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

*Attorneys for The Royal Bank of Scotland N.V. (Formerly Known as ABN AMRO Bank N.V.)*

# **EXHIBIT A**

**(*AS Klaveness Chartering v Pioneer Freight Futures Co. Ltd.*)**

Judgments

# AS Klaveness Chartering v Pioneer Freight Futures Co Ltd and another

*Contract - Condition - Breach - ISDA Master Agreement - Defendant failing to pay sums due under contract - Claimant terminating contract and claiming termination payment in accordance with contract - Claimant commencing proceedings for non-payment - Whether sums owed by defendant*

[2009] EWHC 3386 (Comm), 2009 Folio 233, 2009 Folio 976, (Transcript)


**QBD, COMMERCIAL COURT**

**CHRISTOPHER CLARKE J**


**14, 18 DECEMBER 2009**


**18 DECEMBER 2009**

This is a signed judgment handed down by the judge, with a direction that no further record or transcript need be made pursuant to Practice Direction 6.1 to Pt 39 of the Civil Procedure Rules (formerly RSC Ord 59, r (1) (f), Ord 68, r 1). See Practice Note dated 9 July 1990, [1990] 2 All ER 1024.

T Hill QC and N Henderson for the Claimant

Bentleys Stokes & Lowless


**CHRISTOPHER CLARKE J:**

**[1]** This is a claim by AS Klaveness Chartering ("Klaveness"), for sums said to be due under a number of forward freight agreements ("FFA contracts") between it and Pioneer Freight Futures Co ("PFF"), the First Defendant; and against Pioneer Metals Ltd ("PM"), the Second Defendant under a contract of guarantee whereby PM guaranteed PFF's performance of, inter alia, the FFA contracts up to US$10 million.

**[2]** Both Defendants were previously represented by solicitors and counsel. At about 1800 on the Friday before the trial, which began on Monday 14 December, the Defendants' solicitors, Messrs Clyde & Co, having sought an adjournment from Klaveness' solicitors, which was refused, indicated that they were without instructions and that the Defendants would not be represented. The Defendants have neither appeared nor adduced any evidence. I have, however, thought it right to consider the witness statements of Mr Chen filed by PFF in coming to my conclusions (Despite the fact that no notice in respect of them has been served under Pt 33; and they have not been put in by PFF as statements.).

**[3]** Klaveness is a Norwegian corporation which is engaged in the business of chartering vessels. PFF is not so engaged but it was one of the largest traders in FFA contracts. Although it is incorporated in the British Virgin Islands, it is Chinese owned and its personnel operate from Beijing. PM is incorporated in Hong Kong.

*THE GUARANTEE*

**[4]** On 7 June 2006 PM entered into a guarantee ("the Guarantee"), under which it guaranteed to Klaveness the due and faithful performance by PFF of all of its liabilities and responsibilities under the "Agreements", including the due and punctual performance of the Agreements and the prompt payment of any sums from time to time due, whether by acceleration or otherwise, from PFF to Klaveness. Clause 3 provided that payment under the Guarantee should be made promptly upon receipt by PM of a written demand by PFF to PM's address or fax number stating the circumstances of the default by PFF and the amount demanded (not to exceed the Balance Due). The definition of "Agreements" was wide enough to cover the FFA contracts in suit.

*THE FFA CONTRACTS*

**[5]** Between 27 June 2006 and 18 September 2008 Klaveness and PFF entered into 20 FFA contracts. Each of them was subject to the 1992 version of the (Multicurrency-Cross Border) Master Agreement of the International Swap Dealers Association Inc. ("the Master Agreement"); and each of those 20 contracts was a "Confirmation" for the purpose of that Agreement.

**[6]** On 17 September 2008 Baumarine A/S entered into a single FFA contract with PFF. Baumarine is a company related to Klaveness but with a different beneficial ownership. That contract was also subject to the Master Agreement.

**[7]** In the 20 contracts PFF was sometimes the Seller and sometimes the Buyer and Klaveness was sometimes the Buyer and sometimes the Seller. The contracts specified the Contract Route, Rate, Quantity, Month and Settlement Date. Thus, to take an example, in one case PFF was the Seller; the Contract Route was BPI TC as defined by the Baltic Exchange on the Contract Date (or a replacement or substitute route published by the Baltic Exchange); the Contract Rate was $ 48,500 per day; the Contract Quantity was 15 days in each of the months from October to December 2008; and the Settlement Dates were the last Baltic Exchange Index publication days of each Contract Month.

**[8]** The FFA contracts provided:

*"6 SETTLEMENT RATE*

(a) Each settlement rate (the 'Settlement Rate') shall be the unweighted average of the rates for the Contract Route(s) published by the Baltic Exchange over the Settlement Period (defined as All Baltic Exchange Index publication days of the applicable Contract Month up to and including the Settlement Date)

*7 SETTLEMENT SUM*

The 'Settlement Sum' is the difference between the Contract Rate and the Settlement Rate multiplied by the Quantity by Contract Month. If the Settlement Rate is higher than the Contract Rate, the Seller shall pay the Buyer the Settlement Sum. If the Settlement Rate is lower than the Contract Rate, the Buyer shall pay the Seller the Settlement Sum.

*8 PAYMENT PROCEDURE AND OBLIGATIONS*

(a) Payment of the Settlement Sum is due on the later of two (2) London business days after presentation of payee's invoice (with complete payment instructions) or five (5) London business days after the Settlement Date and for this purpose a 'London business day' means a day (other than a Saturday or Sunday) on which commercial banks are open for business in London. The Settlement Sum will be deemed 'paid' when it has been received into the bank account designated by the payee.

(b) Payment of the Settlement Sum shall be made telegraphically, in full, in United States dollars. The costs incurred in effecting payment shall be for the account of the payer. Payment may only be effected directly between the parties. The Settlement Sum shall be paid without any deduction or set-off except as permitted pursuant to the Master Agreement or otherwise as agreed by the Buyer and the Seller in writing.

*9 ISDA MASTER AGREEMENT*

. . .

This Confirmation constitutes and incorporates by reference the provisions of the 1992 ISDA Master Agreement (Multicurrency - Cross Border) (without Schedule) as if they were fully set out in this Confirmation and with only the following specific modifications and elections:

Section 2(c)(ii) shall not apply so that a net amount due will be determined in respect of all amounts payable on the same date in the same currency in respect of two or more Transactions.

. . .

For the purposes of payments on Early Termination, Loss will apply and the Second Method will apply;

(f) Automatic Early Termination will apply to both parties.

*13 NON-ASSIGNABILITY*

Except as provided in Section 7 of the Master Agreement, this Confirmation is non-assignable unless otherwise agreed in writing between the parties to this Confirmation."

**[9]** The Master Agreement contained the following provisions:

"1 Interpretation

. . .

(c) *Single Agreement*. All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this 'Agreement'), and the parties would not otherwise enter into any Transactions.

2. Obligations

(a) *General Conditions*

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

. . .

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing. . . .

. . .

(c) *Netting*: If on any date amounts would otherwise be payable:

(i) in the same currency; and

(ii) in respect of the same Transaction (It is this subsection which is disapplied by the terms of the FFA contracts so as to permit set off between more than one Transaction.),

by each party to the other, then, on such date, each party's obligation to make a payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount

5. Events of Default and Termination Events

(a) Events of Default. The occurrence at any time with respect to a party . . . of any of the following events constitutes an event of default (an 'Event of Default') with respect to such party:

(i) *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

. . .

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:

(1) is dissolved. . .

(2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due;

(3) makes a general assignment, arrangement or composition with or for the benefit of its creditors;

(4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding, or petition instituted or presented against it, such processing or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof;

(5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger);

(6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets;

(7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter;

(8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive). . . .

6 Early Termination

(a) *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the 'Defaulting Party') has occurred and is then continuing, the other party (the 'Non-defaulting Party') may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, 'Automatic Early Termination' is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(c) *Effect of Designation*.

(i) If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii) Upon occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) *Calculations*.

(i) *Statement*. On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the record of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii) *Payment Date*: An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default). . . .

(e) *Payments on Early Termination*. If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either 'Market Quotation' or 'Loss', and a payment method either the 'First Method' or the 'Second Method' (The FFA contracts opted for 'Loss' and the 'Second Method'.). If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that 'Market Quotation' or the 'Second Method', as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(4) Second Method and Loss. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

7 Transfer

Subject to Section 6(b)(ii) neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:

(a) a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b) a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e)

5 of 14

9 Miscellaneous

. . .

(b) *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

. . .

14 Definitions

'*Loss*' means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its termination, liquidating, obtaining or re-establishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

'*Potential Event of Default*' means any event, which, with the giving of notice or the lapse of time or both, would constitute an Event of Default."

## EVENTS AT THE END OF 2008

**[10]** In the second half of 2008 the freight market slumped dramatically. It became apparent to the parties that, although Klaveness would owe sums to PFF in respect of December, PFF would owe very much larger sums to Klaveness in respect of January and beyond. The obligation of PFF to make such payments would badly affect its cash flow in circumstances where the potential inability of PFF's debtors to pay PFF was likely to deprive it of cash with which to make payment of what it owed.

**[11]** A potential solution was at hand. Duferco Shipping SA ("Duferco") was a very creditworthy counterparty of PFF, which would owe it large sums under trades maturing from January onwards (estimated by Klaveness at about $ 25 million). The FFAs precluded any assignment by PFF of its rights against Duferco. But it would be possible to novate PFF's contracts with Duferco so that Klaveness took PFF's place. This would (on the assumption that the Duferco - PFF contracts were, so far as material, in the same form as the Klaveness-PFF contracts) be of some benefit to Duferco since, if PFF were unable to pay its debts, there was a risk of an Automatic Early Termination, which would generate an immediate obligation on Duferco's part to pay "Losses". The solution would involve Klaveness exchanging an obligation on the part of PFF to pay it in the future sums totalling about $ 30 million for obligations on the part of Duferco of lesser value. It would thus, in the jargon, be having a "haircut". But it would have the advantage of a counterparty which was less likely to default.

## 18 DECEMBER 2008

**[12]** Negotiations took place between Mr Preben Richter, Klaveness' trading manager, and Mr Chen Yang (Eddie Chen) of PFF, who was responsible for all its back office operations. The upshot was that by an email of Thursday 18 December 2008 from Mr William L'Orange, who had overall responsibility for Klaveness' FFA contracts, to Mr Chen, Klaveness informed PFF that it had decided to accept a proposal that had been put forward at a meeting in Milan the previous day whereby Klaveness would agree to novate the position

between PFF, Duferco and Klaveness for 2009 and 2010 in line with a draft novation agreement which was then in existence, and Klaveness would cancel all rights and obligations outstanding as between PFF, Klaveness and Baumarine. That offer was expressed to be conditional on all agreements being completed and signed by close of business Oslo time on Tuesday 23 December.

[13] In the email Mr L'Orange said that PFF must start immediately (a) to contact Duferco that day to inform them of PFF's desire to do the novation; and (b) to instruct its lawyers to start drafting and discussing changes to the draft agreements proposed by Klaveness with Klaveness' lawyer. He also said that three agreements needed to be in place (i) a novation agreement PFF/Duferco/Klaveness; (ii) a close out agreement between Klaveness and PFF; and (ii) an agreement between PM and Klaveness where PM guaranteed that PFF was solvent at the time of signing the agreement and the return of the Guarantee. He indicated that the agreements should be completed by Monday 22 December and signing should take place the next day.

*19 DECEMBER*

[14] On Friday 19 December Mr Chen replied saying that PFF accepted this proposal. He said that he had instructed his lawyer to draft the contract which should be available during the weekend. Mr L'Orange emailed back to say that he was glad to hear that "*we have reached an agreement on commercial terms and the timing aspects"*. He said that Klaveness' lawyer would be available during the weekend and expected that PFF's lawyer would still be Mr Derek Chalmers of Clyde & Co. He asked Mr Chen to inform him once he had spoken to Duferco regarding the netting so that the process could be concluded with them during the same timeframe. A little later Mr Chen emailed a Mr Carruba of Duferco to confirm that PFF had agreed to novate all existing contracts with Duferco to Klaveness and saying that Klaveness would contact him soon "*with novation contract*". Then Mr Chen replied to Mr L'Orange to say that Mr Chalmers was on vacation but that his colleague would step up to resume his work during his vacation. He expressed the view that "*Since Klaveness has side deal with Duferco, it might be more appropriate that Klaveness talk to Duferco for this matter*".

*22/23 DECEMBER*

[15] No agreements were forthcoming either over the weekend or on Monday 22 or Tuesday 23. The reason for requiring completion by Tuesday 23 was that Wednesday 24 was the Settlement Date for December. The basis of the proposed deal was that the December Settlement would be "washed out" in the novation agreement ie PFF would not be entitled to receive anything in respect of December nor bound to pay anything in respect of the January (or subsequent) months and Klaveness would step into PFF's shoes vis-à-vis Duferco in respect of December and beyond.

*24 DECEMBER*

[16] On 24 December the Settlement Sums under the various FFA contracts in respect of December were such that $ 702,997.31 was owed by Klaveness and $ 679,836.24 by Baumarine to PFF. Under the terms of the FFAs these sums were due on 5 January 2009.

*THE TELEPHONE CONVERSATION ON 30 DECEMBER*

[17] On 30 December 2008 Ms Bless Lee, who was in the back office of PFF, emailed to the brokers an invoice to Klaveness for $ 702,997.31. Since the novation deal was intended to have the effect that the net December Settlement Sum was not payable Klaveness was surprised to receive it.

[18] Mr Richter telephoned Mr Chen. His account of that conversation was as follows:

> "We discussed two matters. First, when the draft agreements would be provided by PFF's lawyers. Second, what was to happen in relation to the December settlement. It had been intended that the agreements should be completed and signed by 23 December 2008. This had not happened but Mr Chen assured me that from PFF's point of view the deal was still on The December Settlement was going to be washed out in the proposed novation agreement. Mr Chen and I therefore agreed that the settlement for December 2008 in the sum of US $1,382,833.56 otherwise payable by Klaveness and Baumarine to PFF would not take place pending conclusion of the novation agreement. Mr Chen and I did not discuss what would happen in respect of the December Settlement if the novation agreement did not in fact go ahead. This is because we both assumed it would and that the December Settlement would be subsumed with the overall settlement and cancelled together with all other obligations between Klaveness, Baumarine and PFF in accordance with the terms of the original commercial agreement that had been previously discussed."

[19] In para 20 of his second statement Mr Chen accepts that it was agreed that the novation would include the December Settlement Sum but says that he cannot remember expressly agreeing that the settlement for

December would not take place pending the conclusion of the novation. He says that it was his understanding that:

> "We were both working on the novation deals and that if the deal was concluded the December payment would be netted off as part of the deal. It would therefore be fair to say that it was implicitly agreed that I would not chase for the December payment whilst these discussions were ongoing."

[20] I am quite satisfied that there was an *explicit* discussion about the December payment. The whole reason for Mr Richter's call was to deal with the invoice which had, unexpectedly, demanded payment of the December Settlement Sums; it is most unlikely that Mr Richter and Mr Chen did not talk in terms about the December Settlement. I am also satisfied that the agreement was that the Settlement for December would not take place pending the conclusion of the novation agreement.

[21] I reach that conclusion for two reasons. Firstly, having seen him, I regard Mr Richter as an honest and reliable witness and as someone not prepared to say anything he could not really support. Secondly, the basis of the proposed deal, which Mr Chen was confirming was "*still on*" was that if the novation took place the December Settlement Sums would not be payable. If the December Settlement was to be payable the deal would, as Mr Chen knew, either go off or, at any rate, would have to be renegotiated. In those circumstances the likelihood is that the agreement was that, pending the novation, the December Settlement would not take place since that is (a) what Klaveness would require; and (b) the result that the novation deal was intended to secure. It seems to me unlikely that matters were left on the basis that the December Settlement was to be due but PFF would not chase it.

[22] There was sufficient consideration for this agreement in Klaveness' continued preparedness to continue negotiating the proposed novation deal and the keeping open of that deal which would be of considerable benefit for PFF.

[23] PFF would contend that, if there was such an agreement it amounts to an amendment, modification or waiver of the Master Agreement and must, in order to be effective be in writing: see s 9(b). I do not accept this. It seems to me that the agreement made during the conversation on 30 December may properly be regarded as a contract collateral to the Master Agreement. It was not an agreement which had any continuing effect in relation to the Master Agreement. It was a one-off arrangement for a temporary suspension of the December Settlement. There is authority that a contract which is collateral to a contract which is required to be in writing does not itself have to be in writing. *Angell v Duke* (1875) LR 10 QB 174; *City of Westminster Properties v Mudd* [1959] Ch 129, [1958] 2 All ER 733, [1958] 3 WLR 312; *Record v Bell* [1991] 4 All ER 471, [1991] 1 WLR 853, 62 P&CR 192; *Chitty on Contracts*, (30th ed, 2008), paras 12-103 and 22-036.

[24] I do not, however, accept that the combination of the cure notice and the exchange of emails on 12 and 13 January can be regarded as a confirmation of a modification by "an exchange of . . . electronic messages on an electronic messaging machine". Those documents are consistent with the agreement that was made but they are not, to my mind, a confirmation of the actual agreement made.

[25] In the light of that agreement it is necessary to consider when the December Settlement would become payable, assuming that there was no novation as envisaged (as turned out to be the case). The parties did not reach any express agreement on this question. But it seems to me that it was their obvious intention that, if the novation agreement was not to be made, PFF would be entitled to give Klaveness and Baumarine reasonable notice, which could be quite short, to make payment of the December Settlement Sums. It cannot have been their intention that Klaveness and Baumarine should be in immediate default in respect of the December Settlement without any notice once some undefined point had arisen at which it could be said that the negotiations for the novation had gone off (a matter capable of much dispute). No hardship would be involved in requiring such a notice nor would such a notice conflict with the basic understanding that the December Settlement would not be payable whilst the contract of novation was in negotiation. If PFF gave such a notice it would be signifying that it did not intend to go ahead with the deal proposed which assumed that the *December* contracts were novated.

[26] If that conclusion is too bold a result to reach by a process of implication it seems to me that the same result may be achieved by application of the principles of equitable forbearance. The effect of what was discussed and agreed on 30 December was that PFF unequivocally represented that the normal operation of the FFA contracts in respect of December, including in particular the obligation to make payment, was to be suspended and that it was not going to require payment of the December Settlement Sums in accordance with the Master Agreement and the FFA contracts. Klaveness relied on that representation by not paying PFF's invoice in respect of the December Settlement. If that non payment is to be relied on as an Event of Default or a Potential Event of Default, Klaveness will have acted to its detriment. It would be inequitable to

allow PFF now to resile from its representation. PFF was entitled to bring its forbearance to an end on reasonable notice; but it never did so. It is no matter that the Master Agreement required any amendment or modification to be in writing. It is not necessary that any forbearance to enforce should be in writing in order for equitable principles to apply: *MSAS Global Logistics v Power Packaging Inc* [2003] EWHC 1393 (Ch).

**[27]** No notice was ever given by PFF so that the December Settlement Sums did not become due. In any event, as we shall see, the question as to whether the December Settlement Sums were payable was overtaken by events.

*THE CURE NOTICES OF 6 JANUARY 2009*

**[28]** On 6 January 2009 ie the day after the December Settlement Sums would have been due PFF served two notices under cl 5(a)(i) of the Master Agreement ("cure notices") requiring payment within three London Business Days of $ 702,997.31 under the Klaveness/PFF contracts and $ 679,836.24 under the Baumarine/PFF contracts. These notices were signed by Mr Chen. They were received by Klaveness on Friday 9 January 2009.

**[29]** On 12 January Mr Richter emailed Mr Chen:

> "I was surprised to receive your letter of 6 January to Baumarine and [Klaveness] regarding payment of December settlement. We have agreed that the novation between Duferco/PFF/Klaveness will cancel all obligations between Baumarine/Klaveness and PFF. We are still awaiting draft agreement from your lawyers which you on several occasions have promised to produce and send to us. We look forward to receive your draft agreements for the novation agreement."

**[30]** On 13 January Mr Chen replied:

> "I am sorry for the mistake that the Bank office made. They didn't know the deals we are talking.
>
> The contract should be ready today according to my lawyer."

"*Bank office*" is an obvious misprint for "back office".

**[31]** If the cure notices of 6 January were effective there was an Event of Default in relation to both the Klaveness and Baumarine contracts on Thursday 15 January. Such an Event arises if a failure to pay has not been remedied on or before the third Local Business Day after notice of such failure is given. Since the notice reached Klaveness on Friday 9 the three days thereafter were Monday - Wednesday 12 - 14; and any default would have been on the 15.

**[32]** I am quite satisfied that the notices of 6 January were not effective. Even if the December Settlement Sums were due on 5 January (which they were not: see paras 20ff above) the effect of Mr Chen's email of 13 January was to represent to Klaveness that the cure notices were a mistake and were not therefore to be taken as having their apparent effect. If X tells Y that a notice that he has previously sent is a mistake then, in the absence of any indication to the contrary, he must be regarded as not seeking to rely on a notice which he has proclaimed to be an error. Klaveness relied on that representation by not paying the December Settlement Sum or taking any step to clarify the position and, if necessary, altering the terms of the negotiations about novation. It is not open to PFF to resile from it now.

*MONDAY 19 JANUARY*

**[33]** At 0814 Norwegian time, 0714 London time, Mr Richter emailed Mr Chen complaining that it was now more than a month since the novation had been agreed on and pointing out that Klaveness was still waiting for the documentation which he had promised to send on several occasions. He ended by saying:

> "If this deal is to be concluded we have to have an agreement signed by all three parties within 31 January. If not, we expect a timely settlement according to the terms set out in FFABA 2007."

**[34]** At 13.17 Norwegian time, 13.17 London time, Mr Chen forwarded to Clyde & Co the sequence of email correspondence consisting of Mr Orange's email of 18 December, Mr Chen's reply of 19 December and Mr Orange's reply email to Mr Chen of the same day: see paras 11 - 13 above. The forwarding email read *"Below is the commercial terms I agreed with Klaveness. I need your help to put together the contract asap"*. It went on to say that there should be three contracts (i) the novation contract; (ii) an agreement between Klaveness and PM to cancel the Guarantee; and (iii) a settlement agreement with Baumarine.

**[35]** I infer from this that, contrary to the impression given by Mr Chen, PFF had no taken any steps after 19 December to instruct its solicitors to draw up the contractual documentation. This was either through inertia, which seems to me somewhat unlikely, or, as seems to me more likely, because PFF hoped to obtain a more favourable deal by a novation of the Duferco contracts in favour of someone else so as to effect a bigger "haircut" by using the Duferco contracts to buy off an even greater future indebtedness. It is unnecessary to make any specific finding and, in the absence of Mr Chen, I do not do so.

*21 JANUARY*

**[36]** At 1339 London time Clyde & Co emailed to Mr Chen draft documents for review and consideration. At 1723 Norwegian time Mr Chen emailed the three draft agreements to Mr Richter.

**[37]** On 26 January Mr Chetwood of Bentley Stokes, who had been instructed by Klaveness and had received the documents, emailed Mr Chalmers of Clyde & Co with some comments on the drafts.

*28 JANUARY*

**[38]** On 28 January at 0959 Norwegian time Mr Richter emailed Mr Chen to say:

> "Unfortunately the time we have spent on getting the agreements ready has had some unwanted and unexpected consequences. Duferco has re-thought the whole deal and is now trying to see if there are other potential parties for novation.
>
> In order to get our agreement signed we need your support with Duferco. Could you please contact Duferco and put pressure on them to sign the agreement. I think it is important to make a point that there are no other potential novation parties.
>
> As time is running out towards our deadline we need to have a joint effort towards Duferco"

**[39]** On the same day Mr Chalmers indicated that in principle he had no objection to Mr Chetwood's proposed amendments.

*29 JANUARY*

**[40]** Mr Chen replied to Mr Richter's email of 28 January saying that he had sent an email to Duferco on that day. This email has not been disclosed.

*30 JANUARY*

**[41]** Friday 30 January was the Settlement Date for the January contracts. On that day Mr Richter emailed Mr Espen Stange, who was employed in Klaveness' back office, to tell him that Klaveness would be sending the settlement advice for January to PFF as normal and that the withheld settlement for December in respect of both Klaveness and Baumarine was to be deducted from the due amount.

*2 FEBRUARY*

**[42]** On 2 February Mr Richter telephoned Mr Chen to ask whether he had received an answer back from Duferco. Mr Chen said he had not. He agreed to call Mr Francesco Caruba of Duferco and Mr Richter emailed to Mr Chen Caruba's contact details

*3 FEBRUARY*

**[43]** In the morning of 3 February Mr Stange emailed to Mr Chen an invoice in respect of the January 2009 Settlement and advised him that the due date for payment was Friday 5 January. That date was a mistake for 6 February which he corrected an hour later. The invoice specified $ 4,564,840.81 as due for January and gave credit for the $ 702,997.31 due from Klaveness for December, making $ 3,861,843.50. It did not, however, give credit for the amount due from Baumarine.

**[44]** On the same day Bless Lee of PFF sent to the brokers a credit note in the sum of $ 4,564,840.81. which the brokers passed on to Klaveness later that day.

**[45]** In the afternoon of the same day Mr Richter emailed Mr Chen to say:

> "Unfortunately our joint effort on getting Duferco back on track on the novation agreement doesn't seem to have succeeded so far. We do hope that they will come back so we can sign the novation agreement. However, we don't see that this will happen within the next few days.
>
> Under these circumstances we will have to modify the agreement by running January settlement as normal ie PFF shall be paid by Duferco under the existing contracts and Klaveness shall be paid by PFF under the existing contracts. *We will of course deduct the December settlement amount from Baumarine and Klaveness Chartering from the January settlement. . . .*
>
> Let me point out that Klaveness is still very keen to implement the novation agreement with Duferco/PFF but the terms will have to be slightly changed to include the period from February onwards. That also means that some of the documentation has to be slightly changed. However, I think that the most important thing now is to get Duferco back in the game and get them to sign the novation documents."


[Bold added]

*5 FEBRUARY*

**[46]** At some time on 5 February Mr Richter called Mr Chen to assure him that Klaveness was still interested in concluding the novation from February onwards. The exact time of this conversation is unknown. Mr Richter told me that he thought that it was before lunch Oslo time ie before noon and, in my judgment, he is likely to be right about this. His evidence is that after he had given this assurance:

> ". . . Mr Chen then indicated that he wished to 'skip' the January Settlement and wanted to conclude the novation agreement with Duferco. I replied that skipping the January Settlement was out of the question and that the January Settlement had to be paid by PFF. Mr Chen explained that as a result of: (i) a claim of approximately US$50 million from a third party; and (ii) difficulties in collecting payments from other third parties, that it was going to be problematic to obtain the cash necessary for the January Settlements. It was plain to me that he was saying that PFF did not have the money to make the January Settlement. I replied that skipping the January Settlement was out of the question and that the January Settlement had to be paid by PFF. I said that Klaveness would of course give credit for the December Settlement due to PFF. I confirmed that on, this basis, Klaveness would still be interested in a novation for February 2009 onwards. Mr Chen replied 'OK'."


**[47]** At 1051 London time, 1151 Norwegian time, Bless Lee of PFF emailed the brokers asking them "*urgently [to] send us the settlement invoice of Klaveness*". At almost exactly the same time, namely 1154 Norwegian time, Mr Stange of Klaveness emailed to Mr Chen an amended settlement invoice for January 2009, pointing out that the due date was the next day - 6 February. That invoice gave credit for both the Klaveness and Baumarine December Settlement Sums.

**[48]** At 1237 Norwegian time the brokers forwarded to Klaveness Bless Lee's email of 1051 London time and asked Klaveness to send its January invoice for PFF. At 1240 Norwegian time Mr Stange dealt with that request by forwarding to Bless Lee the email he had already sent to Mr Chen at 1154 Norwegian time.

**[49]** Mr Chen's evidence in relation to the conversation with Mr Richter is this:

> "I don't recall the exact details of the conversation, and I don't remember whether he referred to giving credit for the December settlement. If he did, I am confident that I did not agree to it - that would have stuck in my mind and I would have issued orders to my back office to withdraw the cure notice had I reached such an agreement. As stated, the focus of the discussion was the novation agreement, from my side, and I think that must have been what I was referring to

when I said 'ok'. I certainly was not agreeing to net the December settlement if there was no novation."

*CONCLUSION IN RESPECT OF 5 FEBRUARY CONVERSATION*

[50] I am satisfied that Mr Richter's evidence as to 5 February conversation is reliable and that it was agreed between him and Mr Chen that the January settlement was to be paid less a deduction of the December Settlement. Klaveness was understandably not prepared to forego what was due to it under the January Settlement in circumstances where none of the Duferco contracts had been novated. On the footing that the January Settlement Sums were due on the next day it was in PFF's interest that there should be a netting off. It was that netting off, offered in Mr Richter's letter of 3 February and, in effect, confirmed in the oral conversation on 5th, to which, when he said "OK", Mr Chen agreed. I do not find it credible that Mr Chen did not focus on the proposal for set off. Further, he did not need to say "OK" to Mr Richter's indication that Klaveness was still interested in concluding the novation.

[51] Mr Chen says that, if he had agreed to the set off, he would have issued orders to his back office to withdraw the cure notice. But there was no need for him to have done so. He had already said that it was a mistake.

[52] My conclusion that such an agreement was made is supported by what happened, as I find, afterwards. At 1151 Norwegian time Bless Lee asked the brokers for a settlement invoice. At 1154 Mr Stange of Klaveness sent Mr Chen an amended settlement invoice for January giving credit for both December amounts. At 1240 Mr Stange forwarded to Bless Lee what he had sent to Mr Chen at 1154.

[53] It is possible that Mr Stange sent the revised invoice to Mr Chen because he had belatedly realised that his original invoice for January did not give credit for both December amounts as called for by Mr Richter's email of 30 January. In his statement Mr Stange says that he certainly does not remember deciding that the invoice should be amended of his own initiative, and that, if he had, he would remember that. Nor does he remember any specific request from PFF. He thinks that the probable reason for his sending out the revised invoice was that he had received a telephone call from PFF asking for an amended invoice.

[54] The likelihood is that, Mr Chen and Mr Richter having agreed that the January Settlement would be made less a credit for the amounts due under the December Settlement, PFF was keen to have an invoice which gave credit for *both* amounts and, accordingly someone - either Mr Chen or someone else - contacted Mr Stange to request such an invoice. That conclusion tallies with the fact that Mr Strange asked for Mr L'Orange's authority to issue the revised invoice - something that he is not very likely to have done if what he was doing was correcting a mistake that he had realised he had made in not giving effect to an instruction he had already been given. That request, itself, would, in the circumstances, amount to an acceptance of the offer to set off the two December amounts. Bless Lee's request for an invoice is likely also to have been a result of the agreement that had been made. PFF would have been keen to have a record that the amount claimed gave credit for both December amounts.

[55] That agreement was, in my judgment, an agreement in writing for the purposes of Cl 8(b) of the FFA contracts ("shall be paid without any deduction or set-off except as permitted pursuant to the Master Agreement or otherwise as agreed by the Buyer and the Seller in writing") since the relevant terms were contained in the email of 3 February. The acceptance of the offer was not required to be in writing: see by analogy *Zambia Steel & Buildings Supplies Ltd v James Clark & Eaton Ltd* [1986] 2 Lloyd's Rep 225 where it was held that a quotation incorporating an arbitration clause on its back could constitute an "agreement in writing to refer disputes to arbitration" within the meaning of the Arbitration Act 1975 even though the assent to the quotation was oral.

[56] If that be incorrect it seems to me that the agreement made on 5 February may properly be regard as a collateral contract and effective as such: see the authorities cited at para 23 above. In any event the content of the conversation on 5 February together with the request for a revised invoice, its dispatch and acceptance without demur, coupled with the absence of any claim that Klaveness should be paying the December amounts constituted a clear representation that PFF accepted that Klaveness had a right to set off whatever cl 8(b) of the FFA contracts said. Klaveness relied on that by not paying and by proceeding on the basis that PFF was satisfied with the setting off arrangement. PFF cannot be allowed to resile from its representation in circumstances where Klaveness can no longer pay the December Settlement Sum prior to 6 February. Such a payment, if it had been made, would have meant that, on the assumption that the December Settlement Sums were due, there was no longer any Potential Event of Default.

*6 FEBRUARY - NON PAYMENT*

**[57]** Friday 6 February was the day when the January Settlement Sums became due, being five London business days after Friday 31 January. In the light of the agreement for set off what should have been paid by PFF was $ 3,182,007.25. That sum was not paid.

*THE SEQUEL*

**[58]** On 9 February Klaveness served a cure notice on PFF by courier calling for payment of $ 3,861,843, being the amount due from it for January less the amount to it from Klaveness for December. It also served a demand on PFF for the same sum under the Guarantee.

**[59]** On 10 February Mr Chen told Mr Richter in a telephone conversation that PFF had collected only about 10% of its January receivables and was chasing counterparties and paying out as money came in.

**[60]** By a letter of 13 February Klaveness designated the date of receipt of its letter (which was 13 February) as an Early Termination Date in respect of all transactions with PFF under the 1992 Master Agreement.

**[61]** On 16 February Klaveness sent PFF an invoice for the amount calculated in accordance with s 6(e)(4) of the Master Agreement in the sum of $ 30,517,912.25. On the same day it claimed that sum from PM under the Guarantee.

**[62]** The make-up of the $ 30,517,912.75 is carefully explained in Mr Richter's third statement. Although Klaveness has been put to proof as to quantum, no suggestion has ever been made that the calculation is wrong or unjustified and I am satisfied that it is justified.

**[63]** On 19 March 2009 Klaveness' Hong Kong lawyers made a claim by letter to PM for $ 10 million under the guarantee.

**[64]** In those circumstances Klaveness claims against PFF:

> (a) $ 3,182,007.25
>
> ($ 4,564,540.81 - [$ 702,997.31 + $ 679,836.24)
>
> plus
>
> (b) $ 27,335,905.00

making $ 30,517,912.25 in total.

*PFF'S CLAIMS*

**[65]** PFF claims that no sum is due upon the following basis. Clause 2(a) of the Master Agreement makes it a condition precedent of any obligation to pay under s 2(a)(i) that no Event of Default or Potential Event of Default has occurred. The December instalment of $ 702,997.31 was due on 5 January 2009. A cure notice in respect of Klaveness dated 6 January was served on 9 January 2009. Nothing happened to invalidate that notice, as a result of which there was an Event of Default in respect of Klaveness from 15 January onwards. Accordingly PFF was from that date under no obligation to make payment and, in particular, under no obligation to make a payment in respect of January which would otherwise have become due on 6 February. As I have already held, the cure notices of 6 January were, in the light of Mr Chen's email of 13 January, ineffective.

**[66]** PFF further contends that, even if the cure notice was invalid there was at all material times and in any event before 6 February a Potential Event of Default constituted by the non payment of the December Sum due from Klaveness which, with the giving of a valid cure notice and the expiry of three London Business Days days thereafter would constitute an Event of Default. For that reason there was from 5 January 2009, when the December sums became due, a Potential Event of Default in respect of Klaveness.

**[67]** I disagree. For the reasons that I have given I am satisfied that on 30 December an agreement was reached that the Settlement Sums for December 2008 would not be payable by Klaveness and Baumarine pending conclusion of the novation agreement. That agreement was supported by consideration since it was made on the footing that Klaveness would continue to negotiate the proposed contract of Novation despite the

fact that no such contract had been signed by 23 December. It was also in the circumstances of benefit to PFF that such payment would not be made since such a payment would be inconsistent with the proposed novation, which was of potential value to PFF.

[68] Alternatively PFF was not, in equity, entitled to resile from its representation that the December payment was to be suspended.

[69] In order for the December Settlement Sums to become due it was necessary for PFF, either as a matter of contract or in order to terminate its forbearance, to give notice to Klaveness that payment was required. But it never did so. Even if all that PFF said was that it would not chase for the December amounts that would be enough to preclude it from contending that non-payment still amounted to a Potential Event of Default or that it was entitled to serve a cure notice. It could not, in equity, at one and the same time represent that it would not seek payment and rely on provisions of the contracts (Cure notice, Event of Default, Early Termination Date) which are only applicable upon the footing that the payment in question is due.

[70] In any event before 6 February the parties agreed that the two December Sums should be set off against the January sums such that by 6 February there was no amount due from Klaveness which could form the basis of a cure notice leading to a Notice of Default. That renders it unnecessary to decide whether there is a Potential Event of Default if there is a non-payment which would only constitute an Event of Default if three things happened, namely (i) a cure notice was given and (ii) three London Business Days expired *and* (iii) no payment was made on any of those days.

[71] PFF suggest that the effect of Klaveness' email of 20 January indicating that, absent a signed agreement by 31 January, Klaveness expected a timely settlement, was that any agreement made for the suspension of the December payment or any forbearance shown was at an end. The December Settlement Sums, thus, became immediately payable and, not having been paid, there was a Potential Event of Default. I do not accept this. The email of 20 January did not relate to the December amounts. It was a warning that, on the assumption that no deal was concluded by 31 January Klaveness would expect the January Settlement Sum to be paid on 6 February. In any event it was followed by the agreement about set off of 5 February.

[72] Even if any forbearance in respect of the December Sums is to be regarded as coming to an end in the event of non-agreement on 31 January it would seem to me that Klaveness would be entitled to a reasonable time thereafter to pay the December Settlement Sums. A reasonable time would have been the five London Business days provided for in cl 8 of the FFA contracts. That would take Klaveness to 6 February. The effect of that would be that the December Settlement Sums became due on the same day as the January Settlement Sums. The amounts of both are in the same currency and due at the same date and accordingly that which was payable on 6 February, so far as Klaveness was concerned, was the January amount owed to it less the December amount owed by it.

[73] In those circumstances it is unnecessary to decide whether or not PFF was unable to pay its debts as they fell due as early as 30 December 2008 or 5 January 2009. In the action *Marine Trade SA v Pioneer Freight Futures Co Ltd* [2009] EWHC 2656 (Comm) PFF conceded that from 6 February 2009 it was unable to pay its debts as they fell due. The court has previously ordered that that issue is only to be tried after the remaining issues - if necessary.

*CONCLUSION*

[74] PFF was in default in failing to pay anything in respect of January. Klaveness was entitled to serve (as it did) a cure notice, to fix an Early Termination Date, and to recover its Losses. Such a conclusion is consistent with what occurred at the time. It was not suggested in January and February that Klaveness ought to have paid the December sums; or that there was either an actual or Potential Event of Default on its part because it had not done so.

[75] Accordingly I propose to give Klaveness judgment against PFF for the amount specified in para 64 above and against PM for $ 10 million. The latter sum is claimed both in action 2009 Folio No 233, which is against both Defendants, and in the later action 2009 Folio 976, which is against PM only. The latter action was commenced in order to meet the objection made by PM that there was no valid letter of demand until the letter of 19 March 2009. The point is relevant now only as to interest and I invite submissions as to the date from which interest should run and on rate.

[76] I am grateful for the efficient way in which the case has been prepared and presented.

*Judgment accordingly.*

## **EXHIBIT B**

**(September 14, 2011 Hearing Transcript Excerpt)**

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Lead Case No. 08-13555(JMP); 08-01420(JMP)(SIPA)

4  - - - - - - - - - - - - - - - - - - - - -x

5  In the Matters of:

6

7  LEHMAN BROTHERS HOLDINGS INC., et al.,

8          Debtors.

9  - - - - - - - - - - - - - - - - - - - - -x

10  In the Matters of:

11

12  LEHMAN BROTHERS INC.,

13          Debtor.

14  - - - - - - - - - - - - - - - - - - - - -x

15              U.S. Bankruptcy Court

16              One Bowling Green

17              New York, New York

18

19              September 14, 2011

20              10:02 AM

21

22  B E F O R E :

23  HON. JAMES M. PECK

24  U.S. BANKRUPTCY JUDGE

25

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 59

1    are certainly started at very different positions and what's

2    going to lie ahead, regardless of which Court ends up presiding

3    over this.  The speech are as follows:

4              As is shown by the LBI's trustee's initial motion in

5    this matter, they take the position that RBS N.V. owes 345

6    million dollars under an ISDA contract, has admitted its owing,

7    and the only issue to be decided is whether triangular set-off

8    is enforceable in bankruptcy.

9              The RBS position is very much different.  The RBS

10   position is there is an ISDA contract, but there's also another

11   contract called the terms of agreement.  And that contract came

12   into being because in trade confirmations that RBS furnished

13   the LBI over 880 times without objections as they were doing

14   all their trading, those were the terms on which the parties

15   were transacting business.  And there are at least two terms of

16   agreement that have particular significance here.

17             One is that they grant RBS a security interest in all

18   property it holds of any of the LBI and Lehman entities.

19             THE COURT:  Let me stop you right there.  That's

20   paragraph 14 I think of the terms of agreement.

21             MR. BIENENSTOCK:  That is correct.

22             THE COURT:  I've looked at it.  I also looked at the

23   form of this unsigned apparent adhesion contract created by RBS

24   internally, and I am frankly shocked that you are hanging your

25   hat on so weak a hook.  If that's your hook, I'm really amazed

Page 60

1    at all of the paper you have generated to suggest that this is

2    a dispute that takes you out of SIM Crude (ph).  I am amazed.

3    But go right ahead.  I've looked at it.  You don't have to go

4    into your merits argument.  I'm fully familiar with the facts,

5    we're just going to deal with a narrow motion you're making now

6    on the Part VII rules and what happens to the trustee's motion.

7              I've also read, by the way, with care, your motion to

8    withdraw reference, and I'll make no comment with respect to

9    it.

10             MR. BIENENSTOCK:  Your Honor, I wasn't coming here to

11   argue the merits of the trustee's motion, but I wanted to in

12   part lay out the different facts in dispute.

13             THE COURT:  I know them.  I've read your papers.  I

14   don't want to hear them again.  At least not now.

15             MR. BIENENSTOCK:  Okay.

16             THE COURT:  I want to hear the specifics of your

17   pending motion.

18             MR. BIENENSTOCK:  Okay.

19             THE COURT:  I'm fully familiar with the facts you

20   allege.

21             MR. BIENENSTOCK:  Then the -- sticking to the

22   procedural motion, Your Honor, as I said a moment ago, there

23   are two methods of resolution.  One is under Bankruptcy Rule

24   9014(c), the Court can make Part VII applicable, and doesn't

25   have to get into any of the individual factual disputes that

Case 1:11-cv-05709-NRB Document 11 Filed 10/03/11 Page 47 of 48
LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 72

1   correctly applied to what I view as a triple play.  The three

2   things that you are engaged in involve one, a transformation of

3   the contested matter, which has been filed against your client,

4   dealing one way or the other with the adversary proceeding,

5   which involves some different claims, and then dealing in a

6   third proceeding in the withdrawal of reference.

7          I didn't say that you were engaged in a strategy

8   that's inappropriate.  I didn't say that you were doing

9   anything that was inconsistent with your duties to your client.

10  But if I connect what I've just said to something I said

11  earlier, you'd engaged in issue proliferation, that's hard to

12  deny but you don't have to say anything in response to it.

13         I view what you are doing as complicating in as many

14  ways as you can creatively do it consistent with Rule 11, what

15  started out as a standard issue, relatively standard issue,

16  motion to enforce the automatic stay and to seek recovery of

17  damages, you've sought to distinguish that, we don't need to

18  get into the merits.

19         I'm simply saying that a relatively plain vanilla

20  procedural start has been transformed into a matter of enormous

21  complexity, mostly through your design.  My concern --

22         MR. BIENENSTOCK:  I would say it's the opposite.

23         THE COURT:  My concern is that the parties not

24  proliferate the issues, but rather manage the issues, hence my

25  earlier question which got sidetracked as to what you have done

Page 73

1   within the context of this case to make it easier, smoother,

2   more efficient, as opposed to just the opposite, which is what

3   I have perceived.

4           No merits conversations, please, I don't want to hear

5   any of your merits arguments.

6           MR. BIENENSTOCK:  I'm not --

7           THE COURT:  I've read them.  I've evaluated them.

8   But I haven't made up my mind with respect to them.

9           MR. BIENENSTOCK:  Your Honor, the first thing I must

10  say in response to what you just said is, what you characterize

11  is the standard stay enforcement, we think is a horrible abuse.

12  There is no way the motion can ever get to the stay issue

13  without deciding the contract issue, and they're camouflaging

14  that this is an action on a contract, a Northern Pipeline

15  action as an excuse to make it seem like a contested matter in

16  a court proceeding.

17          THE COURT:  We don't need to get into

18  characterizations here.

19          MR. BIENENSTOCK:  Okay.  But --

20          THE COURT:  I'm simply urging --

21          MR. BIENENSTOCK:  So what we've done is --

22          THE COURT:  I'm urging that in the context of this

23  case now, that the parties actually try to make some progress

24  as opposed to gaming the system.

25          MR. BIENENSTOCK:  Well, okay.  We obviously disagree